# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

RECEIVED

2007 SEP 12  P 2: 03

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

BUTLER BROWDER,                    *

    Plaintiff                    *
                                   *
v.                                 *    CIVIL ACTION NO. 2:07-CV-546-MEF
                                   *
                                   *
JOHN E. POTTER, USPS               *
POSTMASTER GENERAL,                *
                                   *
    Defendants.1                *
                                   *
                                   *
                                   *

## PLAINTIFF'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### I. BACKGROUND

1. Plaintiff, Butler Browder, was hired by the US. Postal Service in 1969 as a preference eligible disabled veteran. See Exhibit 1

2. Plaintiff has used sick leave throughout his employment period (1969 – 2006) when he was unable to perform his duties as a Mailhandler. (Mailhandlers are required to stand, bend, lift and walk throughout their tour of duty.)

3. Plaintiff filed an EEO Complaint (Class Action) alleging discrimination (racial) in the promotional practices employed at the Montgomery, Alabama GMF Postal Facility on April/May 2005.

4. Almost immediately, a Black supervisor, C.J. Harris, was sent to the tour of duty where Browder was assigned, who began to harass Browder, i.e. change job, discipline for any and all matters, impose different standards on Browder than other employees.

5. On November 1, 2005, Browder submitted request for FMLA, which was approved by letter dated November 13, 2005.

Page 9
B.B. Browder

>          If your case involved such claims and you are unwilling to abandon the
>   discrimination claims forever, you must proceed in a district court or the
>   Equal Employment Opportunity Commission.  In order to proceed in the
>          court in a case involving discrimination, you must waive your
>   discrimination claims on the 15© form.  A discrimination claim raised for
>   the first time in the court does not affect the jurisdiction of the court to
>                 decide the issues raised before the MSPB.

This document directed the Plaintiff to file this matter or EEOC on the District
Court unless he intended to abandon his EEO complaint.  The EEO complaint
is the only subject of this action.  If the Plaintiff has appealed to the Federal
Circuit, as the Defendant claims is mandatory, and had prevailed, there would
be no course of left for the MSPB to hear.  The Plaintiff, therefore, took the
only plausible course of action given his instruction by the Board.


**B.**

The Defendant states, "Alternatively, even if the FMLA claims were not barred
by the settlement, those claims would still have to be dismissed because Plaintiff
cannot demonstrate that he suffered any injury due to the alleged FMLA
violation." The Plaintiff disagrees.  To that end, the Agency relies on the
Arbitrator's decision of November 29, 2006, as stated on Page 7 of that award.
This court has limited jurisdiction in determining whether that Arbitrator's award
violates or offends legal precedent.

The Arbitrator, a former postal attorney, states that the Grievant was not sick.
However, the only evidence provided by the Postal Service at the hearing was the
photo's taken by the OIG Inspector and the OIG Inpector's testimony that he
observed Browder just sitting there.  The photo reflects the same.  Even when
others around Browder were standing or applauding, Browder was just sitting
there, hardly showing a jubilant nature.

Page 10
B.B. Browder

On the other hand, the Union produced a witness, Mrs. Grubbs, who testified that
she drove Browder to the game(s) (both) and that he was in fact sick, suffering
with his head (sinus) and pain in his leg, hip and back regions. Also, introduced
was prescription medication for these conditions, which the taking of, alone,
would render Browder a safety hazard if he attempted to work, and therefore
unable to perform his duties. See Exhibit 11 Documentation

The court is reminded that Browder is a Mailhandler who is required to lift
seventy (70) pounds, stand, bend and walk his entire tour of duty. The Union also
introduced medical documentation to substantiate Browder's illness due mainly to
conditions he developed while in the military. Browder was hired by the Postal
Service as a preference-eligible Disabled Veteran, Vietnam era, in 1969. During
his entire employment, Browder has used his sick leave when he could not safely
perform his duties. Browder has only sought light duty once, December 5, 2005
through February, 2006, during his total thirty-five (35) years of service.

While in employment with the U.S. Postal Service, Browder witnessed many
employees who were somehow impaired from performing these duties, but had
little or no sick leave. In most cases, the Postal Service denied them the right to
work and forced them to take sick leave.

These employees were not bedridden, just unable to perform their duties, as was
Browder, on the sited occasions. This court has heard cases in that regard and
upheld the Agency's rights to not provide work for employees under these
conditions.

The ELM, Chapter 513, states:

1.  Purpose

    513.11 - Sick Leave for Employee Incapacitation

    Sick leave insures employees against loss of pay if they are incapacitated
    for the performance of duties because of illness, injury, pregnancy and
    confinement, and medical (including dental or optical) examination or
    treatment.

Page 12
B.B. Browder

The Defendant states, "Since his claim rests solely upon his refusal to return to duty while on FMLA leave in order to participate in two separate-set investigatory interviews, he cannot meet the statutory elements necessary to his FMLA claim." Plaintiff disagrees. The Arbitrator's decision in the matter did not terminate the Plaintiff, the Agency's Letter of Decision of March 1, 2006 did. That action was taken by the Agency for four (4) collected reasons comprising represented element as charges. Those charges, specifically #2, address Browder's invoking his rights under the FMLA and not attending the meetings, which at first were disguised by Browder simply being told to clock on and go to the Supervisor's office. Noteworthy is the fact that Browder had requested light duty, which was never granted in part or total. Had Browder reported, he would have been deemed able to perform all of his normal duties.

In that Browder did not meet to engage in the investigatory interview with management, the proper course of action would be to wait until Browder returned to duty. An investigatory interview is mandatory prior to discipline being issued, not the attempt to have the interview.

Management's actions were therefore premature with respect to the November, 2005 and January, 2006 incidents   Normally, that has been the course of action. A direct relationship exit between the use of sick leave, and invoking my rights the FMLA Rules, Policies and Guidelines. While stated in Joey Sherman's Letter of Decision that two (2) questionable incidents were grounds for termination, he also sited the FMLA Failure to Report on January 10th and 17th, while Plaintiff was on sick leave (FMLA). No other employee has been terminated for such few absences or Request to Report while on FMLA. The Postal Service has been instructed not to issue notices to report to those who have applied for or who are on approved FMLA. See Exhibit 17. Further, the OIG testified that another postal employee of fewer years of service had stolen time and money from the Postal Service, but was still in employment at the Montgomery, Alabama facility.

it resolves question of contractual rights. And thus, the District Court was bound by the Arbitrator's interpretation of the bargaining agreement and statute of the

Page 14
B.B. Browder

Since you failed to report as instructed, you are hereby notified that you are absent without leave and will be placed in a LWOP status effective January 10, 2006." See Exhibit 5

Also on January 10, 2006, Plaintiff was sent two (2) correspondences from the FMLA Coordinator, Stanley Christianson. One such document stated the type of leave available to him: "Annual leave, sick leave, LWOP." The Plaintiff elected sick leave but was given LWOP as per Mr. Carleton's letter, as previously sited. The other letter simply approved the FMLA from January 6, 2006 through February 5, 2006. Postal records reveal that Browder had accrued annual leave of 413.73 hours, sick leave of 1007.30, and FMLA leave of 2481.24 hours, yet Browder was not paid. This, in and of itself, represents a claim.

On March 7, 2006, Joey Sherman terminated the Plaintiff for all the composite reasons stated in the proposed Removal Letter of February 2, 2006.

The Arbitrator did not issue his decision until November 29, 2006, to which the Agency did not implement due to its alleged settlement of December 4, 2006, which rendered the Arbitrator's decision moot and of no effect.

For the period between Joey Sherman's Decision letter and the Arbitrator's award, Browder received no pay or compensation of any kind, which forced him to liquidate assets, deplete his savings, etc., in order to live.

### III. ARGUMENT

The Defendant argues that Plaintiff's claim is barred by the December 4th MSPB settlement. Plaintiff disagrees that the document of December 4, 2006, is a valid settlement for the reasons stated:

1) The document is not signed and violated the lawful requirements, as outlined in the initial decision of the Administrative Judge and the Acknowledgement Letter from MSPB, which states only **written agreements** may be read into the record.

Page 16
B.B. Browder

The Plaintiff offers as proof of the discriminatory action documents found in the EEO case file, Case #1H-361-0004-06. (This is the case file developed by the Agency's internal processing of this case.) See Plaintiff Exhibit 14

A White female, Shannon Butler, has a zero (0) leave balance, and used hundreds of hours unscheduled leave before she was disciplined. She worked another job while on sick leave from the Postal Service. This is a direct violation of postal regulations. Shannon Butler is still employed by the U.S. Postal Service.

Patrick Roberts, White male, has a zero (0) leave balance and still works at the U.S. Postal Service. Mark Chrisk, White male, has a zero (0) leave balance and still works at the U.S. Postal Service. None of these employees, as of January 17, 2006, were ordered to report to duty while on FMLA. See Plaintiff's Exhibit 14  None of these employees were disciplined for absences covered by FMLA. None of these employees were disciplined for the few hours usage, as was the Plaintiff.

The Agency also employed a different method when disciplining the Plaintiff. All other employees, as mentioned above, were disciplined by supervisor within the ir chain of command. However, in Browder's case, Joey Sherman, a manager not in Browder's chain of command, was employed. The Agency has asserted that this was due to Sherman's lack of knowledge of the Plaintiff. However, Mr. Sherman has been found guilty of retaliating against other employees who have engaged in protected activity by Judge Miller, Administrative Judge of MSPB.

The Plaintiff does not believe that it is a coincidence or that the responsible management officials did not know of Mr. Sherman's record of retaliation. But rather, it was the intention and instruction to have Sherman decide as he did.

The Plaintiff hereby argues that, even if it were found that the Agency did not violate the FMLA statutes, the question would still remain as to if the Agency applied the rule equitably. That is why Browder selected the EEO procedure rather than the collective bargaining procedure.

the Agency would contest the Plaintiff retirement request if he did not select that settlement offer. In that the Agency entered into talks with the Union after the Union had

Page 18
B.B. Browder

    2)   The postal Legal Department advised the Postal Service several times not to send notices to report for duty if they had applied for or were on approved FMLA; and

    3)   An investigatory interview had not been held with Browder concerning these two matters.  (Attempts to have such interviews does not satisfy that requirement.)

An investigatory interview is mandatory, yet had not been held prior to the agency processing these allegations or alleged infractions as charges against the Plaintiff.

Further, the Agency brought its action against the Plaintiff supposedly because it believed that the Plaintiff was not sick when he attended football games.  "Sick" means that he was not able to perform his duties as a Mailhandler.  However, the Agency granted sick leave and FMLA for the same conditions after the alleged infractions, December 4, 2005 through January 10, 2006

. Then, the Agency agreed to allow the Plaintiff the right to take the very same sick leave without further documentation as a condition for settling this complaint.  Postal regulations require medical documentation for absences for a period which exceeds three (3) days.  The Plaintiff had approximately one thousand (1,000) hours of sick leave when he was terminated.  See Exhibit 15

The Arbitrator states that if medical documentation had been provided, the decision would be much different.  However, the Arbitrator states that the Grievant and Ms. Grubbs testified that Browder was sick.  Further, Browder testified that he had back problems on November 18, 2005.

The Arbitrator was given copies of medical documentation dated June 2, 2005, with an attachment of June 9, 2005, to the Veterans Administration, documentation from Dr. John Jernigan, November, 2005, Dr. Joseph Jackson, and Jackson Hospital, October, 2005, documentation dated December 5, 2006, which requested light duties.  This documentation sited joint pain – knees, shoulders, etc.  Another on January 6, 2006, sited lumbar-region pain, arthritis – multiple sites, and Fibromyalgia.  Copies of MRI's and Bone Scans were also introduced.  See Attached Exhibit 16

Page 19
B.B. Browder

The first discipline the Plaintiff received was due to an incident occurring between May 29, 2005, and June 4, 2005. The Plaintiff provided medical documentation which stated that he was under the doctor's care from May 29, 2005 and would be unable to return to work until June 4, 2005. This documentation was disapproved because it did not use the term, "incapacitated." The Defendants apparently do not understand the language in the ELM "Incapacitated for Duty," as opposed to "Incapacitated."

The second discipline was for the same occurrence, alleging that the Plaintiff had falsified the medical documentation for that absence. The Defendant chose to believe Browder was being dishonest when he told the OIG Inspector that he was suffering from conditions that started while he was in the military, as documented by Dr. Jernigan's letter to the Veteran's Administration dated the very same day that he sent the doctor's statement to the Postal Service.

This court is not barred from review of Arbitrator's decisions, though limited in that capacity. The Plaintiff avers that this decision falls within the court's disgression.

In Joey Sherman's Decision Letter, he states that the grievant nor his representative has issued documentation which states that he was **incapacitated**. Yet, several pieces of documentation have been submitted to management from June 2, 2005 through January 7, 2006 that indicated that the Plaintiff was undergoing treatment for conditions which would render him unable or incapacitated from performing his normal duties. Most notably were the requests for light duty on December 5, 2005 and January 5, 2006, just days after the sited November, 2005 incidents.

Plaintiff claims that the Defendant's retaliation against him due to use of FMLA is as follows:

1) Plaintiff was disciplined which resulted in his removal/termination from the U.S. Postal Service due mainly to matters involving the time the Plaintiff was on FMLA. All subsequent action developed from their initial action.

2) Plaintiff was denied pay even though he had more than adequate accrued leave balances:

Page 20
B.B. Browder

3) Plaintiff was denied workers unemployment compensation due to the Defendant
   stating to workers compensation that the Plaintiff had voluntarily resigned his
   postal position while he exercised his rights under FMLA:

4) As a result of the Plaintiff taking FMLA, he was terminated on March 7, 2006 by
   letters of C.J. Harris and Joey Sherman. Plaintiff was without **any** income for over
   a year, which caused him grave financial hardship. Plaintiff, therefore, claims
   $1,000.000.00 compensatory damages and $10,000.000.00 punitive damages,
   individually and jointly, from Rod Carleton, C.J. Harris, Joey Sherman, and the
   U.S. Postal Service for past and future lost earnings.

   **As to the question if the Defendants may be sued individually or not, see**
   **email Connie English, Exhibit 17, Page 2 of 2, where a Plaintiff was awarded**
   **$300,000.00 from a District Court from a supervisor as per a claim such as**
   **these FMLA violations.**


## CONCLUSION

In this country, one is presumed innocent until proven guilty of an offense. The
Defendant has charged the Plaintiff with misconduct and dishonesty regarding attending
a social function or traveling to a social function while on sick leave or during a period he
was on sick leave. However, the Defendant has no evidence, medical or otherwise, to
prove that the Plaintiff was not sick. Only that he attended a football game, where he **sat**
while all others were jumping, standing, applauding, etc. This, in itself, seems to support
the Plaintiff's claim of being "unable to perform his duties." He has not duty that
requires him to sit during his tour of duty.

Further, the Plaintiff has submitted medical documentation from June 2, 2005 through
February 2, 2006, documenting his conditions.

By the regulations of collective bargaining agreements and the CBA management, it is
required that the Plaintiff be sent a certified medical professional for a "Fitness for Duty
Exam" to determine any question as it relates to the question of if or if not the Plaintiff
could perform his duties.

Page 21
B.B. Browder

The OIG, nor Joey Sherman, nor the arbitrator could make this determination and therefore, could not determine Browder's illness or honesty as it relates to his ability to perform his duties.

The Plaintiff concludes that there are genuine issues of material fact in dispute in this case that, when presented to a trier of fact, will prove a prima facie case of discrimination based on race and retaliation due to the Plaintiff's prior EEO activity. Further, that the proposed settlement agreement, which caused the MSPB's action, constitutes an illegal act in that it violates the law with respect to the legal requirement of such an agreement. This document bears no signature of any of the agreeing parties, was involuntarily entered.into, and represents fraud in that it violates the requirement for sick leave usage..

This agreement has not been implemented by the Postal Service or enforced by the MSPB.

The Defendants herein seeks to have this court to apply the principles of "res judicaata" to these claims. However, the merits of neither of these cases have been adjudicated, litigated, or decided in any forum. Therefore, "res judicata" does not apply.

PRO se
4504 Sunnybrook Dr
Montg AL 36108
281473

Certificate of Service

This is to certify that the attached documents were sent to the below named individuals via U.S. mail on 9/12/2007

Signed _[signature]_

_[signature]_
Butler Browder  Pro Se
4504 Sunnybrook Dr
Montgomery AL 36108
281-1473
LEURA G. CANARY
1 COURT SQUARE
MONTGOMERY,AL

ANDERSON NELMS
847 S. MCDONOUGH ST.
MONTGOMERY, AL 36104

NOTIFICATION of PERSONNEL ACTION

U. S. Postal Service

| | | |
|---|---|---|
| 01 | Effective Date | 10-01-2005 |
| 02 | Social Security Number | 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 |

**EMPLOYEE INFORMATION**

| | | | | | |
|---|---|---|---|---|---|
| 03 | Employee Name-Last | BROWDER JR | 39 | FLSA Status | N - NON-EXEMPT |
| 04 | Employee Name-First | BUTLER | 40 | Pay Location | 211 |
| 05 | Employee Name-Middle | B | 41 | Rural Carrier-Route | |
| 06 | Mailing Address Street/Box/Apts | 4504 SUNNYBROOK DR | 42 | Rural Carr-L-Rte ID | |
| | | | 43 | Rural Carr-Pay Type | |
| 07 | Mailing Address-City | MONTGOMERY | 44 | Rural Carr-Tri-Weekly | |
| 08 | Mailing Address-State | AL | 45 | Rural Carr-FLSA | |
| 09 | Mailing Address-Zip+4 | 36108-5046 | 46 | Rural Carr-Commit | |
| 10 | Date of Birth | 07-20-1948 | 47 | Rural Carr-EMA | |
| 11 | Veterans Preference | 2 - 5 POINTS | 48 | Rural Carr-Hours | |
| 12 | Sex | | 49 | Rural Carr-Miles | |
| 13 | Minority | | 50 | Job Sequence | 1 |
| 14 | Disability | | 51 | Occupation Code | 2315-62XX |
| 15 | Leave Comp Date | 12-30-1966 | 52 | Position Title | MAIL HANDLER TECH |
| 16 | Enter on Duty Date | 06-27-1970 | 53 | Labor Dist Code | 1700 |
| 17 | Retirement- Comp Date | 12-30-1966 | 54 | Designation/Activity | 12/0 |
| 18 | Serv Anniversary PPYR | 21-1971 | 55 | Position Type | 1 - FULL TIME |
| 19 | TSP Eligibility | Y - ELIGIBLE WITH DEDUCT | 56 | Limit Hours | |
| 20 | TSP Service Comp Date | | 57 | Allowance Code | |
| 21 | Prior CSRS Service | | 58 | Employment Type | |
| 22 | Frozen Csrs Time | | | **SALARY INFORMATION** | |
| 23 | Leave Data-Category | 8 - HOURS/PP | 59 | Pay Rate Code | A - ANNUAL RATE |
| 24 | Leave Data-Chg PPYR | | 60 | Rate Schedule Code | M - MAIL HANDLERS |
| 25 | Leave Data-Type | 1 - ADVANCED AT BEGINNING | 61 | Grade/Step | 05/ 0 |
| 26 | Credit Military Serv | | 62 | Base Salary | 45,120 |
| 27 | Retired Military | | 63 | Cola | |
| 28 | Retirement Plan | 1 - CSRS | 64 | Cola Roll-In Ind | |
| 29 | Employee Status | | 65 | Next Step PPYR | |
| 30 | Life Insurance | Z1-Basic+Opt A+5x B+1x C | 66 | Merit Anniv Date | |
| 31 | Special Benefits | | 67 | Merit Lump Sum | |
| | **POSITION INFORMATION** | | 68 | Special Salary Code | |
| 32 | Employ Office-Fin No | 01-5631 | 69 | Protected RSC | |
| 33 | Employ Office-Name | MONTGOMERY P&DC | 70 | Protected Grade/Step | |
| | | | 71 | Expiration PP/YR | |
| 34 | Employ Office-Address | MONTGOMERY AL 36119-9998 | 72 | Protected RC Hours | |
| | | | 73 | Protected RC Miles | |
| 35 | Duty Station-Fin No | 01-5631 | 74 | RC Guaranteed Salary | |
| 36 | Duty-Station-Name | MONTGOMERY P&DC | 75 | Annuity Amount | |
| 37 | Appt Expiration Date | | 76 | Red Circle Code | 0 |
| 38 | Probation Expir Date | | | | |

**NATURE OF PERSONNEL ACTION**

| | | | | | |
|---|---|---|---|---|---|
| 77 | Nature of Action Code | 721 | 78 | Authority | 39-USC SECT. 1001 |
| 79 | Description | REASSIGNMENT | 80 Code 511 | 81 Code | 82 Code | 83 Code |

84 Remarks

THIS ACTION DOES NOT CHANGE DUE DATE FOR ADVANCEMENT TO THE NEXT HIGHER STEP.
SUCCESSFUL BIDDER ON JOB #7380669 POSTING #SE05MH
JP 9/23/05

| | | | | |
|---|---|---|---|---|
| 85 | Authorization WILLIAM BROWN, VICE PRESIDENT AREA OPERATIONS-SOUTHEAST AREA | 86 | Processed Date | 10-05-2005 |
| | | 87 | Personnel Office ID | AE97 |
| | | 88 | OPF Location | MONTGOMERY POST OFFICE |

...arch 1990 (Exception to Standard Form 50)    2 - OPF COPY

**PLAINTIFF'S EXHIBIT**

CASE NO. _____

EXHIBIT NO. _____

Exhibit _/_
Page _/_ of _/_



MANAGER, PROCESSING & DISTRIBUTION

**UNITED STATES POSTAL SERVICE**

*FMLA CASE ID*

DELIVERY CONFIRMATION NUMBER:
0304 1560 0004 0000 3783

**U.S. Postal Service™ Delivery Confirmation™ Receipt**

Postage and Delivery Confirmation fees must be paid before mailing.
Article Sent To (to be completed by mailer)

*Butler B. Browder Jr
4504 Sunnybrook Rd
Montgomery AL 36108-5046*

PS Form 152, May 2002

POSTAL CUSTOMER:
Keep this receipt. For Inquiries:
Access Internet web site at
www.usps.com ®
or call 1-800-222-1811

CHECK ONE (POSTAL USE ONLY)
☐ Priority Mail® Service
☑ First-Class Mail™ Service
☐ Package Services parcel
(See Reverse)

Date:          December 8, 2005

Subject:      Request for Light Duty Assignment

To:            Butler B. Browder Jr
                4504 Sunnybrook Dr
                Montgomery AL 36108-5046

Delivery Confirmation:  0304 1560 0004 0000 3783

This letter is to notify you that your request for light duty assignment received December 8, 2005, has been disapproved because adjustments cannot be made without seriously affecting the production of your work assignment and work is not available within your restrictions.

***Reason for disapproval:***

- ***Can work an 8-hour day.***
- ***Can lift up to 6-7 pounds, 4-6 hours.***
- ***Bending, stooping, kneeling, twisting, and climbing – 0-1 hour.***
- ***Walking, sitting, pulling, pushing, and reaching (includes above head) 2-4 hours.***

I am enclosing another request for temporary light duty in the event your physician allows you to return to light duty with less restrictions than you currently have, following your next visit to him.  Requests for temporary light duty must be updated every 30 days.  You should contact your immediate supervisor during your normal tour of duty and advise him/her what type of leave you are requesting for your absence.

Per your request, I am enclosing a copy of the Request for Temporary Light Duty that you submitted.

Sincerely,

*R. M. Carleton*

R. M. Carleton

RMC/src

Enclosure

cc:          Manager, Distribution Operations
              FMLA Coordinator
              File

**PLAINTIFF'S EXHIBIT**

CASE NO.

EXHIBIT NO. 2

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9997
(205) 244-7513
FAX: (205) 244-7558

*Exhibit 2*

## REQUEST FOR TEMPORARY LIGHT DUTY

| NAME/POSITION/PL: | MAILING ADDRESS (Include ZIP +4): |
|---|---|
| Butler B. Braxton<br>MailHandler | 4502 Springbrook R Ex<br>Montgomery fl 36108 |
| SS# 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 | HOME TELEPHONE NUMBER: 334 281 1473 |

**TO ATTENDING PHYSICIAN:** Please complete the following:                                    12/5/05

General nature of illness: _Joint Pain (Ankle & knee pain due to strenuous overexertion)_
                                   (without giving diagnosis)

LENGTH OF LIGHT DUTY PERIOD (must be updated every 30 days)
From 12/7/05   To 1/7/06

Can patient work an 8-hour day? Yes ✓   No____
If no, how many hours per day can the patient work? ____ hrs

Patient can lift up to 6-7 pounds.
How often can lifting occur? 0-1 hrs ____  2-4 hrs ✓  4-6 hrs ✓  6-8 hrs ____

Patient is able to perform the following tasks (check all that apply):

| TASK | 0-1 hr | 2-4 hrs | 4-6 hrs | 6-8 hrs | 8+ hrs |
|---|---|---|---|---|---|
| Walking | | ✓ | | | |
| Sitting | | ✓ | | | |
| Bending | ✓ | | | | |
| Stooping | ✓ | | | | |
| Kneeling | ✓ | | | | |
| Twisting | ✓ | | | | |
| Pulling | | ✓ | | | |
| Pushing | | ✓ | | | |
| Climbing | ✓ | | | | |
| Reaching (above head) | | ✓ | | | |

# of flights 10

REQUIRED WALKING AIDS (walker, crutches, surgical shoe, wheelchair) Yes____ NO ✓
If yes, what type? ____
Other limitations (flight of stairs, visual, hearing, cardiac, psychiatric, etc.) ____

_signature_   334-265-6153   12/5/05
Physician's Signature   Telephone #   Date

[illegible redacted block]

### U. S. POSTAL SERVICE USE ONLY

**TO EMPLOYEE'S SUPERVISOR:** Upon receipt, complete the lower portion; advise employee whether light duty can be provided. Forward this form to the Plant Manager/Postmaster immediately. A letter will be prepared and sent to employee with a copy to the supervisor. IT IS THE RESPONSIBILITY OF THE MDO TO TRACK LIGHT DUTY.

Is this employee a PTF? ____   Can light duty be provided? ____
If Yes, Tour____ PL____ Hours____ Off Days____
Duties: ____

If not provided, give reason: ____

Manager's Signature ____   Date ____

EX

**Christianson, Sandra R - Montgomery, AL**

| | |
|---|---|
| From: | Lee, Deborah M - Montgomery, AL |
| Sent: | Thursday, December 08, 2005 8:20 AM |
| To: | Christianson, Sandra R - Montgomery, AL |
| Subject: | Light duty Request – Butler Browder |



Scan440, December
08, 2005.max...

Butler presented the attached request for light duty yesterday afternoon. The Plant Manager and MDO Harris have reviewed and state that they cannot provide light duty within these restrictions. Please send him the usual letter stating his limitations are too restrictive. Make sure that the letter advises him to notify his supervisor of the type of leave he is requesting and that he has to update every thirty days. Also, I told him you would be mailing him another FMLA package........

He requested a copy of this light duty request be sent back to him with the letter.

Thanks

**Deborah Lee**
Administrative Assistant
Montgomery P&DC
(334) 244-7513
deborah.m.lee@usps.gov

1

EX- ___

DELIVERY CONFIRMATION NUMBER:
0304 1560 0004 0000 3776

FMLA Coordinator
Montgomery AL 36119-9704


UNITED STATES
POSTAL SERVICE

Date:           December 8, 2005

Subject:        FMLA approval
                **CASE ID 2280737**

To:             Butler B. Browder Jr
                4504 Sunnybrook Dr
                Montgomery AL 36108-5046

Delivery Confirmation:   0304 1560 0004 0000 3776

You will be receiving a Publication 71 which outlines your rights and responsibilities under the Family and Medical Leave Act (FMLA) and a form WH-380, which may be used to document a serious health condition. This was mailed to you by the FMLA Fulfillment Center.

However, based on the documentation your provided and the disapproval of your request for temporary light duty, FMLA (Family and Medical Leave Act) protection is approved December 7, 2005 – January 7, 2006 provided there is no significant change in your condition. Your FMLA entitlement will not exceed 480 hours in a leave year. You will be retested for eligibility upon your first FMLA claimed absence resulting from this condition in leave year 2006. All FMLA cases are reviewed periodically and are subject, with cause, to a request for recertification.

**Your case ID number for this condition is 2280737. To insure accurate application of your documentation and leave, please refer to this number in all correspondence, requests for leave, and call-ins related to this condition. If you do not provide your FMLA case number at the time of your request for leave, we may assume that you intended to request FMLA protection for a new condition, a new case number will be created and you will be given 15 days to certify the new condition.**

If you have any questions, please contact me at (334) 244-7546.

Sandra R. Christianson

cc.             MDO Tour 2
                File

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9704
PHONE: (334) 244-7546
FAX: (334) 244-7668

EX-

**UNITED STATES POSTAL SERVICE®**

# Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested |
|---|---|---|---|
| Brander BB | 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 | 12/1/05 | |

| Installation (For PM leave, show city, state, and ZIP code) | N/S Day | Pay Loc. # | D/A Code | From Date | Hour |
|---|---|---|---|---|---|
| Montg Al 36119 | SM | 211 | 120 | 12-7-05 | 0530 |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (if needed) | Thru Date | Hour |
|---|---|---|---|---|
| 0530 | 0530 | ☐ No Call | 2/7/06 | 1400 |

**Type of Absence**

- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See reverse)
- ☒ Sick (See reverse)
- ☐ Late
- ☐ COP
- ☐ Other: _____

**Documentation (For official use only)**

- ☐ For FMLA Leave (Certification reviewed)
- ☐ For COP Leave (CA1 on file)
- ☐ For Advanced Sick Leave (1221 on file)
- ☒ For Military Leave (Orders reviewed)
- ☐ For Court Leave (Summons reviewed)
- ☐ For Higher Level (1723 on file)
- ☐ Scheme Training Testing, Qualifying (Memo on file)

Remarks (Do not enter medical information)

| Revised Schedule for (Date) | Approved in Advance |
|---|---|
| | ☒ Yes ☐ No |

| | |
|---|---|
| Begin Work | |
| Lunch-Out | |
| Lunch-In | |
| End Work | |
| Total Hours | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| BB Brandt 12/1/05 | | |

**Official Action on Application (Return copy of signed request to employee)**

- ☐ Approved, not FMLA*
- ☒ Approved, FMLA (See Publication 71)
- ☐ Approved FMLA, Pending Documentation Noted on Reverse
- ☐ Disapproved (Give reason):
- ☐ Ineligible for FMLA (Estimate eligibility date): _____

| Signature of Supervisor and Date | |
|---|---|
| | 12-08-05 |

☐ Continued on Reverse

PS Form 3971, April 2001 (Page 1 of 2)

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

| | PP | Year |
|---|---|---|
| Scheduled / Un-Scheduled | Day | Init. | Hours |
| | Sat 01 | | |
| | Sun 02 | | |
| | Mon 03 | | |
| | Tue 04 | | |
| | Wed 05 | | |
| | Thur 06 | | |
| | Fri 07 | | |
| | Sat 08 | | |
| | Sun 09 | | |
| | Mon 10 | | |
| | Tue 11 | | |
| | Wed 12 | | |
| | Thur 13 | | |
| | Fri 14 | | |

Mailed with approval letter
12-8-05

EX-C-14

DELIVERY CONFIRMATION NUMBER:
0304 1560 0004 0002 7918

FMLA Coordinator
Montgomery AL 36119-9704



Date:          January 10, 2006

Subject:       FMLA approval
               **CASE ID 2280737**

To:            Butler B. Browder
               4504 Sunnybrook Dr
               Montgomery AL 36108-5046

Delivery Confirmation:   0304 1560 0004 0002 7918

FMLA (Family and Medical Leave Act) protection is approved January 6 – February 5, 2006
provided there is no significant change in your condition. Your FMLA entitlement will not exceed 480
hours in a leave year.    All FMLA cases are reviewed periodically and are subject, with cause, to a
request for recertification.

**Your case ID number for this condition is 2280737.  To insure accurate application of your
documentation and leave, please refer to this number in all correspondence, requests for
leave, and call-ins related to this condition.  If you do not provide your FMLA case number at
the time of your request for leave, we may assume that you intended to request FMLA
protection for a new condition, a new case number will be created and you will be given 15
days to certify the new condition.**

If you have any questions, please contact me at (334) 244-7546.

Sandra R. Christianson

cc.            MDO Tour 2
               File

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9704
PHONE: (334) 244-7546
FAX: (334) 244-7668

R. M. CARLETON
MANAGER, PROCESSING AND DISTRIBUTION


UNITED STATES
POSTAL SERVICE

January 10, 2006

Butler B. Browder Jr.                    Delivery Confirmation: 0300 1290 0005 0472 3974
4504 Sunnybrook Dr
Montgomery AL  36108-5046

Re:  Request for Temporary Light Duty/Failure to Report for Duty As Instructed

This will have reference to your letter dated January 7, 2006 regarding your refusal to report for duty as instructed.  Please be advised that my letter dated January 6, 2005 specifically instructed you to report for duty on January 10, 2006.  My letter also advised you as to the reason you needed to report for duty; specifically to meet with your supervisor regarding several important issues.

Although you were advised on December 8, 2005 that work was not available within your restrictions at that time, you may be required to report for duty at such time as work becomes available within your restrictions.  Additionally, management has the right to change employee's schedules in order to accommodate requests for temporary light duty.  Meeting with your supervisor is within the restrictions that have been placed upon you by your physician, and you were notified accordingly to report for duty on January 10, 2006.

Your request for sick leave has been approved for the period of December 8, 2005 through January 7, 2006.  You were instructed to report for duty on Tuesday, January 10, 2006 at 5:30 a.m.  Since you failed to report as instructed, you are hereby notified that you are absent without leave and will be placed in a LWOP status effective January 10, 2006.  <u>You are again instructed to report for duty as scheduled immediately, but no later than Tuesday, January 17, 2006.</u>  Please be advised that failure to report as instructed may result in further corrective actions being taken.

As previously stated in my letter of January 6, 2006, your supervisor is attempting to meet with you to discuss several important issues which include conducting an investigative interview regarding a Report of Investigation received from the Office of Inspector General dated 12/7/05 regarding Butler Browder.  I am enclosing a copy of the Investigation for your review so that you may familiarize yourself with the contents prior to meeting with your supervisor.  In addition to discussing the OIG Report, there is also a matter of a Letter of Demand which needs to be issued to you for salary overpayment.   The remaining days in your request for temporary light duty until February 6, 2006 will also be discussed at this meeting.

Sincerely,

R. M. Carleton
Enclosure: (1) Report of Investigation (USPS Office of Inspector General)
Cc: FMLA Coordinator
     A/MDO, Tour 2

6701 WINTON BLOUNT BOULEVARD
MONTGOMERY AL 36119-9997
(334) 244-7613
FAX: (334) 244-7558

EX- 2 -

R. M. CARLETON
MANAGER, PROCESSING AND DISTRIBUTION


UNITED STATES
POSTAL SERVICE

January 6, 2006

Butler B. Browder Jr.
4504 Sunnybrook Dr
Montgomery AL  36108-5046

Delivery Confirmation:  0300 1290 0005 0472 3967

This letter is in response to your request for temporary light duty received in my office on January 6, 2006.

You are hereby instructed to report for duty on Tuesday, January 10, 2006 at your normal reporting time of 05:30 a.m.  Please be advised that your supervisor needs to meet with you regarding several issues of importance, therefore you need to report directly to your supervisor's office after clocking in.

If you are unable to report for duty as scheduled on Tuesday, January 10, 2006 for any reason, you are instructed to contact your supervisor, Charlie J. Harris, immediately to advise him of the reasons you are unable to report and arrange for an alternate reporting time.

Sincerely,

R. M. Carleton

Cc:     FMLA Coordinator
        A/MDO, Tour 2
        File

6701 WINTON BLOUNT BOULEVARD
MONTGOMERY AL 36119-9997
(334) 244-7613
FAX: (334) 244-7558

EX - - -

## REQUEST FOR TEMPORARY LIGHT DUTY

| NAME, POSITION , PL:<br>Butler Browder<br>Mail Handler | MAILING ADDRESS (include ZIP +4):<br>4504 Sunny brook Dr<br>Montgomery, Al. 36108 |
|---|---|
| SS#<br>422 68 4124 | HOME TELEPHONE NUMBER:<br>334-281-1473 |

**TO ATTENDING PHYSICIAN:** Please complete the following:

DIAGNOSIS: Lumbar Region Pain ; Arthritis multiple sites, Fibromyalgia

LENGTH OF LIGHT DUTY PERIOD (must be updated every 30 days)
From 1-6-06          To 2-6-06

Can patient work an 8-hours day? Yes ✓ No_____
If no, how many hours per day can the patient work? _____ hrs

Patient can lift up to 6-7 pounds.
How often can lifting occur None _____, 1-2 hrs_____, 3-4 hrs_____, 5-6 hrs ✓, 7-8 hrs_____

Patient is able to perform the following tasks (check all that apply):

| TASK | NONE | 1-2 HRS | 3-4 HRS | 5-6 HRS | 7-8 HRS |
|---|---|---|---|---|---|
| Walking | | | ✓ | | |
| Standing | | | ✓ | | |
| Sitting | | | ✓ | | |
| Bending | | ✓ | | | |
| Stooping | | ✓ | | | |
| Kneeling | | ✓ | | | |
| Twisting | | ✓ | | | |
| Pulling | | | ✓ | | |
| Pushing | | | ✓ | | |
| Climbing (includes stairs) | | ✓ | | | |
| Reaching (includes above head) | | | ✓ | | |

REQUIRED WALKING AIDS (walker, crutches, surgical shoe, wheelchair) Yes_____ No ✓
If yes, what type?_____
Other limitations (flight of stairs, visual, hearing, cardiac, psychiatric, etc.)
_____
_____

_____          334-2656153          1-5-06
Physician's Signature                Telephone #                Date

**TO EMPLOYEE:** In accordance with Article 13 of the National Agreement, I request Temporary _____,
Permanent_____ Light Duty. This request is based on physical limitations outlined by my physician and
subject to verification by the USPS Medical Review Officer. I understand if I am granted light duty, I will
voluntarily accept the reporting schedule as my current assignment.

_____ 1-5-06
Employee's Signature & Date

NOTES: DELIVER COMPLETED FORM TO THE PLANT MANAGER AND/OR THE FMLA
Coordinator. The completed form may be faxed to FMLA office at (334) 244-7668.

The approval of temporary light duty is no guarantee that eight hours of work will be available.
Reasonable efforts will be made to identify light duty assignments. If there is no work available,
you will be sent home.

Updated 1/13/05 by vmj

EX

Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor** 
Employment Standards Administration
Wage and Hour Division

*(When completed, this form goes to the employee, Not to the Department of Labor.)*

| OMB No.: 1215-0181 |
| Expires:     07/31/07 |

1. Employee's Name

   *Butler Browder*

2. Patient's Name *(If different from employee)*

   ~~Butler B~~

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described?  If so, please check the applicable category.

   (1) _____  (2) _____  (3) _____  (4) _____  (5) _____  (6) _____ , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

   Joint pain; multiple sites - Arthritis
   Fibromyalgia; Lumbar Region pain

5. a.  State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **Incapacity**[2] if different):

   b.  Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

   No

   If yes, give the probable duration:

   c.  If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

   N/A

---

[1] Here and elsewhere on this form, the information sought relates **only** to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999



6.  a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

*follow up with medical physician every 3 months or prn*

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

c.  **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (*e.g.*, prescription drugs, physical therapy requiring special equipment):

7.  a.  If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

*N/A*

b.  If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

*N/A*

c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment?**

*N/A*

EX-

8. a. If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

*N/A*

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

*N/A*

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

*N/A*

Signature of Health Care Provider

Type of Practice: *I. M*

Address: *Mulberry Medical Associates*
*1301 Mulberry St.*
*Montgomery, Al. 36106*

Telephone Number: *334-265-6153*

Date: *1-5-05*

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

Employee Signature

Date

*Ex—*

FMLA Coordinator


**UNITED STATES**
**POSTAL SERVICE**

Date:           January 11, 2006

Subject:        Release of information

To:             Butler B. Browder Jr
                4504 Sunnybrook Dr
                Montgomery AL 36108-5046

Delivery Confirmation:   0304 1560 0004 0002 7963

I found a voice mail this morning.   I returned your call, but you did not answer.

Before I can release documents, I need a signed statement from you that lists the documents you
want released, the name of the person to give them to, and your authorization to release them.


Sandy Christenson


Cc              File


6701 Winton Blount Blvd
Montgomery AL 36119-9704
Phone (334)244-7546
Fax (334)244-7668

Ex-


**UNITED STATES**
**POSTAL SERVICE**

January 18, 2006

Delivery Confirmation: 0300 1290 0005 0472 3981

Butler B. Browder
4504 Sunnybrook Dr
Montgomery AL 36108-5046

Subject:  Requirement of Documentation for Absence
          (EMRS Notification: Leave Request for 240 Hours Sick Leave From
          January 17, 2006 to 17 February, 2006)

This is to inform you that, pursuant to ELM 511.43, 513.362, 513.363, 513.364, and 513.365, I am requiring you to provide documentation for paid sick leave purposes for your absence beginning January 17, 2006.  <u>I am requiring you to provide this documentation by January 20, 2006.</u>  Such documentation should be furnished by your attending physician or other attending practitioner who is performing within the scope of his or her practice.  The documentation should provide an explanation of the nature of your illness or injury sufficient to indicate to management that you are unable to perform any duties for the period of absence.  Medical statements such as "under my care" or "received treatment" are not acceptable evidence of incapacitation to perform duties.

Please understand that I am not asking for certification or recertification of any condition covered by the Family and Medical Leave Act (FMLA).  I am asking you to provide documentation for Sick Leave purposes only, pursuant to the ELM.

The reason for this request is on January 5, 2006 you submitted a request for temporary light duty indicating that you were available for work as long as accommodations could be made for the physical restrictions as noted by your physician.  On January 6, 2005, you were sent a letter in response to your request for light duty instructing you to report for duty on January 10, 2006.  You were sent another letter on January 10, 2006, again instructing you to report immediately, but not later than January 17, 2006.  The chain of events leading up to your call-in request for 240 hours of sick leave beginning on January 17, 2006 leads me to believe that it is in the best interests of the Postal Service to require acceptable evidence of incapacitation to perform any duties prior to authorizing the use of paid sick leave.  Therefore, you will remain in a leave without pay status until such time as acceptable documentation has been provided.  I have been notified by the FMLA Coordinator that you have been provided FMLA protection through February 5, 2006, therefore your leave status at this time is FMLA/LWOP.

If you have questions regarding these instructions, please contact me at 244-7578 during your normal scheduled hours.

Charlie J. Harris
Manager, Distributions Operations (A)

Cc:    FMLA  Coordinator
       File

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9997

FAX (334) 244-7558

EX-

BUTLER B. BROWDER
4504 SUNNYBROOK DRIVE
MONTGOMERY, AL 36108
JANUARY 21, 2006



MR. C. J. HARRIS
ACTING MDO TOUR II
MONTGOMERY, ALABAMA GMF
U. S. POSTAL SERVICE
6701 WINSTON BLOUNT BLVD.
MONTGOMERY, AL 36119

Dear Sir:
    As per your letter of January 18, 2006, which indicates that my request for FMLA Sick Leave has some how been deemed FMLA LWOP. Please take note of the following: **"Under the FMLA, a supervisor may require the substitution of earned or accrued paid leave for unpaid leave, even where the employee requests unpaid leave. DOL 825.207. Under the 514.22 of the ELM, however, as incorporated into the National Agreement, a supervisor <u>may not</u> require the employee to use his or her paid leave for an FMLA covered absence. Whether the employee chooses to take LWOP is entirely within the employee's discretion, and the supervisor cannot require the employee to use his or her annual or sick leave before going on LWOP. Should the employee choose to take LWOP, he or she remains entitled to all accrued or earned paid leave. [DOL 825,207(f)]."**
    Mr. Carleton's office has received medical documentation for my absence, as has the FMLA Coordinator. The FMLA Coordinator has approved the absence and therefore, it is my (the employee's) option, as to the kind of leave to take for that absence.
    Granted is the fact that my latest request extents beyond the period, already approved. So by that time, I will either return to full duty or remain in my present status (FMLA/Sick Leave). This will depend on my physical progress solely, for I have far too long endangered my body to come to work. The Postal Service will be there when I am dead and gone.
    Please, be mindful that my request for light duty has not been acted upon. Further, that the policy in place at the GMF does not afford and has not afforded any employee, with my restriction, the opportunity to work in a light duty capacity. These are virtually, the same limitations for which I was not granted light duty December, 2005 thru January, 2006. Then, I elected sick leave as I do, now.
    Your continued good health.

Butler B. Browder

*Ex —*

R. M. CARLETON
MANAGER, PROCESSING AND DISTRIBUTION

 UNITED STATES
POSTAL SERVICE

February 7, 2006

Butler B. Browder Jr.
4504 Sunnybrook Dr.
Montgomery AL 36108-5046

Re: Request for Temporary Light Duty

This letter is to notify you that your request for temporary light duty dated
February 6, 2006 cannot be acted upon at this time.

As you are already aware, you were issued a Proposed Letter of Removal on
February 2, 2006. In accordance with Article 16, Section 16.5 of the National
Agreement, you have been placed on administrative leave for a period of 30 days
pending the outcome of the final decision on your case.

Sincerely,

R. M. Carleton

R. M. Carleton

Cc:    FMLA Coordinator
       A/MDO, Tour 2
       Labor Relations Specialist
       File

6701 WINTON BLOUNT BOULEVARD
MONTGOMERY AL 36119-9997
(334) 244-7013
FAX: (334) 244-7655

| | |
|---|---|
| Butler Browder | 4564 Sunnybrook Dr. |
| Mailhandler | Montgomery, Al 36108 |
| SS# | HOME TELEPHONE NUMBER: |
| 422684124 | 334-281-1473 |

**TO ATTENDING PHYSICIAN**: Please complete the following:

General nature of illness: Fibromylagia; Lumbar Region Pain, Arthritis Multiple Sites
(without giving diagnosis)

LENGTH OF LIGHT DUTY PERIOD (must be updated every 30 days)
From 2-7-06 To 3-9-06

Can patient work an 8-hour day? Yes ✔ No____
If no, how many hours per day can the patient work?_____ hrs

Patient can lift up to 6-7 pounds.
How often can lifting occur? 0-1 hrs____, 2-4 hrs____, 4-6 hrs____, 6-8 hrs ✔

Patient is able to perform the following tasks (check all that apply):

| TASK | 0-1 hr | 2-4 hrs | 4-6 hrs | 6-8 hrs | 8+ hrs |
|---|---|---|---|---|---|
| Walking | | | ✔ | | |
| Sitting | | | ✔ | | |
| Bending | | ✔ | | | |
| Stooping | | ✔ | | | |
| Kneeling | | ✔ | | | |
| Twisting | | ✔ | | | |
| Pulling | | | ✔ | | |
| Pushing | | | ✔ | | |
| Climbing | | ✔ | | | # of flights____ |
| Reaching (above head) | | | ✔ | | |

REQUIRED WALKING AIDS (walker, crutches, surgical shoe, wheelchair) Yes____ NO ✔
If yes, what type?_____
Other limitations (flight of stairs, visual, hearing, cardiac, psychiatric, etc.)
_____

_____  334-265-6153  2/6/06
Physician's Signature    Telephone #    Date

**TO EMPLOYEE:** In accordance with Article 13 of the National Agreement, I request Temporary ✔
Permanent____ Light Duty. This request is based on physical limitations outlined by my physician and subject to verification by the USPS Medical Review Officer. I understand if I am granted light duty, I will voluntarily accept the reporting schedule as my current assignment.

_____ 2/6/06
Employee's Signature & Date

DELIVER COMPLETED FORM TO IMMEDIATE SUPERVISOR

---

### U. S. POSTAL SERVICE USE ONLY

**TO EMPLOYEE'S SUPERVISOR:** Upon receipt, complete the lower portion; advise employee whether light duty can be provided. **Forward this form to the Plant Manager/Postmaster immediately.** A letter will be prepared and sent to employee with a copy to the supervisor. IT IS THE RESPONSIBILITY OF THE MDO TO TRACK LIGHT DUTY.
Is this employee a PTF?_____ Can light duty be provided?_____
If Yes, Tour_____ PL_____ Hours_____ Off Days_____
Duties:_____

If not provided, give reason:_____

_____  _____
Manager's Signature    Date

Ex-

PS Form 152, May 2002

DELIVERY CONFIRMATION NUMBER:
0304 1560 0004 0003 0116

U.S. Postal Service™ Delivery Confirmation™ Receipt

Postage and Delivery Confirmation fees must be paid before mailing.
Article Sent To (to be completed by mailer)

POSTAL CUSTOMER:
Keep this receipt. For inquiries:
Access internet web site at
www.usps.com®
or call 1-800-222-1811

CHECK ONE (POSTAL USE ONLY)
☐ Priority Mail™ Service
☑ First-Class Mail® Service
☐ Package Services parcel

(See Reverse)

FMLA Coordinator
Montgomery AL 36119-9704



UNITED STATES
POSTAL SERVICE

| Date: | February 7, 2006 |
|---|---|
| Subject: | Unsolicited certification |
| To: | Butler B. Browder |
| | 4504 Sunnybrook Dr |
| | Montgomery AL 36108-5046 |

DELIVERY CONFIRMATION:   0304 1560 0004 0003 0116

On February 6, 2006, you submitted Form WH-380 for purposes of FMLA protection. This is to advise you that the Postal Service is returning the WH-380 because we did not request certification.

Sandra R. Christianson

| Enclosures: | Form WH-380 |
|---|---|
| | 3971 |

cc.        File

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9704
PHONE (334)244-7546
FAX (334)24407668

EX- 2

Butler Browder
Mailhandler

SS#
422684124

4564 Sunnybrook Dr.
Montgomery, Al. 36108

HOME TELEPHONE NUMBER:
334-281-1473

**TO ATTENDING PHYSICIAN:** Please complete the following:

General nature of illness: Fibromyalgia; Lumbar Region Pain, Arthritis Multiple Sites
(without giving diagnosis)

LENGTH OF LIGHT DUTY PERIOD (must be updated every 30 days)
From 2-7-06       To 3-9-06

Can patient work an 8-hour day? Yes ✓ No_____
If no, how many hours per day can the patient work?_____ hrs

Patient can lift up to 6-7 pounds.
How often can lifting occur? 0-1 hrs_____, 2-4 hrs_____, 4-6 hrs_____, 6-8 hrs ✓

Patient is able to perform the following tasks (check all that apply):

| TASK | 0-1 hr | 2-4 hrs | 4-6 hrs | 6-8 hrs | 8+ hrs |
|------|--------|---------|---------|---------|--------|
| Walking | — | — | ✓ | — | — |
| Sitting | — | — | ✓ | — | — |
| Bending | — | ✓ | — | — | — |
| Stooping | — | ✓ | — | — | — |
| Kneeling | — | ✓ | — | — | — |
| Twisting | — | ✓ | — | — | — |
| Pulling | — | — | ✓ | — | — |
| Pushing | — | — | ✓ | — | — |
| Climbing | — | ✓ | — | — | — |
| Reaching (above head) | — | — | ✓ | — | — |

# of flights_____

REQUIRED WALKING AIDS (walker, crutches, surgical shoe, wheelchair) Yes____ NO ✓
If yes, what type?_____
Other limitations (flight of stairs, visual, hearing, cardiac, psychiatric, etc.)
_____

_____

X _____     334-265-6153     2/6/06
Physician's Signature          Telephone #          Date

**TO EMPLOYEE:** In accordance with Article 13 of the National Agreement, I request Temporary ✓
Permanent_____ Light Duty. This request is based on physical limitations outlined by my physician and subject
to verification by the USPS Medical Review Officer. I understand if I am granted light duty, I will voluntarily accept
the reporting schedule as my current assignment.

_____ 2/6/06
Employee's Signature & Date

DELIVER COMPLETED FORM TO IMMEDIATE SUPERVISOR

---

## U. S. POSTAL SERVICE USE ONLY

**TO EMPLOYEE'S SUPERVISOR:** Upon receipt, complete the lower portion; advise employee whether light duty can
be provided. **Forward this form to the Plant Manager/Postmaster immediately.** A letter will be prepared
and sent to employee with a copy to the supervisor. IT IS THE RESPONSIBILITY OF THE MDO TO TRACK LIGHT
DUTY.
Is this employee a PTF?_____ Can light duty be provided?_____
If Yes, Tour_____ PL_____ Hours_____ Off Days_____
Duties:_____

If not provided, give reason:_____

_____                              _____
Manager's Signature                                    Date

EX-

Certification of Health Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



---

*(When completed, this form goes to the employee, Not to the Department of Labor.)*

| OMB No.: 1215-0181 |
| Expires:    07/31/07 |

1. Employee's Name

   Luther B Browder

2. Patient's Name *(If different from employee)*

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

   (1) _____  (2) _____  (3) _____  (4) X  (5) X  (6) X  , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

   Multiple sites of joint pain, Arthritis, Fibromyalgia Lumbar Region pain

5. a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):

   b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

      NO

      If yes, give the probable duration:

   c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

      N/A

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

Page 1 of 4

Ex-    1/8

6. a. If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

*follow up visit with physician every 3 months or as needed*

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b. If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

c. **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (*e.g.*, prescription drugs, physical therapy requiring special equipment):

7. a. If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

N/A

b. If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

N/A

c. If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment**?

N/A

EX—

8. a. If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

*N/A*

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

*N/A*

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable duration of this need:

*N/A*

*[stamp: MONTGOMERY, AL 36119 FEB 6 2006]*

Signature of Health Care Provider _____

Type of Practice _____ *I. M*

Address _____ *Mulberry Medical Associates*

Telephone Number _____ *334-265-6153*

_____ *1301 Mulberry St*

_____ *Montgomery, Al. 36106*

Date _____

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

Employee Signature _____          Date _____

*EK*

FMLA Coordinator


**UNITED STATES**
**POSTAL SERVICE**

Jan 10, 2006

|.||.||......|||.|..|.|.|.|.||.|....|.|.||.|

**BUTLER B BROWDER JR**
**4504 SUNNYBROOK DR**
**MONTGOMERY AL 36108-5046**

RE:    **Request for Leave**
       **NEW FMLA Case #2280737**

Enclosed is a copy of Publication 71, "Notice for Employees Requesting Leave for Conditions Covered by the Family and Medical Leave Act" and a copy of Department of Labor Form WH-380, Certification of Health Care Provider, which may be used by a health care provider to document a serious health condition.

You are being sent this packet because you requested leave, and:
- you indicated your absence was for an FMLA covered condition, or
- information you provided indicates your absence may be for an FMLA covered condition, or for a condition requiring specific documentation and return to work procedures; or
- an FMLA coordinator has determined that you need to recertify your condition.

You must meet the eligibility criteria (see attached PUB 71) and not exceed 480 hours in the leave year for the leave to qualify for FMLA protection.

**Note:**  If this absence is for an FMLA condition for which you are already approved, please contact your local FMLA office within 5 days of receipt of this letter.

**Documentation Required**
In order for your absence to receive FMLA protection, if you are eligible, your local FMLA Coordinator must receive the documentation required on page 2 of Publication 71 within 15 days, in accordance with the notice you received when you called to report your absence.  If you fail to provide the required documentation your absence may not be FMLA-protected.  This documentation must be sent or given to your local FMLA Coordinator (See attached Area/District FMLA Coordinator's address listing. Locate the appropriate FMLA Coordinator for your office.)

If you have any questions, please contact your local FMLA Coordinator's office.

**RETURN TO WORK**
Return to work clearance, pursuant to Section 865 of the Employee & Labor Relations Manual, may be required for absences due to an illness, injury, outpatient medical procedure (surgical) or hospitalization when there is a reasonable belief that you may not be able to perform the essential functions of your position, or that you may pose a direct threat to your own or others health or safety due to your medical condition. **This documentation must be provided in accordance with your local return to work procedures.**

Exhibit _____
Page _____ of ____

We wish you or your family member a quick recovery.

Postal Service Management




**UNITED STATES**
**POSTAL SERVICE**®

# Notice for Employees Requesting Leave for Conditions Covered by the Family and Medical Leave Act

Under the Family and Medical Leave Act (FMLA), employees have certain obligations to provide notice and information such as medical certification to their employers. Failure to provide such notice, medical certification, or other required supporting information could result in denial of leave or other protections afforded under the Act.

## I.    Qualifying Conditions

The FMLA provides that, if you meet the eligibility requirements, you must be allowed to take time off for up to 12 workweeks in a leave year for the following conditions:

1.  Because of the birth of a son or daughter (including prenatal care), or in order to care for such son or daughter. Entitlement for this condition expires 1 year after the birth.

2.  Because of the placement of a son or daughter with you for adoption or foster care. Entitlement for this condition expires 1 year after the placement.

3.  In order to care for your spouse, son, daughter, or parent who has a serious health condition. Also, in order to care for those who have a serious health condition and who stand in the position of a son or daughter to you or who stood in the position of a parent to you when you were a child.

4.  Because of a serious health condition that makes you unable to perform the essential functions of your position.

## II.    Eligibility

For an absence to be covered by FMLA, you must have been employed by the Postal Service ™ for a total of at least 1 year **and** must have worked a minimum of 1,250 hours during the 12-month period before the date your absence begins. Once eligible for a given condition, if your work hours subsequently fall below 1,250 during the Postal Service leave year, your eligibility for FMLA-protected absences for that condition remains in effect for the duration of the leave year. However, if a second and unrelated condition arises in the leave year, you must meet the 1,250 eligibility test anew in order to obtain FMLA-protected leave for that (i.e., second) reason.

## III.    Type of Leave or Pay

Absences counted toward the 12 workweeks allowed for the qualifying conditions can be any one or a combination of the following:

1.  Time off you take as annual leave, sick leave, and/or leave without pay (LWOP) in accordance with current leave policies and collective bargaining agreements.

2.  In the case of job-related injuries or illnesses, time off during which you are receiving continuation of pay (COP) and/or time during which you are placed on the Office of Workers' Compensation Program (OWCP) payroll.

Publication 71, May 2005                                                                                    **1**

Exhibit ____
Page ____ of ____

4. **If the time off requested is to care for someone other than a biological parent or child** — appropriate explanation or evidence of the relationship may be required.

Supporting information that is not provided at the time of the request for absence must be provided within 15 days of receipt of notice, unless this is not practical under the circumstances. If the Postal Service questions the adequacy of a medical certification, a second opinion may be required. If the first and second opinions differ, a third and final opinion may be required. These opinions are obtained off the clock. However, the Postal Service will pay for these opinions, plus reasonable out-of-pocket travel expenses incurred to obtain the opinions. Employees may be required to provide recertification periodically. During your absence, you must keep your supervisor informed of your intentions to return to work and status changes that affect your ability to return.

## V. Benefits

**Health Insurance** — to continue your health insurance during your absence, you must continue to pay the employee portion of the premiums. This payment continues to be withheld from your salary. If the salary for a pay period does not cover the full employee portion, you will be invoiced and are required to make the payment.

**Life Insurance** — your basic life insurance and any optional life insurance that you carry continue while you are in a pay status. In an LWOP status, these are continued at no cost to you for one (1) year. After you are in a non-pay status for one (1) year, this coverage is discontinued, but you have the option to convert the coverage to an individual policy within thirty-one (31) days of the discontinuance in accordance with the Office of Personnel Management's (OPM) current Federal Employee Group Life Insurance policy on conversion. See OPM's Web site at *http://www.opm.gov/insure.*

**Flexible Spending Accounts (FSAs)** — if you participate in the FSA program, see your employee brochure for the terms and conditions of continuing coverage during leave without pay.

## VI. Placement and Documentation on Return to Duty

At the end of your FMLA-covered absence, you will return to the same position you held when the absence began (or to an equivalent position) provided you are able to perform the essential functions of the position and would have held that position at the time you returned had you not taken the time off. If you are returning to work after an absence due to your own incapacitation, you must provide certification from your health care provider that you are able to return to work and perform the essential functions of your position.

In addition, if you are a bargaining unit employee returning to work from your own serious health condition, management may require more detailed return-to-work clearance when there is a reasonable belief, based upon reliable and objective information, that you may not be able to perform the essential functions of your position or that you may pose a direct threat to the health or safety of yourself or others due to your medical condition.

Your return-to-work medical certification must be detailed medical documentation and not simply a statement that you may return to work. There must be sufficient information to make a determination that you can perform the essential functions of your job and do so without posing a hazard to yourself or others. In addition, the documentation must note whether there are any medical restrictions or limitations on your ability to perform your job and any symptoms that could create a job hazard for you or other employees.

Exhibit ____
Page ___ of ___

FMLA Coordinator
Montgomery AL 36119-9704


**UNITED STATES**
**POSTAL SERVICE**

Date:          January 10, 2006

Subject:       FMLA approval
               **CASE ID 2280737**

To:            Butler B. Browder
               4504 Sunnybrook Dr
               Montgomery AL 36108-5046

Delivery Confirmation:   0304 1560 0004 0002 7918

FMLA (Family and Medical Leave Act) protection is approved January 6 – February 5, 2006
provided there is no significant change in your condition. Your FMLA entitlement will not exceed 480
hours in a leave year.     All FMLA cases are reviewed periodically and are subject, with cause, to a
request for recertification.

**Your case ID number for this condition is 2280737.  To insure accurate application of your
documentation and leave, please refer to this number in all correspondence, requests for
leave, and call-ins related to this condition.  If you do not provide your FMLA case number at
the time of your request for leave, we may assume that you intended to request FMLA
protection for a new condition, a new case number will be created and you will be given 15
days to certify the new condition.**

If you have any questions, please contact me at (334) 244-7546.

Sandra R. Christianson

cc.            MDO Tour 2
               File

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9704
PHONE: (334) 244-7546
FAX: (334) 244-7668

Exhibit
Page _____ of _____


**UNITED STATES**
**POSTAL SERVICE**

January 18, 2006

Delivery Confirmation: 0300 1290 0005 0472 3981

Butler B. Browder
4504 Sunnybrook Dr
Montgomery AL 36108-5046

Subject:  Requirement of Documentation for Absence
(EMRS Notification: Leave Request for 240 Hours Sick Leave From
January 17, 2006 to 17 February, 2006)

This is to inform you that, pursuant to ELM 511.43, 513.362, 513.363, 513.364, and 513.365, I am requiring you to provide documentation for paid sick leave purposes for your absence beginning January 17, 2006.  **I am requiring you to provide this documentation by January 20, 2006.**  Such documentation should be furnished by your attending physician or other attending practitioner who is performing within the scope of his or her practice.  The documentation should provide an explanation of the nature of your illness or injury sufficient to indicate to management that you are unable to perform any duties for the period of absence.  Medical statements such as "under my care" or "received treatment" are not acceptable evidence of incapacitation to perform duties.

Please understand that I am not asking for certification or recertification of any condition covered by the Family and Medical Leave Act (FMLA).  I am asking you to provide documentation for Sick Leave purposes only, pursuant to the ELM.

The reason for this request is on January 5, 2006 you submitted a request for temporary light duty indicating that you were available for work as long as accommodations could be made for the physical restrictions as noted by your physician. On January 6, 2005, you were sent a letter in response to your request for light duty instructing you to report for duty on January 10, 2006.  You were sent another letter on January 10, 2006, again instructing you to report immediately, but not later than January 17, 2006. The chain of events leading up to your call-in request for 240 hours of sick leave beginning on January 17, 2006 leads me to believe that it is in the best interests of the Postal Service to require acceptable evidence of incapacitation to perform any duties prior to authorizing the use of paid sick leave. Therefore, you will remain in a leave without pay status until such time as acceptable documentation has been provided.  I have been notified by the FMLA Coordinator that you have been provided FMLA protection through February 5, 2006, therefore your leave status at this time is FMLA/LWOP.

If you have questions regarding these instructions, please contact me at 244-7578 during your normal scheduled hours.

Charlie J. Harris
Manager, Distributions Operations (A)

Cc:    FMLA  Coordinator
File

6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-8997

FAX: (334) 244-7558

Exhibit ____
Page __ of ____

R. M. CARLETON
MANAGER, PROCESSING AND DISTRIBUTION


UNITED STATES
POSTAL SERVICE

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.   3

January 6, 2006

Butler B. Browder Jr.
4504 Sunnybrook Dr
Montgomery AL  36108-5046

Delivery Confirmation:  0300 1290 0005 0472 3967

This letter is in response to your request for temporary light duty received in my office on January 6, 2006.

You are hereby instructed to report for duty on Tuesday, January 10, 2006 at your normal reporting time of 05:30 a.m.  Please be advised that your supervisor needs to meet with you regarding several issues of importance, therefore you need to report directly to your supervisor's office after clocking in.

If you are unable to report for duty as scheduled on Tuesday, January 10, 2006 for any reason, you are instructed to contact your supervisor, Charlie J. Harris, immediately to advise him of the reasons you are unable to report and arrange for an alternate reporting time.

Sincerely,

R. M. Carleton

Cc:    FMLA Coordinator
       A/MDO, Tour 2
       File

6701 WINTON BLOUNT BOULEVARD
MONTGOMERY AL 36119-9997
(334) 244-7613
FAX: (334) 244-7558

Exhibit 3
1 - 1



BUTLER B. BROWDER
4504 SUNNYBROOK DRIVE
MONTGMERY, AL 36108
JANUARY 07, 2006

MR. R.M. CARLETON
DISTRICT MANAGER
MONTGOMERY, ALABAMA GMF
U. S. POSTAL SERVICE
6701 WINSTON BLOUNT BLVD.
MONTGOMERY, AL 36119

Dear Sir:

    I am in receipt of your dated January 06,2006, regarding my request for temporary light duty, which does not indicate whether or not my request of extended light duty is approved or denied and thus is suspect in that I have been on twenty-nine (29) days of sick leave due to the denial of my original request for light duty from December 08, 2005 – January 07, 2006.

    Further, I am somewhat baffled due to the mixed signal that I am receiving from you with regard to being in that Postal Facility while I am on sick leave. To that end, I submit the following:

--On December 07,2005, I submitted a request for light duty which was denied on December 08, 2005.

--I, then, submitted a request for sick leave from December 08, 2005 to January 08, 2006.

--Subsequently, I received a FMLA package from the FMLA Coordinator.

--On January 05, 2006, I entered the GMF Break Room, where I briefly socialized, with fellow employees, which I had not seen for the past month.

--Mr. C. J. Harris entered the Break Room a few minutes after 1400 hours. (My normal tour is 05:30 to 1400 hours.)

--He stated to me that he needed to talk to me in his office.

--I told him that I was not on the clock.

--A few minutes later, Charles Norton came to the Break Room, stating that he was there at C. J. Harris's request.

--A few minutes later C. J. Harris and you reported to the Break Room where you came to me and asked me if I was on the clock.

--I responded, "No".

--You, then, told me I had to leave the Break Room.

--I asked if I could finish my hand of cards.

--You said "No. If you are not on the clock, you can't be in the building."

--You never asked me why I was there. I was there to see the FMLA Coordinator concerning my leave status.

--I called my Union Representative, later who arranged for me to see the FMLA Coordinator.

--While meeting with Mrs. Christianson, she told me that she had been warned that I

*Exhibit 4*
*1~1*

would be coming to see her and that she was to call you and C. J. Harris.

--She called both of you, but could not reach you.

--She, then, told me that she could not approve my FMLA because she could not reach either of you.

--My FMLA request contained a prognosis and diagnosis.

--It is the responsibility of the FMLA Coordinator (only) to approve or disapprove FMLA.

--Nevertheless, Mrs. Christanson said she would have to answer my request by mail in that she could not reach you.

---Now, I am in receipt of a letter from you regarding a light duty request, which is essentially the same as the one you have already denied which does not indicate whether the request is approved or denied.

--You attention is drawn to the fact that whether the FMLA is denied or not, a 3971 was submitted for sick leave from January 06, thru February 06, 2006, which is supported by a doctor's statement as per the FMLA documents.

--I was on sick leave when you told me to leave the Break Room.

--I'm on sick leave now.

--I will be on sick leave January 10, 2006.

--I have been on sick leave in excess of twenty-one (21) days, not released for full duty by my doctor, not approved to return to duty by the Postal Service Medical Staff or given approved light duty.

--Your letter indicates that Mr. Harris has issues of importance to discuss with me. A discussion is a two-sided process. As of this time, I know of nothing that I wish to discuss with Mr. Harris. Therefore, I see no need for that particular meeting.

--My return to work as indicated by your letter would violate every Postal rule I know of, regarding the matter.

Signed,

Butler B. Browder

EX 1-2

PLAINTIFF'S EXHIBIT

CASE NO.

EXHIBIT NO. 5

R. M. CARLETON
MANAGER, PROCESSING AND DISTRIBUTION


UNITED STATES
POSTAL SERVICE

January 10, 2006

Butler B. Browder Jr.                    Delivery Confirmation: 0300 1290 0005 0472 3974
4504 Sunnybrook Dr
Montgomery AL  36108-5046

Re:  Request for Temporary Light Duty/Failure to Report for Duty As Instructed

This will have reference to your letter dated January 7, 2006 regarding your refusal to report for duty as instructed.  Please be advised that my letter dated January 6, 2005 specifically instructed you to report for duty on January 10, 2006.  My letter also advised you as to the reason you needed to report for duty; specifically to meet with your supervisor regarding several important issues.

Although you were advised on December 8, 2005 that work was not available within your restrictions at that time, you may be required to report for duty at such time as work becomes available within your restrictions.  Additionally, management has the right to change employee's schedules in order to accommodate requests for temporary light duty.  Meeting with your supervisor is within the restrictions that have been placed upon you by your physician, and you were notified accordingly to report for duty on January 10, 2006.

Your request for sick leave has been approved for the period of December 8, 2005 through January 7, 2006.  You were instructed to report for duty on Tuesday, January 10, 2006 at 5:30 a.m.  Since you failed to report as instructed, you are hereby notified that you are absent without leave and will be placed in a LWOP status effective January 10, 2006.  **You are again instructed to report for duty as scheduled immediately, but no later than Tuesday, January 17, 2006.**  Please be advised that failure to report as instructed may result in further corrective actions being taken.

As previously stated in my letter of January 6, 2006, your supervisor is attempting to meet with you to discuss several important issues which include conducting an investigative interview regarding a Report of Investigation received from the Office of Inspector General dated 12/7/05 regarding Butler Browder.  I am enclosing a copy of the Investigation for your review so that you may familiarize yourself with the contents prior to meeting with your supervisor.  In addition to discussing the OIG Report, there is also a matter of a Letter of Demand which needs to be issued to you for salary overpayment.   The remaining days in your request for temporary light duty until February 6, 2006 will also be discussed at this meeting.

Sincerely,

R. M. Carlet

R. M. Carleton
Enclosure: (1) Report of Investigation (USPS Office of Inspector General)
Cc: FMLA Coordinator
     A/MDO, Tour 2

6701 WINTON BLOUNT BOULEVARD
MONTGOMERY AL  36119-9997
(334) 244-7613
FAX: (334) 244-7558

Exhibit 5
1 - 1

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.          6


**UNITED STATES**
**POSTAL SERVICE**

Delivery Confirmation No. 0304290 0005 0472 4001
Certified Mail No. 7099 3220 0002 5939 2990
Return Receipt Requested

February 2, 2006

Our Ref:      CJHarris:05561:aw

Subject:      Notice of Proposed Removal

To:           Butler Browder
              4504 Sunnybrook Dr.
              Montgomery, AL 36108-5046

This is advance written notice it is proposed to remove you from the Postal Service no sooner than 30 calendar days from the confirmed delivery of this notice. Day 1 of this time frame is the day following the confirmed delivery by either priority mail or certified mail of this proposal, whichever day is earlier. The reason for this action is:

## CHARGE 1: IMPROPER CONDUCT

- On November 12, 2005 after reporting to work you requested approximately 7 hours of sick leave and submitted a signed form 3971. Later this day you attended the Auburn-Georgia football game which was held in Athens, Georgia approximately 230 miles or more from your home.

- On November 18, 2005 you called in sick for two days, which would include November 19, 2005. On November 19, 2005 you attended the Auburn-Alabama football game, which was held in Auburn, Alabama approximately 60 miles or more from your home. You signed a form 3971 for this sick leave request.

Each form 3971 carries the following notation:

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. *(18 U.S.C. 1001)*

You thus improperly obtained both sick leave and sick leave compensation for these dates and, separately, falsified documents in furtherance of this plan.

## CHARGE 2: FAILURE TO FOLLOW INSTRUCTIONS

- On December 2, 2005 you left a form 3971 at the general clerk's desk requesting sick leave, indicating you had a doctor's appointment and left the building. Your actions were contrary to instructions to notify your supervisor before clocking out and leaving the building prior to your scheduled ending time.

Exhibit_____
Page____ of ___

*Exhibit 6*

Browder, B., page 2

- On January 6, 2006 you were sent a letter directing you to report to work on January 10, 2006 in order to discuss the issues of your request for light duty. You failed to do as instructed.

- On January 10, 2006 you were again sent a letter directing you to report to work immediately, but no later than January 17, 2006. This letter informed you of the need to conduct an investigative interview concerning a report from the OIG and several other matters. You failed to do as instructed.

## CHARGE 3: FAILURE TO FOLLOW AGENCY LEAVE REQUESTING PROCEDURES

- On October 3, 2005 you failed to report for duty when scheduled to work overtime. You failed to follow established call-in procedures to report your unscheduled absence.

- On November 18, 2005 you failed to follow established call-in procedures to report your unscheduled absence. You called the workroom floor and informed Acting Supervisor, Nikki N. Lowe you were requesting sick leave for two days. Ms. Lowe instructed you to call the Interactive Voice Response (IVR) Call Center to report your unscheduled absence. You failed to do so and are charged accordingly.

## CHARGE 4: FAILURE TO MAINTAIN A REGULAR WORK SCHEDULE

A review of your attendance record reveals you are failing to maintain a regular work schedule. You have been absent on all or a portion of your following scheduled work dates.

### DATES

| | |
|---|---|
| 10/03/05 | 11/12/05 |
| 10/18/05 | 11/18/05 |
| 10/19/05 | 11/19/05 |
| 10/20/05 | 12/02/05 |
| 10/21/05 | |

You are required to be regular in attendance and have failed to be so.

The following prior elements of discipline have been considered in making this proposal:

07/05 Letter of Warning – Failure to Maintain a Regular Work Schedule
09/05 7-Day No Time Off Suspension—Unacceptable Conduct

You and/or your representative may review the material relied on to support the reasons for this notice at the Labor Relations office located in the Montgomery P&DC. If you do not understand the reasons for this notice, contact Jerri W. Taylor at (334) 244-7680 for further explanation.

Exhibit _____
Page ____ of ____

*EX- - -*

Browder, B., page 3

You and/or your representative may answer this proposal within 10 calendar days from the date of your receipt of this letter, either in person or in writing to Joey Sherman, Officer-in-Charge, Mobile, AL, at 250 St. Joseph St., Mobile, AL 36601-9998 or both. You may call his office at 251-694-5901 to make an appointment. You may also furnish affidavits or other written material to Mr. Sherman within 10 calendar days from your receipt of this letter.

You will be afforded a reasonable amount of official time for the above purpose if you are otherwise in a duty status. After the expiration of the 10-day time limit for reply, all the facts in the case, including any reply you submit will be given full consideration before a decision is rendered. You will receive a written decision from Mr. Sherman.

You have the right to file a grievance under the grievance-arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of this notice. If this action is overturned **in the grievance-arbitration procedure**, back pay will be allowed, unless otherwise specified in the appropriate award or decision, **only if you have made reasonable efforts to obtain other employment during the relevant non-work period.** The extent of documentation necessary to support your back pay claim is explained in the ELM, Section 436.

*Charlie J. Harris*
Charlie J. Harris
Acting Manager, Distribution Operations
Montgomery P&DC

Attachments: ELM 436

Exhibit____
Page____of____

EX __ —



**UNITED STATES**
**POSTAL SERVICE**

CERTIFIED# 7002 3150 0000 5865 9450

March 1, 2006

OUR REF:     JSherman:36119:jwt

SUBJECT:     Letter of Decision

TO:     Butler B. Browder
           Mail Handler
           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 / PL 211
           Montgomery P&DC

On or about February 2, 2006, you were issued a notice proposing to remove you from the Postal Service no sooner than 30 calendar days from your receipt of that letter.

In the notice of proposed removal you were instructed when and where you could review the material related to the action. You were also afforded the right to respond to the proposal to me in person or in writing within 10 days of your receipt of the letter. I met with your NPMHU representative, Jessie Leonard, on February 10, 2006 to discuss your case and Mr. Leonard requested to submit a written response. After review of Mr. Leonard's written response dated February 10, 2006, I must therefore render my decision.

I have given careful consideration to all the evidence in the record and the information presented by your representative on the above date. I find the charges as stated in the Notice of February 2, 2006, to be fully supported and warrant your removal from the Postal Service.

You were charged with Improper Conduct, Failure to Follow Instructions, Failure to Follow Agency Leave Requesting Procedures and Failure to Maintain a Regular Work Schedule. I considered the nature and seriousness of the offense(s) and their relation to your duties, position, and responsibilities.

Records indicated on November 12, 2005 you requested and received payment for approximately 7 hours sick leave. You admitted to attending the Auburn – Georgia football game. Again, on November 19, 2005 you requested and received payment for sick leave. You admitted to attending the Auburn – Alabama football game. In his written response, your representative claimed you were sick on both occasions, but you never indicated you were incapacitated. The ELM, Section 513.1 defines sick leave as leave which "insures employees against loss of pay if they are incapacitated for the performance of duties because of illness, injury. . ." Even after receiving the Notice of Proposed Removal, neither you nor your representative offered documentation indicating you were incapacitated. I find Charge 1 alone sufficient to support your removal from the Postal Service.

Your continued Failure to Follow Instructions and Failure to Follow Agency Leave Requesting Procedures is unacceptable. Your received instructions to notify your supervisor before clocking out and leaving the building, yet on December 2, 2005 you clocked out and left without notifying your supervisor. You received written instructions to report for duty on January 10, 2006 and again to report no later than January 17, 2006 to discuss your light duty request and further investigation concerning the OIG report respectively. Your written response dated January 7, 2006 indicating you had nothing you wished to discuss with your supervisor shows a disregard for authority. You demonstrated the same disregard for postal regulations by your continued failure to follow proper procedures to report your absences.

The charge of Failure to Maintain a Regular Work Schedule is supported by the evidence. Although, this charge alone would not rise to the level of removal, it offers support to your lack of dependability.

There is no question as to whether you knew of the consequences in violating rules concerning requesting and receiving payment for sick leave under false pretenses. You received a 7-Day Suspension for attempts to receive sick leave pay while gambling at a casino in Biloxi, Mississippi. Your continued failure to follow

Exhibit _____
Page_____of_____

*Ex -*

Butler Browder
Letter of Decision
Page 2

instructions of your supervisor(s) and attendance policies will not be tolerated. Consequently, your higher level Manager(s) have no confidence in your ability to perform your duties as a mail handler with honesty and integrity.

In arriving at this decision, I considered a number of factors, including, but not limited to: (1) the nature and seriousness of the offense; (2) the nature of your position as a Mail handler; (3) the effect of the offense on your supervisors' trust and confidence in your ability to perform your assigned duties; (4) your work record, including your length of service, job performance, and dependability; (5) the fact you were clearly aware that the conduct you engaged in was wrong; (6) the written submission of your representative; (7) your potential for rehabilitation; and (8) the adequacy and effectiveness of alternative sanctions to deter such conduct by you or other employees in the future.

In addition to what has been discussed above, I have also considered your 35 year tenure with the Postal Service and your time in the Armed Forces. I am compelled to treat you the same as I would any other similarly situated employee. Based on your receipt of prior discipline for attempting to receive sick leave pay while not incapacitated for duty, I do not believe there is any potential for rehabilitation. It is a basic requirement for Postal Service employees to be honest, reliable and trustworthy. The PS Form 3971 is an official document. Your request for sick leave while attending football games is an intentional misrepresentation. In the written response to me on your behalf, it is clear you were not incapacitated. This constitutes misconduct. The warning on the form itself indicates the seriousness of the matter.

The remaining charges reveal you have demonstrated a willful disregard for Postal Service management officials and policies. Your background as a former management official and your service in leadership positions in the Mail handlers Union support the fact you have a clear understanding of Postal Service regulations.

I believe your actions violate the Code of Conduct which requires employees to be honest, reliable, trustworthy, and of good character and reputation. I do not believe you can be trusted to uphold the policies of the Postal Service. It is essential to the mission of the Postal Service that employees conduct themselves in a manner which reflects favorably upon the Postal Service, regardless of duty status. You have failed to do this.

I considered alternate sanctions for your misconduct, but find a lesser penalty would not be conducive to the integrity and/or efficiency of the Postal Service or serve as a deterrent of similar misconduct by you or other employees. Therefore, it is my decision to sustain the penalty of removal as outlined in the Notice of Proposed Removal. Your removal will be effective on March 7, 2006.

As a preference eligible, you have the right to appeal this decision in writing to the Merit Systems Protection Board (MSPB) within 30 days from the effective date of this action. The address for such appeal is:

Merit Systems Protection Board (MSPB)
Atlanta Regional Office
401 West Peachtree Street, NW 8th Floor
Atlanta, GA 30308-3510

Your appeal to the MSPB should state whether you do or do not wish a hearing and you should furnish me a copy of your appeal within 30 days from the effective date of this decision. For further information on appeal procedures contact Mr. Albert Ward, Manager, Labor Relations (205) 521-0284, or his designee in his absence. Attached for your reference are a copy of the MSPB regulations and a copy of the appeal form.

For a grievance to be filed timely in accordance to Article 15 of the National Agreement, it must have been presented at Step 1 within 14 calendar days of the receipt of the proposed action. The Notice of Proposed Removal was dated February 2, 2006. You have the right to file an MSPB appeal and a grievance on the same matter. However, the filing of a grievance will not extend the time limit for filing an appeal with the MSPB. You do not have the right to a review by the MSPR of the final decision grievance.

Exhibit
Page    of

EX

Butler Browder
Letter of Decision
Page 3

An arbitration hearing on your grievance will be deferred if:

- You have an MSPB appeal pending and the Union appeals your grievance on the same action to arbitration; or
- You appeal to the MSPB after your grievance has been appealed to arbitration.

You will be deemed to have waived access to arbitration if:

- An MSPB hearing begins on the merits or your appeal;
- The MSPB issues a decision on the merits of your appeal;
- You settle the MSPB appeal; or
- The MSPB closes the record after you request a decision without a hearing.

If you believe that the action is based, in whole or in part, on discrimination you have the option of filing an appeal with the MSPB or filing and EEO complaint with the Postal Service, but not both. Before filing an EEO complaint, you must bring the matter to the attention of Ms. Virginia Files, Manager, EEO Dispute Resolution at 205-521-0264, within 45 calendar days of the effective date of this decision. The EEO complaint will be processed pursuant to the appropriate regulations (29 CFR Section 1614.302 through 1614.310).

If you file an MSPB appeal, you are not entitled to a hearing by the Equal Employment Opportunity Commission (EEOC), unless:

- Your appeal to the MSPB is dismissed for lack of jurisdiction, or
- The Postal Service fails to issue a final agency decision on your EEO complaint within 120 days of the date you filed your EEO complaint.

You may request a hearing by the MSPB after the Postal Service has rendered a decision on your EEO complaint or after 120 calendar days from the date of filing your complaint, whichever occurs first.

If you appeal this action, you will remain on the rolls, but in a non-pay, non-duty status after the effective date of this action until disposition of your case has been reached either by settlement or through exhaustion of your administrative remedies.

If this action is reversed or modified on appeal, back pay may be allowed in accordance with 5 CFR Section 550.801 et.seq. as applicable, unless the award or decision specifies otherwise.

If this action is reversed or modified in arbitration, back pay may be allowed unless the award specifies otherwise and only if you have made reasonable efforts to obtain alternate employment during the potential back pay period. The documentation which you must maintain and present to support a back pay claim is described in Subchapter 436 of the Employee and Labor Relations Manual.

Joey Sherman
(A) Postmaster
Mobile, AL

cc:    Manager, Labor Relations

Attachments:    MSPB Regulations
                MSPB Appeal Form
                Subchapter 436 (ELM)

250 Saint Joseph St.
Mobile AL 36601-9998
251-694-5901

Exhibit_____
Page____of____

EX

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.          7



Browder
scated

EXhibit 7
103



Browder
Seated

Exhibit 7
Page 2 of 3



Bruther
seated

Exhibit 2
Page 3 of 3


**UNITED STATES POSTAL SERVICE** ®

**EEO Complaint of Discrimination in the Postal Service**
(See Instructions and Privacy Act Statement on Reverse)

| 1. Name | 2. SSN | 3. Case No. |
|---|---|---|
| Butler B. Browder | 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 | 1H-361-0004-06 |

| 4a. Mailing Address (Street or P.O. Box) | 4b. City, State, and Zip + 4 |
|---|---|
| 4504 Synnbrook DR | Montgomery AL 36108 |

| 5. Email Address * | 6. Home Phone | 7. Work Phone |
|---|---|---|
| | (334) 281-1473 | ( ) Terminated |

| 8. Position Title (USPS Employees Only) | 9. Grade Level (USPS Employees Only) | 10. Do You Have Veteran's Preference Eligibility |
|---|---|---|
| MailHandler | P-05 | ☒ Yes   ☐ No |

| 11. Installation Where You Believe Discrimination Occurred (Identify Installation, City, State, and Zip+4) | 12. Name & Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory |
|---|---|
| Montgomery AL GME Montgomery AL 36119 | C S Harris Acting MDO Tour II Rod Carleton Plant Manager GME Joey Sherman Acting Postmaster Mobile OIC/Rep, District Manager, Lead Plant Manager |

| 13a. Name of Your Designated Representative | 13b. Title |
|---|---|
| | |

| 13c. Mailing Address (Street or P.O. Box) | 13d. City, State, and ZIP + 4 |
|---|---|
| | |

| 13e. Email Address * | 13f. Home Phone ( ) | 13g. Work Phone ( ) |
|---|---|---|
| | | |

* Providing this Information will authorize the Postal Service to send important documents electronically.

| 14. Type of Discrimination You Are Alleging | | 15. Date on Which Alleged Act(s) of Discrimination Took Place |
|---|---|---|
| ☒ Race (Specify): BLACK | ☐ Sex (Specify): | March 1, 2006 and continues |
| ☐ Color (Specify): | ☐ Age (40+) (Specify): | |
| ☐ Religion (Specify): | ☒ Retaliation (Specify Prior EEO Activity): CLASS ACTION | |
| ☐ National Origin (Specify): | ☐ Disability (Specify): | |

16. Explain the specific action(s) or situation(s) that resulted in you alleging that you believe you were discriminated against (treated differently than other employees or applicants) because of your race, color, religion, sex, age (40+), national origin, or disability. *Note that if your allegation is like or related to a previous complaint, that complaint may be amended. 29 C.F.R. § 1616.106(d)*

on 2/2/06 I received a Notice of Proposed Removal and on or about Feb 28, 2006 - March 4, 2006 I received a notice of removal; These acts constitute the completion of the agency's constructive discharge which began shortly after the complainant filed a class action complaint against the agency's Administrative Procedures.

17. What Remedy Are You Seeking to Resolve this Complaint?

I Seek to be made whole of all losses suffered by the agency's action to include Promotion to the highest level position filled by the Agency during the relative Period, Back Pay with all Premiums Bonuses, OT etc, Holiday Pay and Compensatory Damages $300,000.00

18. Did You Discuss Your Complaint with a Dispute Resolution Specialist or a REDRESS Mediator?

☒ Yes (Date you received the Notice of Final Interview):

| 19a. Signature of Dispute Resolution Specialist | 19b. Date |
|---|---|
| *Linda Banks* | March 31, 2006 |

| 20. Signature of Complainant or Complainant's Attorney | 21. Date of this Complaint |
|---|---|
| *Butler B. Browder* | April 4, 2006 |

PS Form **2565**, March 2001 *(Page 1 of 2)*

PLAINTIFF'S EXHIBIT

CASE NO.

EXHIBIT NO. ⊘

Exhibit 8
1 of 1

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.            10

# GUIDE FOR PRO SE PETITIONERS
## FILING PETITIONS FOR REVIEW OF
## MERIT SYSTEMS PROTECTION BOARD DECISIONS

**1.     Notice**

This guide was prepared by the United States Court of Appeals for the Federal Circuit. It is distributed by the Merit Systems Protection Board at the request of the court. This guide accompanies the initial decision of the administrative judge of the MSPB in your appeal. Only those who appealed to the MSPB pro se (without representation by counsel) are given this guide.

The initial decision itself contains a statement describing your alternative rights of appeal. Study that statement carefully.

If you choose to petition the MSPB for review of the administrative judge's decision, you do not need to read this guide or complete the forms at this time. The final order of the MSPB will explain any rights to further review and the MSPB will provide you with the appropriate version of the guide.

You should use this version of the guide and its forms only if you choose to file a petition for review of the initial decision with the court and not with the MSPB. Furthermore, you should not file a petition for review in the court until the initial decision of the administrative judge has become the final decision of the MSPB on the date indicated on the initial decision. The court takes no position on whether you should file a petition for review of the administrative judge's decision with the MSPB or with the court.

This guide is derived from the court's Rules of Practice. You will receive a copy of the entire Rules of Practice, which includes a Guide for Pro Se Petitioners and Appellants, if you file a petition for review in the court.

**2.     Filing a petition for review; timeliness**

You must file your petition for review within 60 days after the initial decision becomes final. Your petition or notice is not considered filed at the time it is postmarked by the U.S. Postal Service; it must actually be received in the court's office of the clerk within the 60-day time period. If it appears that a petition for review is untimely, the clerk may reject the petition. The petition for review may not be faxed to the court.

The initial decision will inform you of the time to petition the court for review. If you petition the MSPB to review the initial decision of the administrative judge, then the MSPB's order or decision regarding your petition will inform you of the time to file a petition for review with the court. If you simultaneously petition the MSPB and the court to review the initial decision of the administrative judge, your petition to the court will be dismissed as premature.

You do not need to use a special form to file a petition for review, but you may use the form provided herein. On your petition for review submitted to the court, you should include the MSPB's case number and indicate your current mailing address and telephone number. You should also attach to the petition a copy of the board's decision or order. All papers must be 8 ½ by 11 inches.

Either your employing agency, the Office of Personnel Management, or the MSPB will be the respondent in your petition for review. In your petition for review, you should identify the agency named in the MSPB's decision or order. If the respondent is changed in your petition for review with the court, you will be notified by the clerk.

Exhibit 10

1 of 2

3.    *Requests for extensions of time to petition for review*

The court lacks the authority to extend the time to petition for review. When a request to extend the time to petition for review is received by the clerk of the court, if the time to petition has not yet passed, the request will be deemed to be the petition for review and the petition will be docketed. However, if the time to petition for review has passed, the request for an extension of time will be returned by the clerk.

4.    *Fees*

You are required to pay a docketing fee to the clerk of the court when you petition for review. For petitions received by the court before April 9, 2006, the docketing fee is $250. For petitions received by the court after April 9, 2006, the docketing fee is $450. If the fee has not been paid or if you have not filed a motion for leave to proceed in forma pauperis (form included herein) within 14 days after the case is docketed in the court, the case will be dismissed.

You may qualify to proceed in forma pauperis if the court determines, after the filing of a completed in forma pauperis form, that you are unable to pay the docketing fee. You are required to disclose all your financial resources on the form. If you do not answer all of the questions, your motion may be denied. If the court grants your motion for leave proceed in forma pauperis, that means that you do not have to pay the docketing fee.

5.    *Conducting a case pro se or with counsel*

As an individual, you may conduct your case pro se in the United States Court of Appeals of the Federal Circuit. ("Pro se" means "for one's own behalf.") If you decide to proceed pro se, you must file a written entry of appearance, within 10 days after your case is docketed, on the form provided herein. Alternatively, you may be represented by a lawyer admitted to practice before the court. If counsel enters an appearance in your case, only counsel may conduct the case at the court. The court has no procedure to appoint counsel for you. A union nonattorney representative or other nonattorney representative may not represent you in the court even if they represented you before the MSPB. Nor may any other person, such as a relative or friend that is not a lawyer admitted to practice before the court, represent you in the court. If a case involves a petitioner that is deceased, the executor or administrator of the estate of the petitioner must be represented by counsel.

6.    *Discrimination claims in Merit Systems Protection Board cases*

If you petition the court for review, you must complete the Federal Circuit Rule 15(c) form included herein. If you fail to complete and return the 15(c) form within 14 days after the date of docketing of your petition for review, the clerk of the court will dismiss your case.

The court does not have jurisdiction to review cases involving bona fide claims of discrimination based on race, color, religion, sex, national origin, age, and disability that were raised before and considered by the MSPB. If your case involved such claims and you are unwilling to abandon the discrimination claims forever, you must proceed in a district court or the Equal Employment Opportunity Commission. In order to proceed in the court in a case involving discrimination, you must waive your discrimination claims on the 15(c) form. A discrimination claim raised for the first time in the court does not affect the jurisdiction of the court to decide the issues raised before the MSPB.

Ex C 0
2 of 2

PLAINTIFF'S
EXHIBIT

CASE
NO. _____

EXHIBIT
NO. _____

# M E D I C A L   D O C U M E N T A T I O N   &   F M L A

Exhibit 11
1 OF 11

*Mulberry Medical*

*a s s o c i a t e s ,   P . C .*

*301 Mulberry Street*
*Montgomery, AL  36106*
*(334) 265-6153*



*Internal Medicine*
*and Endocrinology*

*John A. Jernigan, M.D.*
*Joel McCloud, Jr., M.D.*
*Norman L. Taylor, M.D.*
*Leon C. Casals, Jr., M.D.*
*Mary M.C. Casals, M.D.*

June 2, 2005

RE: Butler Browder

Dear Sirs:

Mr. Butler Browder currently has a multitude of medical problems that include sinusitis, thyroid nodule, hypertension, hyperlipidemia, metabolic syndrome as well as arthritis. On his exam today he has complaints of congestion in his chest. He has complaints of sinus congestion. The patient has complaints of pain in his shoulders, knees and back. The patient has a multitude of complaints and has had multiple problems with his sinuses.

With all of these things in mind it is logical to include that the patient has some connection between today's complaints and his military record. According to the military records this patient shared with us dating back to 1968 document that he was given IM Penicillin, Robitussin, Ornade and other medications for pharyngitis on 5/20/1969. He was also admitted to the hospital in February 1969 for an upper respiratory tract infection. He was coughing at that time. The patient had 3+ enlargement of his tonsils in Nov. 1968. Again he was given IM Penicillin and he had a temperature of 104. The patient also had symptoms of flu vaccine reaction. On Nov. 12, 1968 the patient again had swollen tonsils and tonsillitis. In 1967 the patient had problems losing his voice. In 1967 the patient also had problems with left upper quadrant abdominal pain. According to our records the patient was diagnosed with having hearing impediments, sinusitis, blurry vision, morning headaches, right hip injury in 1966 and knee problems in 1968. The patient has chronic respiratory problems, history of bronchitis, tonsillitis and a multitude of other problems dating back to his military service. I therefore conclude that the patient who is suffering also on today's visit with upper respiratory problems that there could be a direct correlation between his VA complaints and the current complaints. It is the opinion of this physician that if the patient had all of these symptoms dating back to 1968 one can conclude that more than likely some of his problems have continued and should be a direct correlate of some of his problems in the VA service. Thank you in advance for your kind consideration of this patient who has complaints of respiratory problems dating back to his miliary service days.

Sincerely,

John A. Jernigan, M.D.
JAJ/mt

OMB Approved No. 2900-0
Respondent Burden: 15 min

| VA Department of Veterans Affairs | STATEMENT IN SUPPORT OF CLAIM |
|---|---|

PRIVACY ACT INFORMATION: The law authorizes us to request the information we are asking you to provide on this form (38 U.S.C. 501(a) and (b)).
responses you submit are considered confidential (38 U.S.C. 5701). They may be disclosed outside the Department of Veterans Affairs (VA) only if the disclos
is authorized under the Privacy Act, including the routine uses identified in the VA system of records, 58VA21/22, Compensation, Pension, Education a
Rehabilitation Records - VA, published in the Federal Register. The requested information is considered relevant and necessary to determine maximum bene
under the law.  Information submitted is subject to verification through computer matching programs with other agencies.

RESPONDENT BURDEN: VA may not conduct or sponsor, and respondent is not required to respond to this collection of information unless it displays a vali
OMB Control Number. Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewin
instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you hav
comments regarding this burden estimate or any other aspect of this collection of information, call 1-800-827-1000 for mailing information on where to send you
comments.

| FIRST NAME - MIDDLE NAME - LAST NAME OF VETERAN *(Type or print)* | SOCIAL SECURITY NO. | VA FILE NO. |
|---|---|---|
| Butler B Browder | | 24 981 088 |
| The following statement is made in connection with a claim for benefits in the case of the above-named veteran: | | C/SSS - |

I have attached medical evidence to support my
appeal for Sinusitis

Based on a review of my service medical
records, Dr. Jernigan concluded that I should
be granted service-connection for the following
hearing loss, Migraine headaches, right Hip and
bilateral Knee condition.

Please schedule me for a VA examination as
soon as possible.

I CERTIFY THAT the statements on this form are true and correct to the best of my knowledge and belief.                    (CONTINUE ON REVERSE)

| SIGNATURE | DATE SIGNED |
|---|---|
| *[signature]* | 6/9/08 |

| ADDRESS | TELEPHONE NUMBERS *(Include Area Code)* | |
|---|---|---|
| 4804 Sunnybrook Dr Montg. Al 36108 | DAYTIME 334 281-1473 | EVENING 334 265 1086 |

PENALTY: The law provides severe penalties which include fine or imprisonment, or both, for the willful submission of any statement or evidence of a material
fact, knowing it to be false.

VA FORM
21-4138

EXH    30R11

**UNITED STATES POSTAL SERVICE®**

## Request for or Notification of Absence

Employee's Name (Last, First, M.I.) Browder, B, Jr

Social Security No. 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

Date Submitted 6/3/05

No. of Hours Requested 40 Hrs

Installation (For PM leave, show city, state, and ZIP code) Montg AL

N/S Day S-M

Pay Loc. # 211

D/A Code 120

From Date 5/29/05  Hour 0730

Time of Call or Request

Scheduled Reporting Time

Employee Can Be Reached At (If needed)

Thru Date 6/4/05  Hour 1600

☐ No Call

Revised Schedule for (Date)

Approved in Advance ☐ Yes ☐ No

**Type of Absence**
☐ Annual
☐ Carrier 701 Rule
☐ LWOP (See reverse)
☒ Sick (See reverse)
☐ Late
☐ COP
☐ Other:

**Documentation (For official use only)**
☐ For FMLA Leave (Certification reviewed)
☐ For COP Leave (CA1 on file)
☐ For Advanced Sick Leave (1221 on file)
☐ For Military Leave (Orders reviewed)
☐ For Court Leave (Summons reviewed)
☐ For Higher Level (1723 on file)
☐ Scheme Training Testing, Qualifying (Memo on file)

Begin Work
Lunch-Out
Lunch-In
End Work
Total Hours

Remarks (Do not enter medical information) DR'S SLIP ATTACHED

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

Employee's Signature and Date

Signature of Person Recording Absence and Date

Signature of Supervisor and Date Notified

**Official Action on Application (Return copy of signed request to employee)**
☐ Approved, not FMLA*
☐ Approved, FMLA (See Publication 71)
☐ Approved FMLA, Pending Documentation Noted on Reverse.
☐ Disapproved (Give reason):
☐ Ineligible for FMLA (Estimate eligibility date):

Signature of Supervisor and Date

PS Form 3971, April 2001 (Page 1 of 2)

☐ Continued on Reverse

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

| | | Scheduled | Un-Scheduled | PP | Year |
|---|---|---|---|---|---|
| | | | | Day | Init. | Hou |
| Sat 01 | | | | | | |
| Sun 02 | | | | | | |
| Mon 03 | | | | | | |
| Tue 04 | | | | | | |
| Wed 05 | | | | | | |
| Thur 06 | | | | | | |
| Fri 07 | | | | | | |
| Sat 08 | | | | | | |
| Sun 09 | | | | | | |
| Mon 10 | | | | | | |
| Tue 11 | | | | | | |
| Wed 12 | | | | | | |
| Thur 13 | | | | | | |
| Fri 14 | | | | | | |

MULBERRY MEDICAL ASSOCIATES
1301 MULBERRY STREET
MONTGOMERY, ALABAMA 36106
(334)265-6153

RETURN TO WORK/SCHOOL

Name: Butler Browder

has been under my care from 5-30-05

to

and may be able to return

to work/school on 6-4-05

Limitation/Remarks:

Dr. Jeffrey A. Jennings M.D.

EX II   4 OF 11



# DIGESTIVE DISORDERS & LIVER DISEASE ASSOCIATES

2055 Normandie Drive, Suite 200
Montgomery, AL 36111
(334) 288-0848

Joseph Wellington Jackson, M.D.

To Whom It May Concern

_Butler Browder_ was treated in my office on

_10/19/05_

This patient should:  Mr. Browder will have out patient Surgery
   on Tuesday, Nov. 1, 2005. He may return to
   B. Be placed on light duty ~~of intermittent training~~ Nov. 3, 2005

   C. ~~~~

If you have questions, or require additional information *, please ~~~~

Respectfully,

_Joseph W. Jackson_

Joseph W. Jackson, M.D.

*Please note, certain specific information will only be provided with the patient's written permission.



EX-11        5 OF 11

FMLA Coordinator
Montgomery AL 36119-9704

 **UNITED STATES POSTAL SERVICE**

Date:        November 15, 2005

Subject:     FMLA approval
             **CASE ID 2029190**

To:          Butler B. Browder Jr
             4504 Sunnybrook Dr
             Montgomery AL 36108-5046

Delivery Confirmation:   0304 1560 0004 0000 2779

You will be receiving a Publication 71 which outlines your rights and responsibilities under the Family and Medical Leave Act (FMLA) and a form WH-380, which may be used to document a serious health condition.  This was mailed to you by the FMLA Fulfillment Center.

However, based on documentation you provided, FMLA (Family and Medical Leave Act) protection is approved for your absence of November 1 – 3, 2005 provided there is no significant change in your condition.

**Your case ID number for this condition is 2029190.  To insure accurate application of your documentation and leave, please refer to this number in all correspondence, requests for leave, and call-ins related to this condition.**

If you have any questions, please contact me at (334) 244-7546.


Sandra R. Christianson


cc.          MDO Tour 2
             File


6701 WINTON BLOUNT BLVD
MONTGOMERY AL 36119-9704
PHONE: (334) 244-7546
FAX: (334) 244-7668

*EX 11   6 OF 11*



School / Work Excuse

1722 Pine Street, Suite 300
Montgomery, Alabama 36106
334-293-8168 ◦ 800-454-9067
Fax: 334-264-0295

Date: 1-25-06

To Whom It May Concern:

*Butler Browder* _____ was here at Jackson Sleep Disorders
Center for a sleep study from _____ a.m. / (p.m.) on
10-18-05 _____ until _____ (a.m.) / p.m. on
10-19-05 _____. If you have any questions please
call us at 293-8168.

Notes: _____

_____

_____

Sincerely,

_____
Sleep center employee signature
Jackson Sleep Disorders Center

EX16                    70F11



**Mulberry Medical**
A s s o c i a t e s ,   P . C .
301 Mulberry Street
Montgomery, AL   36106
(334) 265-6153

*Internal Medicine*
*and Endocrinology*

*John A. Jernigan, M.D.*
*Joel McCloud, Jr., M.D.*
*Norman L. Taylor, M.D.*

September 8, 2005

RE: Butler Browder

To Whom It May Concern:

Mr. Butler Browder was seen in my office on 6/2/2005. According to documentation that he has shown me with my signature, he was given an excuse off from work from May 30, 2005 through June 4, 2005. Therefore, please accept this letter as documentation that this patient was seen and received a legitimate excuse from this office. The records also document that his symptoms started on Sunday, May 29, 2005. If further documentation is needed, please feel free to contact me at the above address.

Sincerely,

John A. Jernigan, M.D.
JAJ/mt

EX- 11

EN 254-DC
Revised 03/05
*Electronic Form*

**ALABAMA DEPARTME.  OF INDUSTRIAL RELATIONS**
*UNEMPLOYMENT COMPENSATION DIVISION*
**DOCTOR'S CERTIFICATE**

Cla. .nt's SSN XXX-XX-4124
Claim Date 031206    Claim Type 05
Date Mailed 041106

Browder Jr/ Butler B
4504 Sunnybrook Drive
Montgomery, AL 36108

*NOTE TO CLAIMANT:* SIGN AND DATE
THIS FORM TO AUTHORIZE THE
RELEASE OF THIS INFORMATION.
THIS FORM MUST BE COMPLETED BY
YOUR DOCTOR AND RECEIVED BY
MAIL OR FAX AT THE ADDRESS
BELOW NO LATER THAN 042106.
FAILURE TO RETURN THIS
COMPLETED FORM AS INSTRUCTED
COULD RESULT IN A DENIAL OF
BENEFITS.

CLAIMANT'S SIGNATURE:                                         DATE:

**(NOTE TO DOCTOR):**
The above claimant has applied for unemployment benefits effective **031206** and states his/her usual occupation is **Mail Clerk and Mail Mach**. The following information from you is necessary to determine his/her ability to work. This certificate is furnished to the claimant as a convenience for the purpose of assisting the Alabama Unemployment Compensation Agency in making a decision on his/her claim for unemployment. This agency assumes no responsibility for payment of your professional services. Please complete the following information in its entirety.

1. Dates and Treatment: From ___/ 1 /1984 To ___/ 1 /2006 For *Degenerative Joint Disease*

2. Is this individual able to perform the duties of his/her usual occupation? Yes ☑  No ☐
   If "No," did you advise this individual that continuing to perform the duties of his/her usual occupation would aggravate his/her injury or illness? Yes ☐  No ☐

3. If this individual *is* able to perform the duties of his/her usual occupation, on what date did this individual become able?
   12/7/05 provided limited or light duties is provided as prescribed in #4

4. If unable to perform the duties of his/her usual occupation, is he/she able to perform any type of work? Yes ☑  No ☐
   If "Yes," please explain any limitations (including the dates affected):
   From 1 / 1 /2006 To 3 / 1 /2006
   The patient has limitations with lifting, bending, weight bearing and standing. The patient may preform his normal duties as Mailhandler group leader without limitation in that position allows employee options in limitations areas.

5. If treatment is for pregnancy, enter expected date of confinement: ___/ 1 /___

**REMARKS** (If appropriate):

Signature of Physician  _[signature] M.D._                Phone Number 334-265-6153

Date Completed ___/ 1 /___    Address: 1801 Mulberry St. Montgomery, Al 36106

RETURN COMPLETED FORM TO:
FEDERAL PROGRAMS UNIT                    **Fax Number: 334-242-2018**
649 MONROE ST, ROOM 3441
MONTGOMERY, AL 36131-4200

EX. 11    9 OF 11



**Advanced Medical
Imaging Center**

John Jernigan, MD       03-27-06
1301 Mulberry Street
Montgomery AL. 36106

Re: Browder, Butler
    Account# -  1063993
    DOB – 07/20/1948
    Chart #: 13046
    Exam:    MRI LUMBAR SPINE 03/24/2006

**MRI LUMBAR SPINE:**
HISTORY: Low back pain

TECHNIQUE: Multi-sequence, multi-planar imaging was performed without the use of
Gadolinium contrast material.

FINDINGS: Disc material is degenerative at L3-L4 through L5-S1 with variable mild loss
of disc space height and signal. There are no significant marrow signal abnormalities.
The conus and cauda equina are unremarkable. No spondylolisthesis. There is
preservation of the normal lordosis.
There is no significant degenerative abnormality at L1-L2 or L2-L3.
At L3-L4, there is a disc bulge. There is a focal interforaminal disc protrusion on the right.
There is moderate to severe narrowing of the right neural foramen. There is mild
narrowing of the left neural foramen. There are mild hypertrophic changes in the facets
and ligamentum flavum. There is minimal thecal sac stenosis.
At L4-L5, there is a disc bulge. Mild hypertrophic changes in the facets. There is no
significant thecal sac stenosis. There is moderate narrowing of the neural foramina.
At L5-S1, there is a disc bulge. There are moderate hypertrophic changes in the facets.
There is no significant thecal sac stenosis. There is moderate narrowing of the neural
foramina.

IMPRESSION:
Multi-level degenerative abnormalities. See body of report.

ROBERT L. HUTTO, MD

RLH/lgh

**Advanced Medical Imaging Center**
525 South Lawrence Street Montgomery AL 36103
334-262-7226 Toll Free:800/844-7226 Fax: 334-261-2641

EX-11    100 of 11

**MULBERRY**
**DIAGNOSTIC IMAGING CENTER**
# X-RAY REPORT

| FAMILY NAME | FIRST NAME | MIDDLE NAME | | TECHNOLOGIST | |
|---|---|---|---|---|---|
| BROWDER, | BUTLER | | | IH | |
| EXAMINATION OF | NAME-PART | | SEX | AGE-YEARS | X-RAY NO. |
| BONE SCAN | | | M | 57 | 106829 |
| ATTENDING PHYSICIAN | | | DATE | | |
| DR. JERNIGAN | | | 3 Jan 2006 | | |

REPORT

HISTORY:  LBP, BIL. KNEES, RT. HIP PAIN

BONE SCAN:

He was injected with 24.5mCi of Technetium-99m MDP and scanned at 2 hours in multipl
projections showing a completely normal spine, thorax, and pelvis.  Left knee shows mino
degenerative change.  GU system is normal.

OPINION:

Minor degenerative change in left knee.  Otherwise completely normal study showing no bon
abnormality in the right hip or lower back.

JHL/slh
d:  3 Jan 2006
t:  3 Jan 2006
s:  3 Jan 2006

JAMES H LAROSE MD

SIGNATURE OF RADIOLOGIST

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO. 12

# POSTAL RULES FOR SICK LEAVE USUAGE

Exhibit 12
1 OR 22



Find a ZIP Code  /  Calculate Postage  /  Print a Shipping Label  /  Schedule a Pickup  /  Locate a Post Office  /  Track & C

| BUSINESS >> | HOUSEHOLD >> | BUY STAMPS & SHOP >> | ALL PRODUCTS & SERVICES >> | ABOUT USPS & NEWS |

Home > About USPS & News > Forms & Publications > Postal Periodicals and
Publications > Manuals > Employee and Labor Relations Manual - Issue 17 > 5 Employee
Benefits > 510 Leave > 513 Sick Leave

< Previous                                                                 Next >

# 513 Sick Leave

## 513.1 Purpose

### 513.11 Sick Leave for Employee Incapacitation

Sick leave insures employees against loss of pay if they are
incapacitated for the performance of duties because of illness, injury,
pregnancy and confinement, and medical (including dental or optical)
examination or treatment.

### 513.12 Sick Leave for Dependent Care

A limited amount of sick leave may also be used to provide for the
medical needs of a family member. Nonbargaining unit employees, and
bargaining unit employees if provided in their national agreements, are
allowed to take up to 80 hours of their accrued sick leave per leave year
to give care or otherwise attend to a family member (as defined in
515.2) with an illness, injury, or other condition that, if an employee had
such a condition, would justify the use of sick leave. If leave for
dependent care is approved, but the employee has already used the
maximum 80 hours of sick leave allowable, the difference is charged to
annual leave or to LWOP at the employee's option. (See 515 for
information about FMLA entitlement to be absent from work.)

## 513.2 Accrual and Crediting

### 513.21 Accrual Chart

Time accrued is as follows:

| Employee Category | Time Accrued |
|---|---|
| Full-time employees. | 4 hours for each full biweekly pay period - i.e., 13 days (104 hours) per 26-period leave year. |

## 513.31 Policy

### 513.311 General

Sick leave cannot be granted until it is earned, except as provided in 513.5.

Back to Top ▲

### 513.312 Restriction

An employee who is in sick leave status may *not* engage in any gainful employment unless prior approval has been granted by appropriate authority (see 662, Federal Standards of Ethical Conduct).

### 513.32 Conditions for Authorization

Conditions for authorization are as follows:*

| Conditions | |
|---|---|
| Illness or injury. | If the employee is incapacitated for the performance of official duties. |
| Pregnancy and confinement. | If absence is required for physical examinations or periods of incapacitation. |
| Medical, dental, or optical examination or treatment. | If absence is necessary during the employee's regular scheduled tour. |
| For eligible employees (as indicated in 513.12), care for a family member (as defined in 515.2). | Up to 80 hours of accrued sick leave per leave year if the illness, injury, or other condition is one that, if an employee had such a condition, would justify the use of sick leave. |
| Contagious disease. A contagious disease is a disease ruled as requiring isolation, quarantine, or restriction of movement of the patient for a particular period by the health authorities having jurisdiction. | If the employee (1) must care for a family member afflicted with a contagious disease, (2) has been exposed to a contagious disease and would jeopardize the health of others, or (3) has evidence supplied by the local health authorities or a certificate signed by a physician certifying the need for the period of isolation or restriction. |
| Medical treatment for disabled veterans. | If the employee (1) presents a statement from a duly authorized medical authority that treatment is required, and (2) when possible, gives prior notice of the definite number of days and hours of absence. (Such information is needed for work scheduling purposes.) |

* Sick leave, annual leave, or LWOP is granted as may be necessary for any of these conditions in accordance with normal leave policies and collective

EX-12 3 of 22

## 513.342 Approval or Disapproval

The supervisor is responsible for approving or disapproving requests for sick leave by signing PS Form 3971, a copy of which is given to the employee. If a supervisor does not approve a request for leave as submitted, the Disapproved block on the PS Form 3971 is checked and the reason(s) given, in writing, in the space provided. When a request is disapproved, the granting of any alternate type of leave, if any, must be noted along with the reason for the disapproval. AWOL determinations must be similarly noted.

## 513.35 Postmaster Absences

There are special requirements for postmaster absences:

    a. *Leave Replacement.* A postmaster whose absence requires the hiring of a leave replacement must notify the appropriate official.

    b. *Absence Over 3 Days.* A postmaster who is absent in excess of 3 days must submit PS Form 3971 within 2 days of returning to duty or, for an extended illness, at the end of each accounting period.

## 513.36 Sick Leave Documentation Requirements

## 513.361 Three Days or Less

For periods of absence of 3 days or less, supervisors may accept the employee's statement explaining the absence. Medical documentation or other acceptable evidence of incapacity for work or need to care for a family member is required only when the employee is on restricted sick leave (see 513.39) or when the supervisor deems documentation desirable for the protection of the interests of the Postal Service. Substantiation of the family relationship must be provided if requested.

## 513.362 Over Three Days

For absences in excess of 3 days, employees are required to submit medical documentation or other acceptable evidence of incapacity for work or of need to care for a family member and, if requested, substantiation of the family relationship.

Back to Top ▲

## 513.363 Extended Periods

Employees who are on sick leave for extended periods are required to

EX - 12    4 of 22

# Handbook EL-921

## Supervisor's Guide to Handling Grievances

## August 1990

EX-12 5 of 22

## Preface

The Postal Service, working in conjunction with the national unions, strives continuously toward improvement of the labor-management climate by fostering better communications, greater trust, and improved working relationships at all levels of the company.

You are a key figure in promoting this philosophy. As the management team member that is involved from the outset in problems, complaints, and grievances, you can contribute to the improvement of relations between management and labor by giving your sincere attention and by making every effort to *settle* differences even before they reach the formal grievances stage.

The material contained in this booklet is intended to serve only as broad guidelines. It is provided to assist you in the handling of grievances and disciplinary actions. The guidelines are not necessarily requirements that must be strictly complied with or blindly followed, and *no employee rights are created when these guidelines are not followed.*

*- Labor Relations Department*

EX-12 6 OF 22

# CONTENTS

I. __Introduction__

II. __Handling Grievances__
A. General
B. Supervisory Responsibilities
C. Disciplinary Grievances
D. Role of the Step 2 Designee
E. Summary

III. __Discipline__
A. Basic Considerations
B. Disciplinary Procedures
C. Just Cause
D. Disciplinary Arbitration
E. Investigation
F. How Much Discipline

IV. __Review__
A. Get the Facts
B. Weigh and Decide
C. Take Action
D. Check Results

V. __Grievance Summary Forms__
A. Purpose
B. Grievance Summary - Step 1
C. Grievance Summary - Step 2
D. Grievance Summary - Step 3

*EX-12-7*

# I. Introduction

This material provides a broad guideline for supervisors in handling grievances and disciplinary actions under the current collective bargaining agreements. No attempt has been made to answer specific questions nor to develop a *cure-all* for grievance processing. Effective grievance processing can only be accomplished through additional experience and by applying the concepts outlined in this material.

To continue improving in labor relations, every supervisor must have not only a thorough knowledge of, but also a belief in, the philosophy of labor relations as expressed here. You, as supervisors, must work hard to develop and maintain a positive labor relations attitude in the Postal Service. You have the first opportunity to open communications so that mutual trust, two-way dialogue, and an environment of cooperation are developed between management and labor.

By working out problems before they become grievances and by resolving grievances at the lowest possible step, you can make a contribution to the overall improvement of labor-management relations that will impact favorably on all facets of our organization.

# II. Handling Grievances

## A. General

**The collective bargaining agreements cover all matters agreed to between management and the unions regarding wages, hours of work, overtime, and other terms and conditions of employment. Parts of some handbooks, manuals and published regulations of the Postal Service also contain material that directly relates to wages, hours, or working conditions as they apply to employees covered by the National Agreements, and that material must contain nothing that conflicts with the Agreements. As management conducts its business, there is always the possibility that an employee and/or the unions may believe that a violation of the Agreement(s) has occurred. While problems are best *resolved* before they become grievances, supervisors must know how to handle grievances quickly and satisfactorily when they do arise.**

## B. Supervisory Responsibilities

**Management is responsible for directing its operations; employees and/or the unions, however, have the right to file grievances if they believe their rights have been violated. A supervisor must be in a position to respond properly should a grievance arise. Use the following guides in handling grievances:**

> **Treat every grievance as though it were sure to wind up in arbitration, but do not be adversarial in your approach.**

> **Allow employees and/or unions a full opportunity to present their points of view. Listen: don't interrupt.**

EX-12-8 of

**Make sure that time limits and other procedural requirements under the grievance procedure have been observed.**

**Know the background of the grievance, and the existence of prior similar cases and their outcome. Know the applicable provisions of the Agreement and any information relating to past policies and practices.**

**Make sure the employee and/or the union has presented the full story, specified the exact nature of the alleged violation, and stated the precise remedy that is sought.**

**Make a detailed and accurate record of the results of the investigation. This should include:**

- ■ **Any pertinent payroll documents.**

- ■ **Work, personnel, or disciplinary records.**

- ■ **A summary of the employee's and/or the union's and management's positions.**

- ■ **The names and statements of witnesses.**

- ■ **The nature of any evidence presented by either side.**

**We must stress the importance of finding out *who*, *what*, *when*, *where*, and *why*. Make absolutely sure that you have all the facts. This requires asking questions.**

**It is the responsibility of local management to *resolve* as many grievances as possible at Step 1. When a grievance has merit, you should admit it and correct the situation. *You* are a manager--*you* must make decisions--don't pass the buck. Your decision on a grievance should be based on the facts of the situation and the provisions of the National Agreement. You should listen to the employee's or union's grievance and make sure of the facts.**

## Do's and Don'ts

*Do* **try to make the decision fairly.**

*Do* **try to be reasonable.**

*Do* **take the action you believe should be taken based upon the individual circumstances involved.**

*Do* **give the employee or the union a complete answer including the reasons for your decision.**

*Don't* **make a decision in anger.**

*Don't* **try to "get back" at an employee or the union for some other action you didn't like.**

*Don't* **tell the union you do not have the authority to make a decision.**

*EX-12  9 of 22*

If you do not have the answer, advise the union steward or representative that you will get back to him or her and then seek assistance from higher level management in developing a response.

The time limit for each step is a limit, not the length of time you are expected to take to reach your decision. You are expected to expedite your decision, but not at the expense of sound judgement. If you follow the policy of fair, firm, and decisive, you will find that fewer grievances are appealed to Step 2. Study the facts thoroughly and determine how they relate to the provisions of the Agreement. If you then believe the employee's or union's grievance is unjustified, deny the grievance. Be certain you can justify your decision.

## C. Disciplinary Grievances

Once the discipline has been initiated, the employee or the union may grieve the discipline within the time limits specified in Article 15. Just because the discipline was fully discussed at the time of issuance is no reason for the supervisor to breeze through Step 1 with a quick, "Grievance Denied." Points which should be covered by the supervisor in any such Step 1 discussion include:

> Is there a misunderstanding as to management's reasons for having initiated the discipline?

> On what basis does the employee feel that management lacked just cause?

> On what basis does the employee or the union feel that the action taken is too severe?

We recognize that in many cases the union pursues a discipline grievance simply because of internal reasons, or because there is "nothing to lose and everything to gain." Whatever the reason behind the grievance, the result is the same--management's right to invoke discipline and the way that this right was exercised has been challenged. Therefore, even though the employee and/or the union is the moving party in filing a grievance against management, management must be able to justify the action.

Therefore, it is crucial that the supervisor not only take good notes during the Step 1 discussion, but also advise both the reviewing authority and the designee for Step 2 that a grievance has been filed. Since the reviewing authority thoroughly reviewed the proposed discipline before it was initiated, that person will be a key source of information for management's Step 2 designee. There must be a clear channel of communication between these two individuals.

(See Section V for instructions on use of Form 2608, *Grievance Summary - Step 1*.)

## D. Role of the Step 2 Designee

The reviewing authority looks at the proposed discipline before it is imposed and concurs with the proposed action, based on the facts supplied by the supervisor. On the other hand, the Step 2 designee must look at both sides of the coin in an effort to resolve the grievance at the local level.

EX-12-10
OF 22

A situation may arise where the Step 2 designee finds the discipline either unwarranted or too severe, based on the facts and evidence presented at the Step 2 discussion. If so the Step 2 designee should thoroughly discuss the case with the reviewing authority and the supervisor involved before rendering a decision. Step 2 designees must not handle grievances as though they were "rubber stamping" decisions that have already been made. Also, the Step 2 designee must not accept without question all statements of facts or opinions by other management personnel regarding the case, nor assume automatically that the statements of facts or opinions forwarded by the union or grievant are fabrications or highly biased. Statements of facts by either party should always be documented.

Except to check out new facts which may be presented at the Step 2 discussion, the Step 2 designee will not have to develop management's case if the reviewing authority and supervisor involved have done their homework. The primary responsibility of the Step 2 designee is to review the case to determine whether *just cause* exists for discipline and, if so, whether the degree of discipline is appropriate.

Unlike nondisciplinary grievance for which the union must show that we violated the Agreement, in discipline cases we have to justify the action taken. The burden of proof is on us to establish *just cause*. Many times the union appeals primarily because management takes the position that once the decision is made, it is up to the union to show it is not justified.

(See Section V for instructions on use of Form 2609, *Grievance Summary - Step 2*.)

## E. Summary

Management has the right to manage, but an employee or the union has the right to question management's application of the National Agreement through the grievance procedure.

Supervisors have the responsibility to be firm but fair in handling grievances.

All aspects of a grievance case must be fully documented and considered in reaching a decision.

The burden of proof in disciplinary grievances is on management, while in other grievances, it is on the union.

Supervisors must always be reasonable in their dealings with employees or the union.

# III. Discipline

## A. Basic Considerations

Management can only accomplish its mission through the effective use of people. Labor relations is a people-oriented process, and how successful we are in *working with people* will determine, to a great measure, whether or not the goals of the Postal Service are attained. Getting the job done through people is not an easy task, and certain basic things are required, such as:

EX-12 11 OF 22

employee corrects the shortcomings after this discussion, let it be known that you appreciate the improvement.

What happens if the employee's behavior does not improve? A second discussion is sometimes advisable, or formal disciplinary action may be initiated through issuance of a letter of warning or suspension. Remember, your job is to handle disciplinary actions so they are corrective and not punitive.

In suspending an employee, use extreme caution in convincing yourself that the penalty is appropriate for the offense. Progressively longer suspensions may be in order to correct a situation. When these fail, discharge should be considered. Before you take such action, review thoroughly:

Is it for just cause?

Have we made attempts to correct the employee's behavior?

Have we taken prior progressive disciplinary action?

Is the decision based upon objectivity and not emotionalism?

Remember, however, certain offenses may warrant discharge without prior progressive discipline.

## C. Just Cause

What is *just cause*? The definition of just cause varies from case to case, but arbitrators frequently divide the question of just cause into six sub-questions and often apply the following criteria to determine whether the action was for just cause. These criteria are the *basic* considerations that the supervisor must use before initiating disciplinary action.

Is there a rule?

If so, was the employee aware of the rule? Was the employee forewarned of the disciplinary consequences for failure to follow the rule?

*Important*: It is not enough to say, "Well, everybody knows that rule," or, "We posted that rule 10 years age." You may have to prove that the employee should have known of the rule.

Certain standards of conduct are normally expected in the industrial environment and it is assumed by arbitrators that employees should be aware of these standards. For example, if an employee charged with intoxication on duty, fighting on duty, pilferage, sabotage, insubordination, etc., may be generally assumed to have understood that these offenses are neither condoned nor acceptable, even though management may not have issued specific regulations to that effect.

Is the rule a reasonable rule?

EX-12  12 of 22

Management must maintain work rules by continually updating and reviewing them, and making sure that they are reasonable, based on the overall objective of safe and efficient work performance. Management's rules are reasonably related to business efficiency, safe operation of our business, and the performance we might expect of the employee, and this is known to the employee.

Is the rule consistently and equitably enforced?

If a rule is worthwhile, it is worth enforcing, but be sure that it is applied fairly and without discrimination.

Consistent and equitable enforcement is a critical factor, and claiming failure in this regard is one of the union's most successful defenses. The Postal Service has been overturned or reversed in some cases because of not consistently and equitably enforcing the rules.

Consistently overlooking employee infractions and then disciplining without warning is one issue. If employees are consistently allowed to smoke in areas designated as *No Smoking* areas, it is not appropriate suddenly to start disciplining them for this violation. In such cases, management loses its right to discipline for that infraction, in effect, unless it first puts employees (and the unions) on notice of its intent to enforce that regulation again.

Singling out employees for discipline is another issue. If several employees commit an offense, it is not equitable to discipline only one.

When the Postal Service maintains that certain conduct is serious enough to be grounds for discharge, it is unwise--as well as unfair--to make exceptions. If the Postal Service is to maintain consistency in its position that theft or destruction of deliverable mail is grounds for discharge even on a first offense, for example, then the otherwise good employee guilty of this offense, like the borderline or marginal employee, must be discharged.

Was a thorough investigation completed?

Before administering the discipline, management must make an investigation to determine whether the employee committed the offense. Management must ensure that its investigation is thorough and objective.

This is the employee's *day in court* privilege. Employees have the right to know with reasonable detail what the charges are and to be give a reasonable opportunity to defend themselves *before* the discipline is initiated.

Was the severity of the discipline reasonably related to the infraction itself and in line with that usually administered, as well as to the seriousness of the employee's past record?

The following is an example of what arbitrators may consider an inequitable discipline: If an installation consistently issues 5-day suspensions for a particular offense, it would be extremely difficult to justify why an employee with a past record similar to that of other disciplined employees was issued a 30-day suspension for the same offense.

There is no precise definition of what establishes a good, fair, or bad record. Reasonable

*EX.12-13 of 2*

principle of progressive discipline.

Failure to investigate before taking a disciplinary action can result in some awkward situations for the Postal Service. Examples:

One employee who worked for many different supervisors on a relief assignment was involved in discussions at separate times within one year by different supervisors for similar infractions. When discussion did not correct the employee's irregularity, progressive discipline should have been imposed at an early stage.

In another instance, an employee bid into a new section and immediately became a tardiness problem. During the first 10 days under the new supervisor, the employee was tardy six times. The supervisor held a discussion with the employee without investigating the past record, which would have revealed that the employee had been a continuing problem and had recently returned from a 30-day suspension for tardiness. Obviously, a discussion was not the correct action in this instance.

When in doubt as to the appropriate discipline to be issued, supervisors are encouraged to consult with their managers or with designated labor relations personnel. They will assist you in determining the appropriate corrective action base upon individual circumstances.


## F. How Much Discipline

One of the most difficult areas of discipline is the determination of the amount or type of discipline to be issued for a particular offense. The Postal Service generally does not subscribe to any *discipline formula*, where a table of penalties is maintained for particular offenses. The discipline data base, which is part of the National Labor Relations Information System (NLRIS) and accessible to labor relations professionals, provides guidance concerning corrective actions. Generally, however, certain factors should be considered in assessing discipline, and disciplinary action should be tailored to the particular circumstances.

Items for consideration in assessing discipline include but are not limited to:

The nature and seriousness of the offense.

The past record of the employee; and/or other efforts to correct the employee's misconduct.

The circumstances surrounding the particular incident.

The amount of discipline normally issued for similar offenses under similar circumstances in the same installation.

The length of service.

The effect of the offense upon the employee's ability to perform at a satisfactory level.

*EX-12-14pp*

judgement must be used. An employee's record of previous offenses may never be used to establish guilt in a case you presently have under consideration, but it may be use to determine the appropriate disciplinary penalty.

The Postal Service feels that unless a penalty is so far out of line with other penalties for similar offenses as to be discriminatory, the arbitrator should make no effort to equalize penalties. As a practical matter, however, arbitrators do not always share this view. Therefore, the Postal Service should be prepared to justify why a particular employee may have been issued a more severe discipline than others.

> Was the disciplinary action taken in a timely manner?

Disciplinary actions should be taken as promptly as possible after the offense has been committed.

## D. Disciplinary Arbitration

Management bears the burden of proof in disciplinary arbitrations. This is an important requirement which must not be taken lightly.

At an arbitration hearing, management witnesses are not assumed to be any more honest or credible than union witnesses. The fact that the supervisor testifies that an incident happened a certain way may not convince the arbitrator if the grievant or other union witnesses testify otherwise. The Postal Service should be prepared to prove its case to an arbitrator; therefore, the supporting exhibits should be gathered before the discipline is ever initiated.

A pertinent definition of *proof* is this: *Proof is the testimony and exhibits which convince an arbitrator that the employee committed the offense as charged.*

When conducting the investigation before disciplining an employee, the supervisor should gather all available and relevant evidence that will help to prove the case. This information is frequently available in the form of official records. For instance, if the charge involves tardiness, a copy of the employee's time card showing the arrival time might be introduced. On any attendance-related charge, Forms 3971, 3972, etc., would be relevant. When available, this type of documentation should accompany the supervisor's request for formal discipline.

## E. Investigation

As previously discussed, when an employee commits an offense which seems to warrant discipline, the supervisor must avoid rushing into a disciplinary action without first investigating. The need for an investigation to meet our *just cause* and *proof* requirements is self-evident. However, the employee's past record must also be checked before any disciplinary action is considered. This is obviously necessary if we are to abide by the

Ex-12. 250F22

The effect the offense had on the operation of the employee's work unit; for example, whether the offense made coverage at the overtime rate necessary, whether mail was delayed, etc.

The collective bargaining agreements also provide that discipline be corrective in nature rather than punitive.

# IV. Review

## A. Get the Facts

- Review the record.
- Find out what rules apply.
- Talk with individuals concerned.
- Get opinions and feelings.
- *Be sure you have the whole story.*

## B. Weigh and Decide

- Fit the facts together.
- Consider their bearing on each other.
- Decide what possible actions there are.
- Check practices and policies.
- Consider objective and effect on individual, group, and production.

## C. Take Action

- Are you going to handle this yourself?
- Do you need help in handling it?
- Should you refer this to your supervisor?
- Watch the timing of your action.
- *Don't pass the buck.*

## D. Check Results

- How soon will you follow up?
- How often will you need to check?
- Watch for changes in productivity, attitudes, and relationships.

EX-12-16.0PZ

# V. Grievance Summary Forms

## A. Purpose

Forms 2608, 2609, and 2610, *Grievance Summary - Step 1, 2, and 3*, provide officials at each step of the grievance procedure with a concise and accurate report of the grievance. These forms are used to track grievance activity nationwide.

## B. Grievance Summary - Step 1

Form 2608 focuses attention on the critical aspects of the grievance in a quick, step-by-step method. The form assists management officials in organizing their thoughts and documenting the grievance.

Read the instructions on the form carefully. You must type or print legibly. All items must be completed as indicated:

1. Self-explanatory.

2. Give name of facility at which grievance is filed (e.g., Anytown Post Office, Anytown Station, Anytown Branch).

3. Give craft (e.g., maintenance, clerk, letter carrier, mail handler).

4. Give grievant's title (e.g., distribution clerk, carrier technician).

5. Self-explanatory.

6. See the provisions of the appropriate contract for time limits. If the grievance is denied for untimeliness, explain in Item 12.

7. Give date when management answered the Step 1 grievance.

8. Give union representative, if any, present at Step 1 meeting.

9. Make the statement of the issue presented in the grievance descriptive, but concise (e.g., whether or not management properly charged the grievant AWOL for arriving two hours late).

10. Tell what remedy the employee or union states is necessary to resolve the grievance at Step 1. (For example: Grant grievant 2 hours of annual leave and destroy all records of the AWOL charge.) Do not use phrases such as "Make the grievant whole." Indicate any settlement offers made by either party at Step 1.

11. Self-explanatory.

12. This is one of the more important items. Complete it giving a clear, concise explanation as to how and why the decision referenced in Item 11 was determined. (For example: This is the sixth tardiness for the grievant in this month and no evidence was presented which justified the tardiness; therefore, the AWOL charge was appropriate.)

*EX-12- 17 of 22*

Note: You must complete Items 13-20 if grievance is denied.

13a-e. Give detailed information as to the level, step, tour, section, and pay location of the grievant at the time the grievance was filed.

14. Give grievant's date of seniority that is applicable to this grievance.

15. Tell whether grievant is a full-time regular (FTR), part-time regular (PTR), part-time flexible (PTF), or rural carrier. If the grievant is a rural carrier, include the employee's designation code.

16. Self-explanatory.

17. Include tour and grievant's schedule.

18. Give detailed statement of the background of the grievance. All local memoranda of understanding, documents, or other related information must be attached to this form.

19. Give a concise, descriptive statement of management's position. Cite all contractual provisions (article number and section only--do not recopy the contract) or postal regulations, bulletins, or directives (include specific date, section, part, etc.; e.g., ELM 431.2) that are relied on by management at Step 1.

20. Give a concise, descriptive statement of the union's position. If necessary, for clarification, request from the union representative the position of the union. As in Item 19 above, cite all contractual provisions, regulations, bulletins, or directives that are relied on by the union at Step 1.

21a. Give name and title of management official completing this form.

21b-21c. Self-explanatory.

## C. Grievance Summary - Step 2

Form 2609 is used to efficiently consolidate all information provided by either management or the union at Step 2. It is imperative that a legible copy of all forms and documents cited by either the union or management be attached to the summary. Do not assume that management at a higher step of the grievance procedure will have access to any of your information. You must type or print legibly when completing the items on this form. You are required to complete all items:

1-4. Self-explanatory.

5. Give name of facility at which grievance is filed (e.g., Anytown Annex, Anytown Branch).

6-7. Self-explanatory.

8. Give name of union official at the Step 2 grievance meeting.

9. Give craft of the grievant (e.g., maintenance, clerk, letter carrier, mail handler, rural carrier).

EX-12 18 of 2

10. See the provisions of the appropriate contract for time limits. If the grievance is denied for untimeliness, explain in Item 14.

11. Make the statement of the issue presented in the grievance descriptive, but concise.

12. Tell what remedy the employee or union states is necessary to resolve the grievance at Step 2. Do not use phrases such as, "Make the grievant whole."

13. Self-explanatory.

14. This is one of the more important items. Complete it in detail, giving a clear, concise explanation as to how and why the decision referenced in Item 13 was determined.

15. Give a detailed statement of the background of the grievance, citing all related contractual provisions (article number and section only--do not recopy the contract) or postal regulations having a bearing on the grievance. All local memoranda of understanding, documents, or other related information must be attached to this form. Outline what information was provided by witnesses at the Step 1 meeting. Although they are not required, you may attach verbatim statements of witnesses, even though an outline of the content of such statements has been made.

16. Give a concise, descriptive statement of management's position. Cite contractual provisions, regulations, bulletins, or directives that are relied on by management at Step 2.

17. Give a concise, descriptive statement of the union's position. If necessary, for clarification, request from the union representative the position of the union. Cite contractual provisions, regulations, bulletins, or directives that are relied on by the union at Step 2.

18. Briefly list settlement offers.

19. Include a copy of all documents, forms, or directives cited above and acknowledge by a check on this list that a copy is included. Do not assume that management at the next Step of the grievance procedure will have access to the information.

20a. Give names and titles of management officials completing this form.

20b-20c. Self-explanatory.

## D. Grievance Summary - Step 3

Form 2610 clarifies whether the grievance is an interpretive issue (specifically, the issue to be appealed or arbitrated) and if settlement may be possible at a higher level. You must type or print legibly. All items must be completed as indicated:

1-4. Self-explanatory.

5. Give name of facility at which grievance is filed.

6-7. Self-explanatory.

EX-12 -C9-2

8. Make the statement of the issue presented in the grievance descriptive, but concise.

9. Tell what the union states is necessary to resolve the grievance at Step 3.

10. Self-explanatory.

11. Give the concise, descriptive statement of management's position at Step 3. Cite contractual provisions, regulations, bulletins, or directives that are relied on by management at Step 3.

12. Give a concise, descriptive statement of the union's position at Step 3. Cite contractual provisions, regulations, bulletins, or directives that are relied on by the union at Step 3.

13. Provide information or contentions not set forth at either Step 1 or Step 2, but entered at Step 3. Cite any contentions withdrawn by the union.

14a. Provide a detailed statement as to why this grievance is or is not considered interpretive in nature by management. If interpretive, tell exactly what the interpretive issue is.

14b. Provide a detailed statement as to why this grievance is or is not considered interpretive in nature by the union. If the union states the grievance is interpretive, tell exactly what the union's interpretive issue is.

15-16. Self-explanatory.

Note: If the basic statistical data at the top of the form is available on a label printout, simply paste the label over the requested data.

EX-12=20 0F 22

# V. Grievance Summary Forms

## A. Purpose

EX-12-21 OF 22

Sick-leave.com :: Family Leave    Cases

Her supervisor asked Bailey to get a letter from her doctor describing her condition and its effect on her overtime work. Bailey's doctor told Southwest that because of Bailey's "current medical problem" he had "placed her on medication whose side effect is sedation as well. She should only be working roughly an eight-hour shift each day." Despite repeated requests, Bailey refused to allow her doctor to give Southwest any more details about her condition or medication and was fired. The court affirmed the district court's grant of summary judgment to the employer since Baily was fired only after repeatedly refusing to comply with a legitimate request from her employer so that it could evaluate her fitness to perform her job.)

**Unlike Seven Other Appeals Courts, 9th Circuit Court Says State May Be Sued Under FMLA**
Hibbs v. Department of Human Resources (9th Cir. 2002) Case No. 99-16321 (In upholding the right of a Nevada state employee to sue the state's Department of Human Resources for violations of the FMLA, the 9th Circuit became the first federal circuit court of appeals to declare that a state agency may be vulnerable to an FMLA suit filed against it by its employee. Seven other federal circuit courts of appeals have held that states are generally protected from such suits by the 11th Amendment to the U.S. Constitution. The 9th Circuit has jurisdiction in Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon and Washington.)

**Collective Bargaining Agreement Does Not Automatically Prevent Employees From Taking FMLA Claims to Court**

Pichon v. Murphy (E.D. La. 2001) Case No. 00-2355 ( an agreement to arbitrate disputes arising between the union or an aggrieved employee and the employer does not strip an employee of his right to bring statutory claims in a federal forum, unless the employee has clearly and unmistakably waived the right to sue for violation of the FMLA in a court of law.)

Bonilla v. Small Assemblies Co. (N.D. Ill 2001) Case No. 99 C 6675 (a union cannot consent to a waiver of an employee's statutory rights by signing a collective bargaining agreement.

**Retaliation &/Or Termination In Violation of Public Policy**

Mora v. Chem-Tronics, Inc. (S.D. Cal. 1998) 16 F. Supp. 2d 1192 (to prove a prima facie case for retaliation in violation of the FMLA, the employee must show that: (1) the employee engaged in an activity protected by the FMLA; (2) the employer knew of this exercise of the employee's rights; (3) the employer thereafter took employment action adverse to the employee; and (4) there existed a causal connection between the protected activity and the adverse employment action.)

Nelson v. United Technologies (1999) 74 Cal. App. 4th 597 (CFRA violation can underlie claim for tortious termination in violation of public policy.)

**Inclusion of FMLA Protected Absences In Employee's Discipline Record May Constitute Violation Of FMLA**

Williams v. Shenango, Inc. (W.D. Pa. 1997) 986 F. Supp. 309 (the very inclusion of an FMLA-protected absence on a discipline record could lead reasonable persons to conclude that the employee was being retaliated against for exercising FMLA rights.)

George v. Associated Stationers (N.D. Ohio 1996) 932 F. Supp. 1012 (FMLA leave cannot be counted under "no fault" attendance policies since, pursuant to the FMLA regulations, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions. If an employee's last "occurrence" is due to a serious health condition within the FMLA, the employer may not terminate the employee based on its absenteeism policy.)

**Proximity of FMLA Leave and Discharge May Be Sufficient To Show FMLA Retaliation**

Maxwell v. GTE Wireless Service Corp. (N.D. Ohio Nov. 21, 2000) Case No.1:99CV541 (an employee who was fired the day after returning from leave to care for his ill son may have been protected by the FMLA and wrongfully discharged. Although the employer claimed the worker was

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.    13

**Employee Benefits**

**563.2 Requirements and Procedures by Type of Separation**

**563.21 Involuntary Separation**

*563.211 Additional Requirements.* An employee who is involuntarily separated from the service (not for cause) may apply for an immediate annuity if the employee meets the general requirements in 563.1 and:

a. Has 20 years of creditable service, including 5 years of creditable civilian service, and is 50 years of age or over; or

b. Has 25 years of creditable service, including 5 years of creditable civilian service, regardless of age.

*563.212 Reduced Annuity.* If the retiring employee is under age 55, the basic life annuity rate is reduced by one-sixth of 1% for each full month (2% a year) that the employee is under age 55.

**563.22 Mandatory Retirement.** Law enforcement officers (e.g., Postal Inspectors) are the only postal employees subject to mandatory retirement because of age. Information on mandatory retirement for these employees can be obtained from the Office of the Chief Postal Inspector, Washington, DC 20260-2100.

**563.23 Disability Retirement**

*563.231 Requirements*

a. *Service.* The employee must have completed at least 5 years of creditable civilian service.

b. *Total Disability.* An employee must, while employed under the CSRS, become totally disabled because of disease or injury, to render useful and efficient service in the position occupied and all vacant positions in the employing agency and commuting area at the same grade or pay level and tenure to which the employee is qualified for reassignment.

c. *Conduct.* The disease or injury which caused the disability must not be the result of vicious habits, intemperance, or willful misconduct on the employee's part within the 5-year period immediately prior to becoming disabled.

*563.232 Additional Information.* For additional information concerning disability retirement under the CSRS, see Handbook EL-506, *Civil Service Disability Retirement.*

**563.3 Deferred Annuity**

An employee is eligible for a deferred annuity at age 62 if the employee:

a. Leaves the CSRS before qualifying for an immediate annuity;

b. Has at least 5 years of creditable civilian service;

c. Has worked at least 1 year under the CSRS within the 2 years immediately preceding the separation on which the deferred annuity is based; and

d. Leaves his or her retirement contributions in the Civil Service Retirement and Disability Fund.

**564 Types of Annuities**

**564.1 Annuity without Survivor Benefits**

This type of annuity provides payments at an unreduced rate during the life of the retiring employee. It does not provide survivor benefits. (See 564.24 for current spouse's consent in the case of a married employee.)

**564.2 Annuity with Survivor Benefits**

**564.21 Annuity to Current and/or Former Spouse(s)**

*564.211 General.* This type of annuity provides a retiring employee with annuity payments at a reduced rate and, upon the annuitant's death, provides the current and/or former spouse(s) with survivor annuity payments. An annuity with full survivor benefits to the current spouse is automatic for a retiring employee who is married at retirement and who does *not* make an election for an annuity without survivor benefits.

*564.212 Current Spouse Eligibility.* To be eligible for a survivor annuity after the death of an annuitant, the current spouse must have been married to the annuitant for at least 9 months or a parent of the annuitant's child. This requirement does not apply if the annuitant's death is accidental.

*564.213 Election of Former Spouse Annuity.* To elect a former spouse annuity, the retiring employee must have been married to the former spouse for at least 9 months.

*564.214 Annuity Limitation.* The total survivor annuity(ies) that can be provided to a current spouse and/or one or more former spouses cannot exceed 55% of the retiring employee's unreduced annuity.

*564.215 Reduction in Employee's Annuity.* The reduction in the retiring employee's annuity is 2 1/2% of any amount up to $3,600, specified as the base for the survivor benefit, plus 10% of any amount over $3,600 so specified.

*564.216 Effective Date.* The survivor annuity(ies) begins on the day after the annuitant's death and ends on the last day of the month preceding the one in which the designated survivor remarries or dies. (See 567.16 for eligibility for continuance of annuity for a designated survivor upon remarriage under age 55.)

**564.22 Annuity to Former Spouse Based on Court Order**

*564.221 General.* OPM must honor a court order/divorce decree that gives (awards or requires a retiring employee to provide) a survivor annuity to a former spouse. A court-ordered former spouse annuity takes precedence over an election to provide a survivor annuity to a current spouse. A retiring employee's annuity will be automatically reduced by OPM to provide a court-ordered former spouse annuity.

*564.222 Current Spouse Election.* If a former spouse is entitled to a court-ordered survivor annuity, the retiring employee must make an election concerning a survivor annuity for the current spouse as if there were no court-ordered former spouse annuity. (See 564.24 for

Exhibit 13
1 of 2

in 562.35. An employee may not receive credit for both civilian service and military service covering the same periods of time.

### 562.34 Service Credit Deposit Required

*562.341 Amount of Deposit.* The deposit for post-1956 military service for CSRS purposes is 7% of basic military pay plus interest. See Handbook EL-504, *Post-1956 Military Service Credit Deposits* for procedures.

*562.342 Charging Interest*

*a. Grace Period.* No interest is charged if a deposit for post-1956 military service was completed by September 30, 1986 or within 3 years after the date the employee was first hired in a position subject to CSRS, if later.

*b. Rate of Interest.* The rate of interest is a variable rate which is compounded annually. The variable rate of interest is determined by the Secretary of the Treasury each calendar year on the basis of the average yield of new investments purchased by the Civil Service Retirement and Disability Fund during the previous year.

### 562.35 Military Retired Pay

*562.351 CSRS Annuity.* The receipt of military retired pay bars the crediting of military service toward CSRS annuity except when:

*a.* The retired pay is awarded because of a disability incurred in combat with an enemy of the United States or caused by an instrument of war and incurred in line of duty during a period of war, or

*b.* The retired pay is granted under 1331 through 1337 of Chapter 67, Title 10, U.S. Code, which pertains to retirement from a reserve component of the armed forces on the basis of service instead of disability.

*c.* The employee waives the retired pay.

*562.352 Waiver Of Military Retired Pay*

*a. General.* An applicant for annuity receiving military retired pay which bars the use of the military service in the computation of a CSRS annuity may elect to give up military retired pay. The military service may then be added to the civilian service in computing the CSRS annuity.

*b. Procedures.* An employee retiring from the Postal Service who decides to waive military retired pay:

*(1)* Notifies the Military Finance Center at least 60 days before the retirement date of the decision to waive military retired pay in order to receive credit for the military service for computing the CSRS annuity. The notice includes: (a) the employee's full name, military rank, and serial number; (b) the desired date that retired pay is to stop (the day before annuity begins); and (c) a request that the Military Finance Center notify OPM of the effective date of the waiver.

*(2)* Attaches a copy of the waiver request to SF 2801, *Application for Immediate Retirement*, so that OPM knows a waiver has been requested. If the retired pay finance center's acknowledgment of the waiver is received before the retirement application is submitted

to OPM (through the Minneapolis PDC), attaches a copy of the Military Finance Center's acknowledgment of the waiver.

**562.36 Additional Information.** For additional information concerning credit for military service and deposits required, see Handbook EL-504, *Post-1956 Military Service Credit Deposits.*

### 562.4 Credit For Unused Sick Leave

**562.41 Eligibility.** Unused sick leave to an employee's credit is used in computing service for annuity purposes if the employee: (a) retires on an immediate annuity or (b) dies leaving a survivor entitled to an annuity.

**562.42 Method Of Computing.** After it is determined that an employee meets the minimum length of service required for retirement, any unused sick leave to the employee's credit is converted to years, months, and days on the basis of a 260-day work year and added to the employee's total service time. (See 562.5.) The employee's high-3 average pay is then determined and annuity is computed.

**562.43 Restrictions.** Credit for unused sick leave is allowable only for annuity purposes. It is not allowable for other purposes in which service creditable for retirement is used as a criterion, such as leave or job retention.

### 562.5 Computing Total Length of Service

Total service on which an annuity is based, including periods of military service and unused sick leave, is counted in full years and months. Any fractional part of a month is not counted.

## 563 Annuities--Requirements and Procedures

### 563.1 General Requirements

**563.11 Conduct.** An annuity may not be paid to any employee who has ever been convicted of an offense involving the national security of the United States.

**563.12 Time.** To be eligible for an annuity an employee must:

*a.* Have a minimum of 5 years of creditable civilian service.

*b.* Complete, within the last 2-year period before separation on which retirement is based, at least 1 year in employment covered by the CSRS, except when an annuity is payable because of total disability.

**563.13 Age and Service.** Employees separated for any reason, except as stated in 563.11, are eligible for optional retirement and an immediate annuity if they meet one of the following combinations of age and service:

*a.* Age 62 with 5 years of creditable civilian service.

*b.* Age 60 with 20 years of creditable service, including 5 years of creditable civilian service.

*c.* Age 55 with 30 years of creditable service, including 5 years of creditable civilian service.

*b.* Periods of separation which total more than 3 days are deducted in computing total creditable service, except in certain instances when injury compensation benefits are received (562.252).

**562.213 Deductions Refunded.**   Service for which retirement deductions have been refunded to the employee is creditable in establishing eligibility for annuity. This service may also be used in computing high-3 average pay (566.25), if appropriate. If redeposit is not made, such service is not included in calculating length of service for annuity computation purposes.

**562.22 Service Covered By Social Security.**   Civilian service covered by Social Security (FICA) is creditable for retirement purposes if such service is followed by employment which is subject to the retirement system.

**562.23 Part-time Employment**

**562.231 Part-time Regular Employees.**   Employees who serve on a part-time basis (non-full-time service with a prearranged regularly scheduled tour of duty) such as 4 hours a day, 5 days a week are allowed full calendar credit for all time elapsing between dates of appointment and separation.

**562.232 Part-time Flexible Employees.**   The service of a part-time flexible schedule employee, including substitute rural carriers, is fully creditable from the date of original appointment to the date of separation. Periods during which the employee was on furlough are creditable only if the periods of absence in the aggregate do not exceed 6 months in any calendar year.

**562.233 Annuity Proration.**   Retirement benefits based on part-time employment performed on or after April 7, 1986 will be reduced by a ratio of part-time hours to the number of hours the employee would have worked had employment been full-time.

**562.24 Intermittent Service.**   With the exception of service as a part-time flexible employee or substitute rural carrier (see 562.23), an employee serving on an intermittent basis (non-full-time service without a prearranged regularly scheduled tour of duty) receives credit, for retirement purposes, for *only* the actual days in a pay status. This type of service includes Rural Carrier Relief, Rural Carrier Associate, and Postmaster Relief Leave Replacement.

**562.25 Special Circumstances**

**562.251 Japanese-American Employee**

*a. Conditions.*   Special retirement credit is granted to employees of Japanese ancestry who meet the following conditions:

*(1)* The employee must have been employed on July 15, 1952 by the federal government in a position covered by the CSRS.

*(2)* At some time during the period from December 7, 1941 to September 3, 1945, by reason of United States Policy or program or to enter the U.S. Armed Forces, the employee must have:

*(a)* Been separated from the federal service, or

*(b)* Lost opportunity for, or been denied, probational appointment from a Civil Service register, or

*(c)* Been denied reinstatement to a position in the federal service.

*b. Creditable Time.*   An employee meeting conditions in 526.251a receives retirement credit for:

*(1)* The period of internment;

*(2)* The period for which loss of opportunity for, or denial of, appointment occurred;

*(3)* The period which resulted from denial of reinstatement; or

*(4)* The period which resulted from separation from the service.

*c. Installation Head Responsibility.*   When, based on documented evidence, an employee is found eligible for such special retirement (and leave) credit, installation heads prepare personnel action forms to adjust personnel and retirement records.

**562.252 Employee Receiving OWCP Benefits**

*a. Employee on Leave Without Pay (LWOP) Status.*   Credit is allowed for the entire period that an employee receives Office of Workers' Compensation Program (OWCP) benefits if the employee is carried on the postal rolls in LWOP status.

*b. Employee Separated from Postal Service.*   Full credit is allowed (without deposit) for all separations during which a former employee was in receipt of OWCP benefits, provided that the employee is later reemployed in the Postal Service (or federal service), and the employee was never approved for disability retirement, or, if approved for disability retirement, the employee returns to work full time.

**562.253 Employee Restored After Erroneous Removal Or Suspension**

*a. Policy.*   An employee whose separation or suspension is determined to have been improper and who is restored retroactively is considered for retirement purposes as having properly been in the service during the intervening period of erroneous separation or suspension.

*b. Determining Retirement Credit:*

*(1)* If restoration is with entitlement to pay, the employee's basic pay over the intervening period is subject to regular retirement deductions and the employee receives credit for the entire period.

*(2)* If restoration is without entitlement to pay, retirement credit is allowed for as much of the intervening period without pay as does not exceed 6 months in any calendar year.

*c. Redeposit Requirement.*   An employee who received a refund of retirement deductions before restoration must redeposit the refund in order to be eligible for any future annuity based on the period covered by the refund.

**562.254 Employee Granted LWOP to Serve in Employee Organizations.**   If an employee is granted LWOP to serve as a full-time officer or employee of an employee organization composed primarily of federal/postal employees, the following action is taken:

30 of 3

Alabama District
Labor Relations/jwt

 **UNITED STATES**
**POSTAL SERVICE**

DATE:       February 25, 2006

SUBJECT:    Notice of Removal

TO:         Shannon T. Butler
            Manual Rack Clerk
            Montgomery P & DC

You are hereby notified that you will be removed from the U. S. Postal Service effective
March 28, 2006.  The reason for this action is:

**Charge: Failure to Maintain a Regular Work Schedule**

Specifically, you have not reported for duty as scheduled on all or part of the following dates:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| 01-30 to 02-08-06 | 64.00 hrs. | USWOP/ULWOP |
| 01-03 to 01-07-06 | 24.00 hrs. | ULWOP/USWOP |
| 12-31-05 | 8.00 hrs. | USWOP |
| 12-28-05 | 8.00 hrs. | USL |
| 12-03-05 | 8.00 hrs. | USWOP |
| 11-29 to 11-30-05 | 16.00 hrs. | USLDC/ULWOP |
| 10-25-05 | 8.00 hrs. | USLDC |
| 09-26 to 09-28-05 | 24.00 hrs. | USL/USWOP |

Your actions are in violation of ELM provisions 511.41, 511.43 and 665.41, which require
employees to maintain their assigned schedule.  Reporting for duty *on time* is a part of
maintaining your assigned schedule.  You are therefore charged accordingly.

**ELM**

511.41    **Definition**

          *Unscheduled absences are any absences from work that are not requested*
          *and approved in advance.*

511.43    **Employee Responsibilities**

          Employees are expected to maintain their assigned schedule and must make
          every effort to avoid unscheduled absences. In addition, employees must
          provide acceptable evidence for absences when required.

*Exhibit 14*

*1 OF 18*



**UNITED STATES**
**POSTAL SERVICE**

September 20, 2005

OUR REF:   G.Evans:M0102:cps

SUBJECT:   Notice of Suspension of Fourteen Days or Less

TO:   Shannon Butler
      PL 101
      Clerk
      Montgomery P&DC

You are hereby notified that you will be suspended for a period of 14 calendar days, beginning on October 15, 2005  You are to return to duty at your regular scheduled reporting time on your first scheduled day following  October 28, 2005.  This suspension will not begin until at least 10 days after you receive this notice.  However, if you decide to file a grievance concerning this notice, the suspension will be held in abeyance until the discipline is either resolved by the parties during the grievance process, or an arbitrator issues a decision.  If a decision is made by the parties or an arbitrator to suspend you, you will then serve the suspension.

**CHARGE: Failure To Maintain A Regular Work Schedule**

A review of your attendance record since July 20, 2005 shows the following absences:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| 07/20-29/2005 | 64.00 hrs. | USWOP |
| 08/05-08/2005 | 24.00 hrs. | USWOP |
| 08/16- 28/2005 | 72..00 hrs. | USWOP |
| 08/31/2005 | 8.00 hrs. | USL |

Your actions are contrary to the Employee and Labor Relations Manual, which states in part as follows:

Part 511.41 – Unscheduled absences are any absences from work which are not requested and approved in advance.

Part 511.43 – Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.

Part 666.81 – Employees are required to be regular in attendance.

In addition, the following prior elements have been considered in making this decision:

▪ 06/14/2005   Letter of Warning –Failure to Maintain a Regular Work Schedule.

▪ 07/30/2005   7-Day Suspension

You have the right to file a grievance under the Grievance-Arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of this notice.

Glenn C. Evans
Supervisor, Distribution Operations

RECEIVED ORIGINAL ON _____    _____    _____    Exhibit 14
                        DATE      TIME      SIGNATURE    Page 2 of 18

- 1 -

Page 2, Notice of Removal
Butler, Shannon T.

665.4   **Attendance**

665.41  **Requirement of Regular Attendance**

Employees are required to be regular in attendance. Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service.

A review of your past disciplinary record reveals the following:

- 09-20-05   14-Calendar Day Suspension for Failure to Maintain a Regular Work Schedule
- 07-30-05   7-Calendar Day Suspension for Failure to Maintain a Regular Work Schedule
- 05-14-05   Letter of Warning for Failure to Maintain a Regular Work Schedule

You have the right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within fourteen (14) calendar days of your receipt of this notice.

If this action is reversed or modified on appeal, back pay may be allowed unless the award or decision specifies otherwise and **only if you made reasonable efforts to obtain alternate employment during the potential back pay period.** The documentation which you must maintain and present to support a back pay claim is described in Subchapter 436 of the Employee and Labor Relations Manual.


*Glen C. Evans* 2-25-06 15:10

Glen C. Evans
Supervisor Distribution Operations


Received by

Date: 8/08/05

Time: 8:40

Exhibit 14
Page 3 of 18


**UNITED STATES**
**POSTAL SERVICE**

July 30, 2005

OUR REF:   W.Powell:M0082:cps

SUBJECT:   Notice of Suspension of Fourteen Days or Less

TO:        Shannon Butler
           ██████████ / PL 263
           Clerk
           Montgomery P&DC

You are hereby notified that you will be suspended for a period of 7 calendar days, beginning on August 20, 2005  You are to return to duty at your regular scheduled reporting time on your first scheduled day following  August 26, 2005.  This suspension will not begin until at least 10 days after you receive this notice.   However, if you decide to file a grievance concerning this notice, the suspension will be held in abeyance until the discipline is either resolved by the parties during the grievance process, or an arbitrator issues a decision.   If a decision is made by the parties or an arbitrator to suspend you, you will then serve the suspension.

**CHARGE:  Failure To Maintain A Regular Work Schedule**

A review of your attendance record since May 12, 2005 shows the following absences:

| DATE | AMOUNT | REASON |
|---|---|---|
| 05/12-6/10/05 | 176.00 hrs | USWOP |
| 06/15-29/05 | 88.00 hrs. | USWOP |
| 07/9-10/05 | 16.00 hrs. | AWOL |
| 07/13-15/05 | 24.00 hrs. | USWOP |

Your actions are contrary to the Employee and Labor Relations Manual, which states in part as follows:

Part 511.41 – Unscheduled absences are any absences from work which are not requested and approved in advance.

Part 511.43 – Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.

Part 666.81 – Employees are required to be regular in attendance.

In addition, the following prior elements have been considered in making this decision:

- 05/14/05  Letter of Warning –Failure to Maintain a Regular Work Schedule.

You have the right to file a grievance under the Grievance-Arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of this notice.

*Wm. R. Powell*

William R. Powell
Supervisor, Distribution Operations

RECEIVED ORIGINAL ON 7/30/05  1;30  [signature]
                       DATE   TIME   SIGNATURE

Exhibit 44
Page 4 of 18

- 1 -


**UNITED STATES**
**POSTAL SERVICE**

CERTIFIED# 7002 2030 0005 9744 2513
DELIVERY CONFIRMATION # 0304 1560 0003 9998 1543
**FIRST CLASS**

May 13, 2005

OUR REF:      WPowell:M0047:fj

SUBJECT:     Letter of Warning

TO:            Shannon Butler
               ▬▬▬▬▬/ PL 263
               Clerk
               Montgomery P&DC

Sent First Class Restricted Delivery/ Certified/ Returned Receipt Requested/ Delivery Confirmation

In accordance with Article 16, Section 3 of the Collective Bargaining Agreement, this Official Letter of Warning is being issued to you for the following reason(s):

**CHARGE:  FAILURE TO MAINTAIN A REGULAR WORK SCHEDULE**

A review of your attendance record since February 16, 2005 shows the following unscheduled absences:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| 02/16/05 | 8.00 | LWOP |
| 02/23-03/23/05 | 168.0 | SL/SAL/LWOP/SWOP |
| 04/01-17/05 | 104.0 | LWOP/SWOP |
| 04/24-05/08/05 | 88.00 | SWOP |

Your actions are contrary to the Employee and Labor Relations Manual, which states in part as follows:

**Part 511.41** - Unscheduled absences are any absences from work which are not requested and approved in advance.

**Part 511.43** - Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.

**Part 665.41** - Employees are required to be regular in attendance.  Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service.

This Letter of Warning is directed to you for the express purpose of warning you that there is a serious deficiency in your employment record with respect to your dependability.  You were further warned that there must be immediate, substantial and continued improvement in your attendance; otherwise, you will meet with more severe disciplinary action up to and including removal from the Postal Service.  I am read to assist you in any possible way to improve in this area, and you should not hesitate to contact me regarding such matters if the need arises in the future.  It is sincerely hoped that this Letter of Warning w be sufficient and that you will overcome your deficiency immediately.      Exhibit ⟋⟋
                                                                                    Page ⟋ of ⟋⟍

**U.S. Postal Service**
**Absence Analysis**

Employee's Name: BUTLER, SHANNON T.

Employee ID: ▮▮▮423

Pay Location: 263-MONTGOMERY AFSM TOUR 2

Leave Year 2005

*Instructions*

Using the codes below, and the hours involved, post current and previous quarters. Precede with letter 'F' when absence is recorded as Family Medical Leave Act (FMLA) and with 'U' when absence is recorded as unscheduled on Form 3971. Post additional quarters if circumstances warrant. This form may also be used on an ongoing basis. On the reverse of this form, the employee's supervisor records attendance-related actions; e.g., review of attendance, commendations, restricted sick leave, Letters of Warning, suspensions, etc. A running total of FMLA hours used may be kept on the reverse side of this form.

| | | | |
|---|---|---|---|
| Absent from Schedule OT | AOT* | Emergency AL | EAL* | Sick Leave | SL |
| Absent Without Leave | AWOL* | Family Medical Leave Act | F | Sick Leave/Dependent Care | SLDC |
| Annual Leave | AL | Holiday Leave | H | | |
| Annual Leave in Lieu of SL | SAL* | Late Reporting | L* | | |
| Administrative Leave | ADL | Leave Without Pay | LWOP | *Note: These are not separate leave | |
| Continuation of Pay | COP | LWOP in Lieu of SL | SWOP* | categories, but a distinction is made for | |
| Court Leave | CL | Military Leave | ML | the purpose of analysis.* | |

| Pay Period | | | | Week 1 | | | | | | | Week 2 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

PS Form 3972, October 2000 (Page 1 of 2)

Exhibit 14
Page 6 of 18

**Note:** The Minneapolis DDE System (Under D385) provides employees' hire date, work hours in the last 12 months, and current leave balances, including FMLA and sick leave for dependent care.

BUTLER, SHANNON T.
*(Employee's Name)*

| Pay Period | | | | Week 1 | | | | | | | Week 2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | From | To | Sat | Sun | Mon | Tue | Wed | Thur | Fri | Sat | Sun | Mon | Tue | Wed | Thur | Fri |
| 17 | AUG.06 | AUG.19 | 06 LWOP-8 | 07 LWOP-8 | 08 LWOP-8 | 09 | 10 | 11 | 12 | 13 | 14 | 15 LWOP-8 | 16 LWOP-8 | 17 | 18 | 19 |
| 18 | AUG.20 | SEP.02 | 20 LWOP-8 | 21 LWOP-8 | 22 | 23 | 24 | 25 | 26 | 27 LWOP-8 | 28 | 29 | 30 | 31 SL-X | 01 SDO | 02 |
| 19 | SEP.03 | SEP.16 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 20 | SEP.17 | SEP.30 | 17 | 18 | 19 | 20 | 21 SDO | 22 | 23 | 24 LWOP-3.5 | 25 SL-X | 26 LWOP-8 | 27 LWOP-8 | 28 SDO | 29 | 30 |
| 21 | OCT.01 | OCT.14 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 LL-X | 09 | 10 | 11 | 12 | 13 | 14 |
| 22 | OCT.15 | OCT.28 | 15 | 16 SDO | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 LWOX-X | 26 | 27 | 28 |
| 23 | OCT.29 | NOV.11 | 29 | 30 | 31 | 01 | 02 | 03 SDO | 04 | 05 | 06 | 07 | 08 LL-X | 09 | 10 | 11 |
| 24 | NOV.12 | NOV.25 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 LWOP-X7 | 20 | 21 | 22 LL-X | 23 | 24 | 25 |
| 25 | NOV.26 | DEC.09 | 26 | 27 | 28 SLDC-X | 29 LWOP-4 SLDC-4 | 30 | 01 | 02 | 03 LWOP-X | 04 | 05 | 06 | 07 | 08 SDO | 09 |
| 6 | DEC.10 | DEC.23 | 10 SDO | 11 | 12 | 13 SDO | 14 | 15 SDO | 16 | 17 | 18 | 19 | 20 SDO | 21 | 22 | 23 |
| 1 | DEC.24 | JAN.06 | 24 LL-X | 25 | 26 | 27 SL-X | 28 | 29 | 30 | 31 | 01 LWOP-X | LL-X | LWOP-1.5 | LWOP-8 | LWOP-X | SDO | 06 |

| Attendance Related Actions & Dates (See Instructions) | Reviewing Supervisor's Comments, Signature & Date |
|---|---|
| | Jan. |
| | Feb. |
| | March |
| | April |
| | May |
| | June |
| | July |
| | Aug. |
| | Sept. |
| | Oct. |
| | Nov. |
| | Dec. |

PS Form 3972, October 2000 (Page 2 of 2)



PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO. 14

Exhibit 14
Page 7 of 18



**UNITED STATES POSTAL SERVICE**

September 1, 2005

OUR REF:     C.Harris:M0091:cps

SUBJECT:     Letter of Warning

TO:          Patrick G. Roberts
             ███████ / PL 221
             Clerk
             Montgomery, AL P&DC

This Letter of Warning is being issued to you for the following reason:

**CHARGE:  FAILURE TO MAINTAIN A REGULAR WORK SCHEDULE**

A review of your attendance record since May 10, 2005 shows the following unscheduled absences:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| 05/10-12/05 | 24.00 hrs. | USWOP |
| 05/31-6/2/05 | 24.00 hrs. | UL |
| 06/11-15/05 | 24.00 hrs. | USWOP |
| 06/17-18/05 | 16.00 hrs. | USWOP |
| 06/23-25/05 | 24.00 hrs. | UL |
| 07/09/05 | 08.00 hrs. | UL |
| 07/28/05 | 02.00 hrs. | AOT |
| 07/29/05 | 08.00 hrs. | UL |

Your actions are contrary to the Employee and Labor Relations Manual, which states in part as follows:

Part 511.41 - Unscheduled absences are any absences from work which are not requested and approved in advance.

Part 511.43 - Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.

Part 665.41 - Employees are required to be regular in attendance. Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service. You have the right to file a grievance under the Grievance/Arbitration procedure set forth in Article 15, Section 2 of the National Agreement within 14 days of your receipt of this notice.

*Charlie Harris*
Charlie Harris
Manager, Distribution Operations

Exhibit 14
Page 2 of 18

RECEIVED ORIGINAL ON: **9-1-05** / **1445** / *Patrick G Roberts*
                       DATE      TIME        SIGNATURE

-1-

Shannon Butler                                                    2
Letter of Warning

You have the right to file a grievance under the Grievance/Arbitration procedure set forth in Article 15,
Section 2 of the National Agreement within 14 days of your receipt of this notice.


William Powell
Supervisor, Distribution Operations

RECEIVED ORIGINAL ON: _____/_____/_____
                              DATE         TIME         SIGNATURE

Exhibit _____
Page ___ of __


**UNITED STATES**
**POSTAL SERVICE**

October 21, 2005

OUR REF:    C.Harris:M0111:glj

SUBJECT:    Letter of Warning

TO:    Patrick G. Roberts
███████████ B / PL 221
SPBS Clerk
Montgomery P&DC

In accordance with Article 16, Section 3 of the Collective Bargaining Agreement, this Official Letter of Warning is being issued to you for the following reason(s):

**CHARGE:  Failure To Maintain A Regular Work Schedule**

A review of your attendance record since September 20th, 2005 shows the following unscheduled absences:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| 09/20/05 | 8.00HR | SICK |
| 09/30/05 | 8.00HR | ULWOP |
| 10/01-04/05 | 16.00HR | SICK |
| 10/12/05 | 3.00HR | SICK |

Your actions are contrary to the Employee and Labor Relations Manual, which states in part as follows:

Part 511.41 – Unscheduled absences are any absences from work which are not requested and approved in advance.

Part 511.43 – Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.

Part 666.81 – Employees are required to be regular in attendance.

You are required to be regular in attendance and have failed to be so. You are therefore charged accordingly.

This Letter of Warning is directed to you for the express purpose of warning you there is a serious deficiency in your employment record with respect to your regular attendance. You are further warned there must be immediate, substantial, and continued improvement in your attendance; otherwise, you

- 1 -

Exhibit *14*
Page *10* of *18*


**UNITED STATES**
**POSTAL SERVICE**

December _28_, 2005

OUR REF:    J.Walton:05562:glj

SUBJECT:    Notice of Suspension of Fourteen Days or Less

TO:    Patrick G. Roberts
▆▆▆▆▆▆▆/PL221
SPBS Clerk
Montgomery P&DC

You are hereby notified that you will be suspended for a period of 7 calendar days. This suspension will he held in abeyance pending the final disposition of a grievance, if filed timely.

## CHARGE:  FAILURE TO MAINTAIN REGULAR WORK SCHEDULE

A review of your attendance record reveals you are failing to maintain a regular work schedule. In view of this, it has been determined that you are lacking in dependability. You have had unscheduled absences on all or a portion of the following different work dates:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| *10/21-26/05 | 32.00 HR | SL/LWOP |
| *10/29/05 | 8.00 HR | SL/LWOP |
| *11/08-10/05 | 24.00 HR | LWOP |
| *11/17-19/05 | 24.00 HR | LWOP |
| 12/07-08/05 | 16.00 HR | SL/LWOP |
| *12/13-17/05 | 40.00 HR | SL/LWOP |

*Denotes unscheduled leave taken in conjunction with off days and/or holidays.

In addition, the following listed element(s) were considered prior to rendering this decision:

➢ 10/27/05 – LOW – Failure to Maintain Regular Work Schedule

Exhibit _14_
Page _11_ of _18_

1

This action is taken to impress on you that you must correct your work deficiencies and demonstrate adherence to postal regulations. Failure to meet the above stated or other legitimate work expectations may result in further discipline, up to and including removal from the Postal Service.

You have the right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within fourteen (14) calendar days of your receipt of this notice.

**If you file a timely grievance prior to the effective date of this suspension, the suspension will not be served until disposition of the grievance either by settlement or an arbitrator's final and binding decision.**

Jeffrey S. Walton
Supervisor,
Distribution Operations


RECEIVED ORIGINAL ON _12-28-05_ / _0800_ / _Patrick W. Robinson_
                                    DATE         TIME              SIGNATURE

Exhibit _14_
Page _12_ of _18_

2

Jul 03 06 02:31p      FMLA CoordinatorUSPS      334 244 7668      p.10

| U.S. Postal Service **Absence Analysis** | Employee's Name : ROBERTS, PATRICK G. | Employee ID 3373 | Pay Location 221-MONTGOMERY SPBS TOUR 2 |

Leave Year 2005

*Instructions*

Using the codes below, and the hours involved, post current and previous quarters. Precede with letter 'F' when absence is recorded as Family Medical Leave Act (FMLA) and with 'U' when absence is recorded as unscheduled on Form 3971. Post additional quarters if circumstances warrant. This form may also be used on an ongoing basis. On the reverse of this form, the employee's supervisor records attendance-related actions; e.g., review of attendance, commendations, restricted sick leave, Letters of Warning, suspensions, etc. A running total of FMLA hours used may be kept on the reverse side of this form.

| | | | |
|---|---|---|---|
| Absent from Schedule OT | AOT* | Emergency AL | EAL* |
| Absent Without Leave | AWOL* | Family Medical Leave Act | F |
| Annual Leave | AL | Holiday Leave | H |
| Annual Leave in Lieu of SL | SAL* | Late Reporting | L* |
| Administrative Leave | ADL | Leave Without Pay | LWOP |
| Continuation of Pay | COP | LWOP in Lieu of SL | SWOP* |
| Court Leave | CL | Military Leave | ML |

Sick Leave SL
Sick Leave/Dependent Care SLDC

*Note: These are not separate leave categories, but a distinction is made for the purpose of analysis.*



PS Form 3972, October 2000 (Page 1 of 2)

Exhibit 18
Page 13 of 18

**Note:** The Minneapolis DDE System (Under D385) provides employees' hire date, work hours in the last 12 months, and current leave balances, including FMLA and sick leave for dependent care.

ROBERTS, PATRICK G.
*(Employee's Name)*

|  |  |  |  | Week 1 |  |  |  |  |  |  | Week 2 |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pay Period** | | | Sat | Sun | Mon | Tue | Wed | Thur | Fri | Sat | Sun | Mon | Tue | Wed | Thur | Fri |
| No. | From | To | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 17 | AUG.06 | AUG.19 | LWOP-X SDO | SDO | | LWOP-3.94 | LWOP-4 SL-X | 11 | LWOP-X | SDO | | LWOP-2.75 | LWOP-2.96 | LWOP-1.67 | |
| 18 | AUG.20 | SEP.02 | LWOP-2.95 20 SDO | 21 | 22 | 23 | LWOP-2.92 24 | LWOP-2.97 25 | 26 | LW.WOP-X 27 | 28 SDO | 29 | 30 LWOP-X | 31 LWOP-X | 01 | 02 |
| 19 | SEP.03 | SEP.16 | SL-X 03 | 04 SDO | 05 | 06 | 07 | 08 | LSL-X 09 | 10 | 11 | 12 | LSL.WOP-X 13 LSL-4 | 14 | 15 | 16 |
| 20 | SEP.17 | SEP.30 | 17 SDO | 18 | 19 LWOP-X | 20 | 21 LWOP-X | 22 | LWOP-3 23 | 24 SDO | | 25 | 26 LWOP-2.1 | 27 LWOP-3 | 28 LWOP-X | 29 LW.WOP-X | 30 |
| 21 | OCT.01 | OCT.14 | LSWOP-X 01 | 02 SDO | 03 | 04 LSWOP-X | 05 LWOP-X | 06 | 07 | 08 SDO | 09 | 10 | 11 LWOP-1.1 | 12 LWOP-X | 13 | 14 |
| 22 | OCT.15 | OCT.28 | 15 SDO | 16 | 17 | 18 LSL.WOP-6.39 | 19 | LSWOP-X 20 | 21 | 22 | 23 SDO | 24 LSWOP-X | 25 LWOP-4 | 26 LSWOP-4 | 27 | 28 |
| 23 | OCT.29 | NOV.11 | LSL-4 29 LSWOP-X | 30 SDO | 31 | 01 | LWOP-4 02 | 03 | 04 | 05 SDO | 06 | 07 LWOP-X | 08 LWOP-X | 09 LSWOP-X | 10 | 11 |
| 24 | NOV.12 | NOV.25 | 12 SDO | 13 | 14 | 15 | 16 LSWOP-X | 17 LSWOP-X | LSWOP-X 18 | 19 SDO | 20 | 21 LWOP-1.96 | 22 LWOP-3.43 | 23 | 24 | 25 |
| 25 | NOV.26 | DEC.09 | 26 SDO | 27 | 28 | 29 LWOP-2.73 | 30 | LWOP-2.71 01 | LWOP-2.93 02 | 03 | 04 SDO | 05 | LSL-4 06 LSWOP-4 | 07 | 08 | 09 |
| 26 | DEC.10 | DEC.23 | LWOP-X 10 SDO | 11 | 12 LSL-4 LSWOP-X | 13 LWOP-X | 14 LWOP-3 | LSWOP-X 15 | 16 LSWOP-X | 17 | 18 SDO | 19 | 20 | 21 | 22 LSL-4 LSWOP-X | 23 |
| 1 | DEC.24 | JAN.06 | SL-X 24 SDO | 25 | 26 LSWOP-X | 27 | 28 LWOP-X | 29 | 30 | 31 | 01 SDO | 02 | 03 | 04 | 05 | 06 |

| Attendance Related Actions & Dates (See Instructions) | Reviewing Supervisor's Comments, Signature & Date |
|---|---|
| | Jan. |
| | Feb. |
| | March |
| | April |
| | May |
| | June |
| | July |
| | Aug. |
| | Sept. |
| | Oct. |
| | Nov. |
| | Dec. |

PS Form 3972, October 2000 (Page 2 of 2)

Exhibit 14
Page 14 of 18


**UNITED STATES**
**POSTAL SERVICE**

October 22, 2005

OUR REF:    C.Harris:M0110:cps

SUBJECT:    Letter of Warning

TO:         Mark A. Chriske
            ▮▮▮▮▮▮▮ / PL 211
            Mail Handler
            Montgomery P&DC

In accordance with Article 16, Section 3 of the Collective Bargaining Agreement, this Official Letter of Warning is being issued to you for the following reason(s):

## CHARGE 1: FAILURE TO MAINTAIN A REGULAR WORK SCHEDULE/AWOL

A review of your attendance record since September 9, 2005 shows the following unscheduled absences:

| DATE | AMOUNT | REASON |
|------|--------|--------|
| 09/09/2005 | 4.07 | ULWOP |
| 09/17/2005 | 24.00 | ULWOP |
| 09/16/2005 | 8.00 | ULWOP |
| 10/01/2005 | 8.00 | AWOL |
| 10/02/2005 | 8.00 | AWOL |
| 10/3-4/2005 | 16.00 | ULWOP |

Your actions are contrary to the Employee and Labor Relations Manual, which states in part as follows:

Part 511.41 - Unscheduled absences are any absences from work which are not requested and approved in advance.

Part 511.43 - Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.

Part 665.41 - Employees are required to be regular in attendance. Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service.

You are required to be regular in attendance. You failed to be so and you are, therefore, charged accordingly.

## CHARGE 2: FAILURE TO FOLLOW INSTRUCTIONS

Your assigned work schedule is on Tour 2. On October 3, 2005, you called the Tour 3 supervisor and informed him that you would not be reporting to work on October 4, 2005. You have been previously instructed of the proper procedures of calling the IVR system at 1.877.477.3273 in order to report an unscheduled absence. However on the dates in question, you failed to do so; and you are therefore, charged accordingly.

Exhibit 14
Page 15 of 17

-1-

Mark Chriske
LOW

This Letter of Warning is directed to you for the express purpose of warning you that there is a serious deficiency in your employment record with respect to your dependability. You are further warned that there must be immediate, substantial and continued improvement in your attendance; otherwise, you will meet with more severe disciplinary action up to and including removal from the Postal Service. I am ready to assist you in any possible way to improve in this area, and you should not hesitate to contact me regarding such matters if the need arises in the future. It is sincerely hoped that this Letter of Warning will be sufficient and that you will overcome your deficiency immediately.

You have the right to file a grievance under the Grievance/Arbitration procedure set forth in Article 15, Section 2 of the National Agreement within 14 days of your receipt of this notice.

C. W. Harris, Manager

RECEIVED ORIGINAL ON: _10 - 22 - 05_ / _11:05_ / _Mal Q ll_
                            DATE        TIME        SIGNATURE

Exhibit _14_
Page _16_ of _19_

-2-

Jul 03 06 02:30p   FMLA CoordinatorUSPS   334 244 7668   p.6

| U.S. Postal Service | Employee's Name | Employee ID | Pay Location |
|---|---|---|---|
| **Absence Analysis** | CHRISKE, MARK A. | 331 | 211-MONTGOMERY MAILHANDLER |

Leave Year  2005   *Instructions*

Using the codes below, and the hours involved, post current and previous quarters. Precede with letter 'F' when absence is recorded as Family
Medical Leave Act (FMLA) and with 'U' when absence is recorded as unscheduled on Form 3971. Post additional quarters if circumstances warrant.
This form may also be used on an ongoing basis. On the reverse of this form, the employee's supervisor records attendance-related actions; e.g.,
review of attendance, commendations, restricted sick leave, Letters of Warning, suspensions, etc. A running total of FMLA hours used may be kept
on the reverse side of this form.

| | | | | | |
|---|---|---|---|---|---|
| Absent from Schedule OT | AOT* | Emergency AL | EAL* | Sick Leave | SL |
| Absent Without Leave | AWOL* | Family Medical Leave Act | F | Sick Leave/Dependent Care | SLDC |
| Annual Leave | AL | Holiday Leave | H | | |
| Annual Leave in Lieu of SL | SAL* | Late Reporting | L* | | |
| Administrative Leave | ADL | Leave Without Pay | LWOP | *Note: These are not separate leave | |
| Continuation of Pay | COP | LWOP in Lieu of SL | SWOP* | categories, but a distinction is made for | |
| Court Leave | CL | Military Leave | ML | the purpose of analysis.* | |

| Pay Period | | | Week 1 | | | | | | | Week 2 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | From | To | Sat 08 | Sun 09 | Mon 10 | Tue 11 | Wed 12 | Thur 13 | Fri 14 | Sat 15 | Sun 16 | Mon 17 | Tue 18 | Wed 19 | Thur 20 | Fri 21 |
| 2 | JAN.08 | JAN.21 | | | | AL-2.55 | | | | | HOL-AL-8 | SDO | SDO | SDO | | |
| 3 | JAN.22 | FEB.04 | 22 | 23 | 24 | 25 | 28 | 28 | 30 | 31 | 01 | 02 | 03 | 04 |
| 4 | FEB.05 | FEB.18 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 ISL-8 | 18 |
| 5 | FEB.19 | MAR.04 | 19 SL-8 | 20 | 21 HOL-AL-8 | 22 AL-7.49 | 23 | 24 | 26 | 28 | 27 | 28 | 01 SIXI | 02 | 03 | 04 |
| 6 | MAR.05 | MAR.18 | 05 | 06 | 07 | 08 | 09 | 10 AL-8 | 11 AL-8 | 12 AL-8 | 13 ISL-8 | 14 SL-8 | 15 | 16 | 17 ISL-8 | 18 |
| 7 | MAR.19 | APR.01 | 19 AL-8 | 20 AL-8 | 21 AL-8 | 22 | 23 | 24 AL-8 | 26 | 26 AL-8 | 27 AL-8 | 28 AL-8 | 29 SDO | 30 SDO | 31 SDO | 01 |
| 8 | APR.02 | APR.15 | 02 AL-8 | 03 | 04 | 05 | 06 | 07 | 08 | 09 AL-8 | 10 AL-8 | 11 AL-8 | 12 | 13 | 14 ISL-8 | 15 |
| 9 | APR.16 | APR.29 | 18 DAL-8 AL-6 | 17 FLWOP-8 | 18 FLWOP-8 | 19 SDO | 20 SDO | 21 FLWOP-8 | 23 | 24 USWOP-8 | 25 SWOP-8 | 26 SDO | 27 SDO | 28 SDO | 29 |
| 10 | APR.30 | MAY.13 | 30 | 01 | 02 FISL-AI | 03 SDO | 05 | 06 | 07 SWOP-8 | 08 SL-8 | 10 | 11 | 12 | 13 |
| 11 | MAY.14 | MAY.27 | 14 | 15 | 16 FISL-AI | 17 SDO | 18 SDO | 19 | 20 FSWOP-8 | 21 FSWOP-8 | 22 FSWOP-8 | 23 SDO | 24 SDO | 26 | 26 FSWOP-8 |
| 12 | MAY.28 | JUN.10 | 28 FSWOP-8 | 29 FLWOP-8 | 30 HOL-AL-8 | 31 SL-1.5 | 01 | 02 FSL-WOP-8 | 03 FLWOP-8 | 04 FLWOP-8 | 05 | 06 | 07 | 08 | 10 FLWOP-8 |
| 13 | JUN.11 | JUN.24 | 11 FL-WOP-8 | 12 | 13 | 14 | 15 SL-.35 | 16 | 17 SDO | 19 | 20 | 21 | 22 | 23 FLWOP-8 | 24 |
| 14 | JUN.25 | JUL.08 | 25 FLWOP-8 | 26 FLWOP-8 | 27 FSWOP-8 | 28 FSWOP-8 | 29 | 30 | 01 | 02 | 03 FL-8 | 04 | 05 | 06 | 07 | 08 FLWOP-8 |
| 15 | JUL.09 | JUL.22 | 09 FLWOP-8 | 10 FLWOP-8 | 11 | 12 FLWOP-8 | 13 SDO | 14 | 15 FLWOP-8 | 16 FLWOP-8 | 17 FLWOP-8 | 18 | 19 SDO | 20 | 21 | 22 |
| 16 | JUL.23 | AUG.05 | 23 | 24 | 25 SL-8 | 26 | 27 SDO | 28 FLWOP-8 | 30 | 31 | 01 | 02 SDO | 03 SDO | 04 FLWOP-8 | 05 |

PS Form 3972, October 2000 (Page 1 of 2)

Exhibit 14
Page 10 of 18

**Note:** The Minneapolis DDE System (Under D385) provides employees' hire date, work hours in the last 12 months, and current leave balances, including FMLA and sick leave for dependent care.

CHRISKE, MARK A.
*(Employee's Name)*

| Pay Period | | | | Week 1 | | | | | | Week 2 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. | From | To | Sat | Sun | Mon | Tue | Wed | Thur | Fri | Sat | Sun | Mon | Tue | Wed | Thur | Fri |
| 17 | AUG.06 | AUG.10 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 18 | AUG.20 | SEP.02 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 01 | 02 |
| 19 | SEP.03 | SEP.16 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 20 | SEP.17 | SEP.30 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 21 | OCT.01 | OCT.14 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 |
| 22 | OCT.15 | OCT.28 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 23 | OCT.29 | NOV.11 | 29 | 30 | 31 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
| 24 | NOV.12 | NOV.25 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 25 | NOV.26 | DEC.09 | 26 | 27 | 28 | 29 | 30 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 |
| 26 | DEC.10 | DEC.23 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 1 | DEC.24 | JAN.06 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 01 | 02 | 03 | 04 | 05 | 06 |

| Attendance Related Actions & Dates (See Instructions) | Reviewing Supervisor's Comments, Signature & Date |
|---|---|
| | Jan. |
| | Feb. |
| | March |
| | April |
| | May |
| | June |
| | July |
| | Aug. |
| | Sept. |
| | Oct. |
| | Nov. |
| | Dec. |

PS Form 3972, October 2000 (Page 2 of 2)

Exhibit 14
Page 13 of 18


**UNITED STATES POSTAL SERVICE ®**

| | | |
|---|---|---|
| Report: | TAC500R3 | |
| YrPPWk: | 2005-21-1 | |
| Fin. #: | 01-5631 | |

Restricted USPS T&A Information
MONTGOMERY P&DC
Employee Everything Report
Weekly

| | |
|---|---|
| User ID: | VHD1MB |
| Date: | 12/20/05 |
| Time: | 11:39 AM |
| Page: | 1 |

YrPPWk: 2005-21-1
Sub-Unit: 0000

| | | | | | |
|---|---|---|---|---|---|
| Pay Loc/Fin. Unit | 211 / 0000 | | Variable EAS | N | Annual Lv Bal. | 413.73 | FMLA Hrs | 2481.24 |
| Employee ID | XXX-XX-4124 | | Borrowed | N | Sick Lv Bal. | 1007.30 | FMLA Used | 00.00 |
| Employee Name | BROWDER JR | B  B | Auto H/L | N | LWOP Lv Bal. | 28.64 | SLDC Used | 00.00 |

| Job | D/A | LDC | Oper/Lu | RSC | Lvl | FLSA | Route # | Fin. # | Loaned Fin. # | Effective Start | Effective End | Begin Tour | End Tour | Lunch Amt. | 1261 Ind. | Schedule |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | 12-0 | 1700 | 2300-00 | MO | 05 | N | | 01-5631 | | 2005-21-1 | 2005-21-1 | 05.50 | 14.00 | 0.50 | N | S–TWTF |

**Processed Clock Rings**

**Saturday**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | | | 05200: 011.73 | | 05300: 003.73 | | 05400: 004.06 | | | | | |
| EBR # | | | | | | | | | | | | |
| 000-0000 | OT | 10/01 | 01.94 | 01-5631 | 2300-00 | 000000 | 04.00 | XXX-XX-5790 | 10/04 | 03.43 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | BT | 10/01 | 01.94 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | (W)NonScheduled Begin Tour |
| | | | | | | | | | | 00.00 | |
| 100-0108 | OL | 10/01 | 13.04 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | IL | 10/01 | 13.50 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | ET | 10/01 | 14.13 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | (W)NonScheduled End Tour |
| | | | | | | | | | | 00.00 | |

**Tuesday**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | | | 05200: 007.85 | | 05400: 000.35 | | 05509: 000.15 | | | | | |
| EBR # | | | | | | | | | | | | |
| 888-8888 | 05509 | 10/04 | 05.50 | 01-5631 | 2300-00 | 000000 | 00.15 | XXX-XX-5790 | 10/04 | 07.02 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | BT | 10/04 | 05.65 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | (W)NonScheduled Begin Tour |
| | | | | | | | | | | 00.00 | |
| 100-0108 | OL | 10/04 | 13.12 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | IL | 10/04 | 13.62 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | ET | 10/04 | 14.00 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |

**Wednesday**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | | | 05200: 011.58 | | 05300: 003.58 | | 05400: 004.07 | | | | | |
| EBR # | | | | | | | | | | | | |
| 000-0000 | OT | 10/05 | 01.55 | 01-5631 | 2300-00 | 000000 | 04.00 | XXX-XX-5790 | 10/06 | 05.87 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | BT | 10/05 | 01.93 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | (W)NonScheduled Begin Tour |
| | | | | | | | | | | 00.00 | |
| 100-0108 | OL | 10/05 | 13.09 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |
| 100-0108 | IL | 10/05 | 13.58 | 01-5631 | 2300-00 | 000000 | | | | 00.00 | |
| | | | | | | | | | | 00.00 | |
| 000-0000 | ET | 10/05 | 14.00 | 01-5631 | 2300-00 | 000000 | | XXX-XX-5790 | 10/06 | 05.87 | |
| | | | | | | | | | | 00.00 | |

PLAINTIFF'S EXHIBIT

CASE NO.

EXHIBIT NO. 15

EXhibit 15
1 OF 1




537671745102

## PARTICIPANT COUNSELING
## FOR BUTLER B. BROWDER

**DRUG:** AMBIEN CR    TAB 12.5MG         Rx: 710748623

                                   JERNIGAN, JOHN A. MD

**DIRECTIONS:**    TAKE 1 TABLET AT BEDTIME AS
                   NEEDED FOR SLEEP

**GENERIC NAME:**  ZOLPIDEM (zole-PI-dem)

**IDENTIFICATION:**  This medicine is a BLUE, ROUND-shaped, COATED TABLET imprinted with
A~.

**COMMON USES:**  This medicine is a sedative-hypnotic used for the treatment of
insomnia (difficulty falling or staying asleep).

**HOW TO USE THIS MEDICINE:**  Follow the directions for using this medicine provided by
your doctor. This medicine comes with a patient information leaflet. Read it
carefully. Ask your doctor, nurse, or pharmacist any questions that you may have
about this medicine. SWALLOW WHOLE. Do not break, crush, or chew before
swallowing. TAKE THIS MEDICINE ON AN EMPTY STOMACH, unless otherwise directed by
your doctor. STORE THIS MEDICINE at room temperature, between 59 and 77 degrees F
(15 and 25 degrees C), in a tightly-closed container, away from heat and light.
Brief storage up to 86 degrees F (30 degrees C) is permitted. THIS MEDICINE WORKS
VERY QUICKLY; take this medicine right before going to bed. Use it only when you
will be able to sleep 7 to 8 hours or longer.

**CAUTIONS:**  DO NOT TAKE THIS MEDICINE if you have had an allergic reaction to it or
are allergic to any ingredient in this product. DO NOT EXCEED THE RECOMMENDED
DOSE or take this medicine for longer than prescribed without checking with your
doctor. Exceeding the recommended dose or taking this medicine for longer than
prescribed may be habit-forming. AVOID ALCOHOL while you are using this medicine.
THIS MEDICINE WILL ADD TO THE EFFECTS of alcohol and other depressants. Ask your
pharmacist if you have questions about which medicines are depressants. This
medicine may cause dizziness. DO NOT DRIVE, OPERATE MACHINERY, OR DO ANYTHING
ELSE THAT COULD BE DANGEROUS until you know how you react to this medicine. Using
this medicine alone, with other medicines, or with alcohol may lessen your
ability to drive or to perform other potentially dangerous tasks. CHECK WITH YOUR
DOCTOR if you continue to have trouble sleeping or notice changes in your
behavior or thinking. BEFORE YOU BEGIN TAKING ANY NEW MEDICINE, either
prescription or over-the-counter, check with your doctor or pharmacist. This
includes any medicines for sleep. CAUTION IS ADVISED WHEN USING THIS MEDICINE IN
THE ELDERLY because they may be more sensitive to the effects of the medicine.
FOR WOMEN: IF YOU PLAN ON BECOMING PREGNANT, discuss with your doctor the
benefits and risks of using this medicine during pregnancy. THIS MEDICINE IS
EXCRETED IN BREAST MILK. DO NOT BREAST-FEED while taking this medicine.

**POSSIBLE SIDE EFFECTS:**  SIDE EFFECTS that may occur while taking this medicine
include daytime drowsiness, dizziness, headache, or nausea. If they continue or
are bothersome, check with your doctor. CHECK WITH YOUR DOCTOR AS SOON AS
POSSIBLE if you experience mood or mental changes, memory problems, behavior
changes, back pain, vision changes, or irregular heartbeat. An allergic reaction
to this medicine is unlikely, but seek immediate medical attention if it occurs.
Symptoms of an allergic reaction include rash, itching, swelling, severe

---

Written information about this prescription has been provided to you. Please read this information before you take this medication. If you have any questions
concerning this prescription, a pharmacist is available during normal business hours to answer these questions.

**IMPORTANT INFORMATION**
           CAREMARK Rapid Renewal - It's easy ... as 1, 2, 3!

     Your renewal label appears below. If the medication is to be the same, then:

     1) Take this renewal sticker with you to your next office visit.

     2) Have your physician affix the label to a prescription blank, indicate
        any additional refills and other appropriate information, sign and date.

     3) Mail this in to Caremark as you would any new prescription.

**If you have not received your copy of Caremark's Notice of Privacy Practices,
it is available on Caremark's website at www.Caremark.com or by writing to
Caremark Inc., P.O. Box 1388, Northbrook, IL. 60062-1388.**

---

CAREMARK      NO REFILLS REMAIN - TIME TO RENEW
TO RENEW: Have your physician affix this label to a prescription
blank, indicate additional refills, if any, sign and date.

**710748623**   BROWDER, BUTLER B.
                AMBIEN CR  TAB 12.5MG        Qty.   30 EA
                TAKE 1 TABLET AT BEDTIME AS
                NEEDED FOR SLEEP

```
PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.    16
```

Exhibit 16
1 of 13



It all starts with care



537671745103

**PARTICIPANT COUNSELING**
**FOR BUTLER B. BROWDER**

DRUG:  AMBIEN CR    TAB 12.5MG             Rx: 710748623

JERNIGAN, JOHN A. MD

DIRECTIONS:    TAKE 1 TABLET AT BEDTIME AS
NEEDED FOR SLEEP

Page   2
   dizziness, or trouble breathing. If you notice other effects not listed above,
   contact your doctor, nurse, or pharmacist.

Copyright 2006 Wolters Kluwer Health, Inc.          Information Valid Through 08/2006. All rights reserved.

The information in this monograph is not intended to cover all possible uses, directions, precautions, drug interactions, or adverse effects. This information is generalized and is not intended as specific medical advice. If you have questions about the medicines you are taking or would like more information, check with your doctor, pharmacist, or nurse.

EX 16
2 OF 13





**PARTICIPANT COUNSELING**
**FOR BUTLER B. BROWDER**

420281560102

DRUG:  TRAMADOL HCL TAB 50MG

Rx: 920409792

JERNIGAN, JOHN A. MD

DIRECTIONS:    TAKE 1 TO 2 TABLETS 4 TIMES
               A DAY AS NEEDED

GENERIC NAME:  TRAMADOL (TRA-ma-doll)

IDENTIFICATION:  This medicine is a WHITE, ROUND-shaped TABLET imprinted with E 311.

COMMON USES:  This medicine is an analgesic used to treat or prevent pain.

HOW TO USE THIS MEDICINE:  Follow the directions for using this medicine provided by your doctor. THIS MEDICINE MAY BE TAKEN WITH FOOD if it upsets your stomach. STORE THIS MEDICINE at room temperature, away from heat and light. IF YOU MISS A DOSE OF THIS MEDICINE, take it as soon as possible. If it is almost time for your next dose, skip the missed dose and go back to your regular dosing schedule. Do NOT take 2 doses at once.

CAUTIONS:  DO NOT TAKE THIS MEDICINE IF YOU HAVE HAD A SEVERE ALLERGIC REACTION to codeine, hydrocodone, dihydrocodeine, or oxycodone (such as Tylox, Tylenol with Codeine, Vicodin). A severe allergic reaction includes a severe rash, hives, breathing difficulties, or dizziness. If you have a question about whether you are allergic to this medicine, or if a certain medicine contains codeine, hydrocodone, dihydrocodeine, or oxycodone, contact your doctor or pharmacist. IF YOU EXPERIENCE difficulty breathing, tightness of chest, swelling of eyelids, face, or lips; or if you develop a rash or hives, tell your doctor immediately. Do not take any more doses of this medicine unless your doctor tells you to do so. DO NOT EXCEED THE RECOMMENDED DOSE OR TAKE THIS MEDICINE for longer than prescribed. Exceeding the recommended dose or taking this medicine for longer than prescribed may be habit-forming. If using this medicine for an extended period of time, DO NOT SUDDENLY STOP taking this medicine without your doctor's approval. Your dose may need to be slowly lowered to avoid side effects. BEFORE YOU HAVE ANY MEDICAL OR DENTAL TREATMENTS, EMERGENCY CARE, OR SURGERY, tell the doctor or dentist that you are using this medicine. AVOID ALCOHOL while you are using this medicine. This medicine will add to the effects of alcohol and other depressants. Ask your pharmacist if you have questions about which medicines are depressants. This medicine may cause dizziness or drowsiness. DO NOT DRIVE, OPERATE MACHINERY, OR DO ANYTHING ELSE THAT COULD BE DANGEROUS until you know how you react to this medicine. Using this medicine alone, with other medicines, or with alcohol may lessen your ability to drive or to perform other potentially dangerous tasks. IF DIZZINESS OCCURS, sit or stand up slowly. BEFORE YOU BEGIN TAKING ANY NEW MEDICINE, either prescription or over-the-counter, check with your doctor or pharmacist. Caution is advised when using this medicine in the elderly because they may be more sensitive to the effects of this medicine. FOR WOMEN: IF YOU PLAN ON BECOMING PREGNANT, discuss with your doctor the benefits and risks of using this medicine during pregnancy. THIS MEDICINE IS EXCRETED IN BREAST MILK. DO NOT BREAST-FEED while taking this medicine.

Written information about this prescription has been provided to you. Please read this information before you take this medication. If you have any questions concerning this prescription, a pharmacist is available during normal business hours to answer these questions.

**IMPORTANT INFORMATION**
Please ensure that your doctor writes the month, day and year on all prescriptions that you submit to Caremark. Prescriptions without this information may be delayed. Also, remind your doctor to write your mail service prescriptions for the maximum quantity and days supply allowed by your prescription plan. If there is a discrepancy with your order, please contact Caremark Customer Care within 30 days.

If you have not received your copy of Caremark's Notice of Privacy Practices, it is available on Caremark's website at www.Caremark.com or by writing to Caremark Inc., P.O. Box 1388, Northbrook, IL. 60062-1388.

T

CAREMARK   3 REFILLS REMAIN - Order after 07/27/06
TO ORDER A REFILL PLEASE CALL 1-800-262-7890 OR RETURN THIS STICKER
Prescription expires 07/26/07

920409792 | BROWDER, BUTLER B.                    Qty.    90 EA
           | TRAMADOL HCL TAB 50MG
           | TAKE 1 TO 2 TABLETS 4 TIMES
           | A DAY AS NEEDED

EX 16
3 OF 13

 

**PARTICIPANT COUNSELING**
**FOR BUTLER B. BROWDER**

420281560103

DRUG:   TRAMADOL HCL TAB 50MG                    Rx: 920409792

JERNIGAN, JOHN A. MD

DIRECTIONS:       TAKE 1 TO 2 TABLETS 4 TIMES
                  A DAY AS NEEDED

Page   2

**POSSIBLE SIDE EFFECTS:**  SIDE EFFECTS, that may occur include dizziness, nausea, drowsiness, dry mouth, constipation, headache, or sweating. If they continue or are bothersome, check with your doctor. CHECK WITH YOUR DOCTOR IMMEDIATELY if you experience seizures or hallucinations. AN ALLERGIC REACTION to this medicine is unlikely, but seek immediate medical attention if it occurs. Symptoms of an allergic reaction include rash, itching, swelling, dizziness, or trouble breathing. If you notice other effects not listed above, contact your doctor, nurse, or pharmacist.

Copyright 2006 Wolters Kluwer Health, Inc.          Information Valid Through 08/2006. All rights reserved.

The information in this monograph is not intended to cover all possible uses, directions, precautions, drug interactions, or adverse effects. This information is generalized and is not intended as specific medical advice. If you have questions about the medicines you are taking or would like more information, check with your doctor, pharmacist, or nurse.

BX 16
4 OF 13



DGMAIN    Revision:   801.30   15 NOV 2006              CVS/REVCO #4862                DATE/TIME - 09/04/2007 12:28PM
PHARM NABP/DIV/STORE #-  119138/   0/  4862          DRUG MONOGRAPH PRINT              PAGE-   1

IMPORTANT DISCLAIMER: The side effects listed are not all the possible risks that could be caused by this medication.  This information
is not intended to cover all possible uses, directions, precautions, drug interactions, or adverse effects.  If you have questions
about the medicines you are taking or would like more information, check with your doctor, pharmacist, or nurse.

CELECOXIB - ORAL
(sell-eh-COX-ib)

COMMON BRAND NAME(S): Celebrex

WARNING:   Rarely, this medication can cause serious (very rarely
fatal) stomach/intestinal bleeding. Also, this medication and
related drugs have rarely caused blood clots to form, resulting
in possibly fatal heart attacks and strokes. Talk to your doctor
or pharmacist about the benefits and risks of treatment, as well
as other medication choices.
    If you notice any of these rare but very serious side effects,
stop taking celecoxib and seek immediate medical attention:
coffee-ground vomit, black stools, persistent stomach/abdominal
pain, chest pain, weakness on one side of the body, slurred
speech, sudden vision changes.
    This medication should not be used right before or after heart
bypass surgery.

USES:  This medication is a nonsteroidal anti-inflammatory drug
(NSAID), specifically a COX-2 inhibitor, which relieves pain and
swelling (inflammation). It is used to treat arthritis, acute
pain, and menstrual pain and discomfort. The pain and swelling
relief provided by this medication helps you perform more of your
normal daily activities. Celecoxib is also used to decrease
growths found in the intestines (colon polyps) of persons with a
family history of this condition.
    This drug works by blocking the enzyme in your body that makes
prostaglandins. Decreasing prostaglandins helps to reduce pain
and swelling.

HOW TO USE:  Read the Medication Guide provided by your
pharmacist before you start using celecoxib and each time you get
a refill. If you have any questions regarding the information,
consult your doctor or pharmacist.
    Take by mouth, usually once or twice daily, or as directed by
your doctor. To decrease the chance of stomach upset, this drug
is best taken with food. Dosage is based on your medical
condition and response to therapy. The lowest effective dosage
should always be used, and only for the prescribed length of time
(see also Warning section).
    Take this medication with a full glass of water (8 oz or 240
ml) unless your doctor directs you otherwise. Do not lie down for
30 minutes after taking this medication.
    In certain conditions (e.g., arthritis), it may take up to two
weeks, taken regularly, before significant benefits of this drug
take effect.
    If you are taking this drug on an "as needed" basis (not on a
regular schedule), remember that pain medications work best if
they are used as the first signs of pain occur. If you wait until
the pain has significantly worsened, the medicine may not work as
well.

SIDE EFFECTS:  Stomach upset or gas may occur. If any of these
effects persist or worsen, notify your doctor or pharmacist

EX 16
5 of 13

Remember that your doctor has prescribed this medication because the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects.

Tell your doctor immediately if any of these unlikely but serious side effects occur: severe headache, unexplained weight gain, swelling of the hands or feet, change in amount of urine, difficult/painful swallowing.

This drug may rarely cause serious liver disease. If you notice any of the following highly unlikely but very serious side effects, stop taking celecoxib and consult your doctor or pharmacist immediately: yellowing eyes or skin, dark urine, persistent stomach/abdominal pain, unusual fatigue.

In the unlikely event you have a serious allergic reaction to this drug, seek immediate medical attention. Symptoms of a serious allergic reaction include: rash, itching, swelling, dizziness, trouble breathing.

This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist.

PRECAUTIONS:  Before taking celecoxib, tell your doctor or pharmacist if you are allergic to it; or to sulfa drugs, aspirin, other NSAIDs (e.g., ibuprofen), other COX-2 inhibitors; or if you have any other allergies.

This medication should not be used if you have certain medical conditions. Before using this medicine, consult your doctor or pharmacist if you have: aspirin-sensitive asthma (a history of worsening breathing with runny/stuffy nose after taking aspirin or other NSAIDs), recent heart bypass surgery (CABG).

Before using this medication, tell your doctor or pharmacist your medical history, especially of: blood flow problem in the brain (e.g., stroke, cerebrovascular disease), kidney problems, liver problems, heart disease (e.g., angina, heart attack, high blood pressure, congestive heart failure), alcohol use, swelling (e.g., edema), blood disorders (e.g., anemia), serious infections, stomach/intestine/esophagus problems (e.g., bleeding, ulcers, recurring heartburn), bleeding/clotting problems, asthma, growths in the nose (nasal polyps), dehydration, poorly controlled diabetes.

This medicine may cause stomach bleeding. Daily use of alcohol and tobacco, especially when combined with this medicine, may increase your risk for stomach bleeding. Limit alcohol and smoking. Consult your doctor or pharmacist for more information.

Caution is advised when using this drug in the elderly because they may be more sensitive to the side effects of this medication, especially stomach bleeding and kidney effects.

Caution is advised when using this drug in children with a certain type of arthritis (systemic onset juvenile rheumatoid arthritis) because they may be at increased risk for a very serious bleeding/clotting problem (disseminated intravascular coagulation). Seek immediate medical attention if your child develops sudden bleeding/bruising or bluish skin in the fingers/toes.

This medication should be used only when clearly needed during the first 6 months of pregnancy. It should not be used during the last 3 months of pregnancy. Discuss the risks and benefits with your doctor.

This medication passes into breast milk and may have undesirable effects on a nursing infant. Breast-feeding is not recommended while using this drug. Consult your doctor before breast-feeding.

EX 16
6 OF 13

aware of any possible drug interactions and may be monitoring you for them. Do not start, stop, or change the dosage of any medicine before checking with them first.

This drug should not be used with the following medication because very serious interactions may occur: cidofovir.

If you are currently using the medication listed above, tell your doctor or pharmacist before starting celecoxib.

Before using this medication, tell your doctor or pharmacist of all prescription and nonprescription products you may use, especially of: anti-platelet drugs (e.g., cilostazol, clopidogrel), high blood pressure drugs such as ACE inhibitors (e.g., captopril, lisinopril), oral bisphosphonates (e.g., alendronate), "blood thinners" (e.g., enoxaparin, heparin, warfarin), corticosteroids (e.g., prednisone), fluconazole, lithium, pemetrexed, "water pills" (diuretics such as furosemide, hydrochlorothiazide, triamterene).

Check all prescription and nonprescription medicine labels carefully for other pain/fever drugs (NSAIDs such as aspirin, celecoxib, ibuprofen). These drugs are similar to this medication, so taking one of these drugs while also taking this medication may increase your risk of side effects. However, if your doctor has prescribed low doses of aspirin to prevent heart attack or stroke (usually at dosages of 81-325 milligrams a day), you should continue to take the aspirin. Daily use of NSAIDs (e.g., ibuprofen) may decrease aspirin's ability to prevent heart attack/stroke. Consult your doctor or pharmacist for more details and to discuss other possible treatments (e.g., acetaminophen) for your pain/fever.

This document does not contain all possible interactions. Therefore, before using this product, tell your doctor or pharmacist of all the products you use. Keep a list of all your medications with you, and share the list with your doctor and pharmacist.

OVERDOSE: If overdose is suspected, contact your local poison control center or emergency room immediately. US residents can call the US national poison hotline at 1-800-222-1222. Canadian residents should call their local poison control center directly. Symptoms of overdose may include severe stomach pain, coffee ground-like vomit, change in amount of urine, slow or shallow breathing, severe headache or loss of consciousness.

NOTES: Do not share this medication with others.

Laboratory and/or medical tests (e.g., complete blood count, liver and kidney function tests) may be performed periodically to monitor your progress or check for side effects. Consult your doctor for more details.

Non-drug treatment for arthritis that is approved by your doctor (e.g., weight loss if needed, strengthening and conditioning exercises) may help improve your flexibility, range of motion, and joint function. Consult your doctor for specific instructions.

MISSED DOSE: If you miss a dose, use it as soon as you remember. If it is near the time of the next dose, skip the missed dose and resume your usual dosing schedule. Do not double the dose to catch up.

STORAGE: Store at room temperature at 77 degrees F (25 degrees C) away from light and moisture. Brief storage between 59-86 degrees F (15-30 degrees C) is permitted. Do not store in the bathroom. Keep all medicines away from children and pets.

Properly discard this product when it is expired or no longer

EX 16
7 OF 13

needed. Consult your pharmacist or local waste disposal company for more details about how to safely discard your product.

Information last revised August 2007
Copyright(c) 2007 First DataBank, Inc.

EX 16
8 OF 13

IMPORTANT DISCLAIMER: The side effects listed are not all the possible risks that could be caused by this medication.  This information is not intended to cover all possible uses, directions, precautions, drug interactions, or adverse effects.  If you have questions about the medicines you are taking or would like more information, check with your doctor, pharmacist, or nurse.


PSEUDOEPHEDRINE/CETIRIZINE EXTENDED RELEASE - ORAL
(sue-doh-eff-ED-rin/set-EYE-rizz-een)

COMMON BRAND NAME(S): Zyrtec-D

USES:  This medication is an antihistamine and decongestant combination which provides relief of seasonal and perennial allergy symptoms such as watery eyes, runny nose (rhinitis), itching eyes, sneezing, and stuffy nose (nasal congestion).
     This medication is not recommended for use in children under 12 years of age due to the high amount of pseudoephedrine.

HOW TO USE:  Take this medication by mouth twice daily; or use as directed by your doctor. This drug may be taken with or without food.
     Swallow the tablet whole. Do not break, crush, or chew the tablet; this will destroy the drug's long action and increase the chance of side effects.
     Do not increase your dose or take this more often than directed.
     Do not take this medication for several days before allergy testing since test results can be affected.

SIDE EFFECTS:  Drowsiness, fatigue, dry mouth, dizziness, nervousness, nausea, headache, or trouble sleeping may occur. If any of these effects persist or worsen, notify your doctor or pharmacist promptly.
     Remember that your doctor has prescribed this medication because the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects.
     Tell your doctor immediately if any of these serious side effects occur: fast/irregular heartbeat, uncontrolled shaking or tremor.
     Tell your doctor immediately if any of these unlikely but serious side effects occur: yellowing eyes or skin, dark urine, persistent fatigue, mental/mood changes, seizures, trouble breathing, trouble urinating.
     A serious allergic reaction to this drug is unlikely, but seek immediate medical attention if it occurs. Symptoms of a serious allergic reaction include: rash, itching, swelling, severe dizziness, trouble breathing.
     This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist.


PRECAUTIONS:  Before taking pseudoephedrine with cetirizine, tell your doctor or pharmacist if you are allergic to it; or to hydroxyzine; or if you have any other allergies.
     This medication should not be used if you have certain medical conditions. Before using this medicine, consult your doctor or pharmacist if you have: glaucoma (narrow angle type), severe difficulty urinating (urinary retention), severe high blood pressure, severe heart/blood vessel disease (coronary artery disease), experienced serious side effects with decongestants

Before using this medication, tell your doctor or pharmacist your medical history, especially of: kidney disease, problems urinating (e.g., enlarged prostate), liver disease, high blood pressure, diabetes, heart disease, thyroid problems (hyperthyroidism), glaucoma (open angle type).

This drug may make you dizzy or drowsy; use caution engaging in activities requiring alertness such as driving or using machinery. Limit alcoholic beverages.

Caution is advised when using this drug in the elderly because they may be more sensitive to the effects of the drug.

This medication should be used only when clearly needed during pregnancy. Discuss the risks and benefits with your doctor.

This medication passes into breast milk. Breast-feeding is not recommended while using this drug.

DRUG INTERACTIONS:  Your doctor or pharmacist may already be aware of any possible drug interactions and may be monitoring you for them. Do not start, stop, or change the dosage of any medicine before checking with them first.

This drug should not be used with or within 14 days of taking MAO inhibitors (e.g., furazolidone, linezolid, moclobemide, phenelzine procarbazine, selegiline, isocarboxazid, tranylcypromine).

Before using this medication, tell your doctor or pharmacist of all prescription and nonprescription products you may use, especially of: adrenalin-like drugs (e.g., ephedrine, methylphenidate), certain blood pressure drugs (e.g., methyldopa, guanethidine, reserpine, beta-blockers such as propranolol), certain herbal products (e.g., ephedra).

Before using this medication, tell your doctor or pharmacist of all prescription and nonprescription products you may use, especially of drugs that cause drowsiness such as: anti-anxiety drugs (e.g., diazepam), other antihistamines that cause drowsiness (e.g., diphenhydramine), anti-seizure drugs (e.g., carbamazepine), medicine for sleep (e.g., sedatives), muscle relaxants, narcotic pain relievers (e.g., codeine), psychiatric medicines (e.g., phenothiazines such as chlorpromazine, or tricyclics such as amitriptyline), tranquilizers.

Check the labels on all your medicines (e.g., cough-and-cold products, diet aids) because they may contain ingredients that could cause drowsiness or increase your heart rate or blood pressure. Ask your pharmacist about the safe use of those products.

This document does not contain all possible interactions. Therefore, before using this product, tell your doctor or pharmacist of all the products you use. Keep a list of all your medications with you, and share the list with your doctor and pharmacist.

OVERDOSE:  If overdose is suspected, contact your local poison control center or emergency room immediately. US residents can call the US national poison hotline at 1-800-222-1222. Canadian residents should call their local poison control center directly. Symptoms of overdose may include: severe drowsiness, irregular or unusually fast heartbeat, seizures.

NOTES:  Do not share this medication with others.

MISSED DOSE:  If you miss a dose, use it as soon as you remember. If it is near the time of the next dose, skip the missed dose and resume your usual dosing schedule. Do not double the dose to catch up.

EX 16

10 of 13

STORAGE: Store at room temperature between 68-77 degrees F (20-25 degrees C) away from light and moisture. Brief storage between 59-86 degrees F (15-30 degrees C) is permitted. Do not store in the bathroom. Keep all medicines away from children and pets.

   Properly discard this product when it is expired or no longer n  ed. Consult your pharmacist or local waste disposal company f   more details about how to safely discard your product.

Information last revised August 2007
Copyright(c) 2007 First DataBank, Inc.

EX 16
1/00 13

IMPORTANT DISCLAIMER: The side effects listed are not all the possible risks that could be caused by this medication.  This information is not intended to cover all possible uses, directions, precautions, drug interactions, or adverse effects.  If you have questions about the medicines you are taking or would like more information, check with your doctor, pharmacist, or nurse.

LORATADINE - ORAL
(lor-AT-uh-deen)

COMMON BRAND NAME(S): Claritin

USES:  Loratadine is an antihistamine that provides relief of seasonal allergy symptoms such as watery eyes, runny nose (rhinitis), itching eyes, and sneezing. It is also used for hives.
     Do not use this medication in children younger than 2 years unless specifically directed by the doctor. To decrease the risk for serious side effects, carefully follow all of the doctor's dosage directions. Do not give other cough and cold medication that might contain the same or similar ingredients (see also Drug Interactions section). Ask your doctor or pharmacist about other ways to relieve cough and cold symptoms (e.g., saline nose drops/spray, using a humidifier or infant nasal suction bulb).

HOW TO USE:  Take this medication by mouth once a day or as directed.
     Do not increase your dose or take this more often than directed.
     Do not take this medication for several days before allergy testing since test results can be affected.

SIDE EFFECTS:  Headache, fatigue, dry mouth, thirst, dry nose or hoarseness may occur. These effects should lessen as your body adjusts to the medication. If any of these effects persist or worsen, notify your doctor or pharmacist promptly.
     Remember that your doctor has prescribed this medication because the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects.
     Tell your doctor immediately if any of these unlikely but serious side effects occur: nervousness, constant urge to move around, rapid or pounding heartbeat, unusual weakness, stomach pain, dizziness, diarrhea, wheezing.
     Loratadine does not usually cause drowsiness when used at recommended doses and under normal circumstances. However, be sure of the drug's effects before engaging in activities that require alertness such as driving or using machinery.
     A serious allergic reaction to this drug is unlikely, but seek immediate medical attention if it occurs. Symptoms of a serious allergic reaction include: rash, itching, swelling, severe dizziness, trouble breathing.
     This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist.

PRECAUTIONS:  Before taking loratadine, tell your doctor or pharmacist if you are allergic to it; or if you have any other allergies.
     Before using this medication, tell your doctor or pharmacist your medical history, especially of: kidney disease, liver disease.

EX 16
12 OF 13

Caution is advised when using this drug in the elderly because they may be more sensitive to the effects of the drug.

This medication should be used only when clearly needed during pregnancy. Discuss the risks and benefits with your doctor.

This medication passes into breast milk. Breast-feeding is not recommended while using this drug.

DRUG INTERACTIONS:  If you are taking this medication under your doctor's direction, your doctor or pharmacist may already be aware of any possible drug interactions and may be monitoring you for them. Do not start, stop, or change the dosage of any medicine before checking with your doctor or pharmacist first.

Before using this medication, tell your doctor or pharmacist of all prescription and nonprescription products you may use.

Check the labels on all your medicines (e.g., cough-and-cold products) because they may contain additional antihistamines that could increase your risk for side effects. Ask your pharmacist about the safe use of those products.

This document does not contain all possible interactions. Therefore, before using this product, tell your doctor or pharmacist of all the products you use. Keep a list of all your medications with you, and share the list with your doctor and pharmacist.

OVERDOSE:  If overdose is suspected, contact your local poison control center or emergency room immediately. US residents can call the US national poison hotline at 1-800-222-1222. Canadian residents should call their local poison control center directly. Symptoms of overdose may include: unusual drowsiness, severe headache, fast heartbeat, and unusual muscle movements.

NOTES:  Do not share this medication with others.

MISSED DOSE:  If you miss a dose, use it as soon as you remember. If it is near the time of the next dose, skip the missed dose and resume your usual dosing schedule. Do not double the dose to catch up.

STORAGE:  Store between 36-86 degrees F (2-30 degrees C) away from light and moisture. Do not store in the bathroom. Keep all medicines away from children and pets.

Properly discard this product when it is expired or no longer needed. Consult your pharmacist or local waste disposal company for more details about how to safely discard your product.

Information last revised August 2007
Copyright(c) 2007 First DataBank, Inc.

EX 16
13 OF 13

Per the SEA Legal office:

DO NOT send a notice to report to employees who are **FMLA protected** or **PENDING FMLA** protection. That would be a violation of the FMLA statute and could put you in a position of litigation. If and when the FMLA is denied, you can send the notice.

Labor Representatives:
Please be cognizant of this fact when preparing notices to report. You can check the eRMS FMLA data screen for current FMLA info on employees. If you have questions, please call me or your FMLA Coordinator.

Connie
eRMS Site Coordinator
351 N 24th Street
Birmingham, AL  35203-9600
205 521-7939
Alabama eRMS website:
http://alabamaintranet.usps.gov/index.cfm?treeID=13534

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.  17

Exhibit 17
MEF 2

1. **FMLA Violation Lawsuits, SL or Dr. Appointments, Rural Carriers SL, Light Duty Documentation**

 Intended Audience: All Management

Can you be sued personally for <u>FMLA violations</u>? Yes, you can and I recently heard of a District which had an award against a supervisor for $300,000. Protect yourself and the interests of the USPS by adhering to the law. If you have questions, please call Connie English (205 521-7939) or your local FMLA Coordinator.

Important in this law are:

1.	You cannot require documentation for pay purposes for annual leave or LWOP
2.	You can only require documentation for pay purposes for sick leave if there has been denied leave, a pattern has been set, or you have a valid reason to                suspect an absence.
3.	You cannot do anything to discourage an employee from using FMLA.
4.	You cannot do anything so that the employee suffers any negative repercussions from using FMLA.
5.	You have the responsibility to designate leave as FMLA when you know it is a qualifying condition.

Additionally, if an employee (other than rural carrier) uses <u>SL to go to a doctor's appointment</u>, they should only be paid sick leave for the amount of time traveling and actually spent in the doctor's office. If the remainder of the day is granted for leave, it should be annual or LWOP.

If a <u>rural carrier</u> is granted 8 hours of leave (any type) for an FMLA condition, only the portion of the leave actually used for the FMLA condition should be coded as FMLA and the remainder as regular leave.

Be sure to code SLDC and FMLA in the pay systems for all employees. For rural carriers this means using the 1314-F or the FMLA tab in the 4240 program.

<u>You are responsible</u> for providing the current updated request for continuance of <u>Light Duty</u>/Resolution to the Alabama Medical Office each and every time you receive it. We will not be able to input what we have not received. If you see a message in eRMS or Outlook, it may mean that we have not received notice from you to input. You should not see the message for more than 24 hrs after we receive it. If you have questions, please call Mona Looser at 205 521-0381

PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.    18

# ARBITRATOR'S DECISION

Exhibit 18
1 OF 10

# REGULAR ARBITRATION

In The Matter of the Arbitration

Grievant: Browder JR
Case No: H00M-1H-D 06062642
Union No: RG008

Between

UNITED STATES POSTAL SERVICE

And

National Postal Mail Handlers Union

BEFORE: Thomas H. Pigford
Arbitrator

APPEARANCES:

For the U.S. Postal Service:  Ms. Jerri Taylor

For the Union:        Mr. Jessie J. Leonard

Place of Hearing:      Montgomery, AL P&DC

Date of Hearing:      October 25, 2006

## AWARD SUMMARY

I conclude that Management had just cause to discharge Grievant from employment.
Accordingly, the grievance must be DENIED

EX18
2 OF 10

2.

**Issue:**

Did the Postal Service have just cause to discharge Grievant from employment and, if not, what is the appropriate remedy?

**Stipulations:**

The parties stipulated Jt. Ex. 1, the National Agreement; Jt. Ex. 2, the grievance file, (pp. 1 – 170, excluding pp. 69, 70, 90-94, 100-103, 118-120, and 130); Jt. Ex. 3 (2 pages from the Employee and Labor Relations Manual-ELM); and Jt. Ex. 4 (2 pages from the Contract Interpretation Manual-CIM); into evidence.

The parties also stipulated that on November 19, 2005 Grievant attended the Auburn University vs. The University of Alabama football game played in Auburn, AL.

**Background:**

The hearing was held on October 25, 2006. The parties presented documentary evidence and witnesses for sworn testimony. Additionally, the parties requested and were granted the opportunity to present written briefs. The briefs were to be postmarked by November 24, 2006. All briefs and citations of authority were duly received and have been considered in reaching the decision herein. The record was closed on November 24, 2006.

The initial issue raised concerned the appearance of a Court Reporter at the hearing to transcribe the proceedings. Management had procured the services of the reporter stating that there were other legal proceedings occurring with Grievant and that a transcript of the Arbitration proceedings may be needed. The Union vigorously objected to the Court Reporter's presence to transcribe the proceedings. The Contract, Article 15.B.8, p. 81, states;

> Normally, there will be no transcripts of arbitration hearings or filing of post-hearing briefs in cases heard in Regular Regional level arbitration, except either party at the National level may request a transcript, and either party, at the hearing may request to file a post-hearing brief. ---

Since both parties desired to file briefs in the case there were no contested issues regarding the filing of briefs.

With respect to the Court Reporter's transcribing the arbitration proceeding Management pointed to the file, Jt. Ex. 2, p. 1, revealing a letter dated October 16, 2006 from a National Level Postal Official to a National Level Union Official requesting the transcription of the hearing. No response from the Union was found in the file. The Union advocate noted the date on the letter, October 16, 2006, and its proximity (time-

*EX-18*
*3090*

3.

wise) to the hearing date, and stated that he was unaware of the Union's permission being given to transcribe the hearing. The Union representative argued that the Contract only gave USPS the right to request a transcript and absent evidence that the Union's consent had been given the transcription should not be allowed.

My ruling at the hearing was that there is obvious ambiguity in the contractual language regarding transcription of such arbitration proceedings absent the consent of both parties, and that I would allow the Court Reporter to remain and transcribe the hearing but that my notes would be the official record of the arbitration hearing and that I would not use the Court Reporter's transcription in reaching a decision in the case. Additionally, I stated that my notes of the arbitration proceeding would be destroyed following issuance of my decision as is my usual practice and I also stated that the Union and/or the Grievant could make their objections known to any other Hearing Official(s) in which the Postal Service might attempt to use the Court Reporter's transcript and that official could rule on such matters should they occur. I have not received a copy of the Court Reporter's transcription and obviously have not read nor relied upon such in reaching my conclusions herein.

Management issued Grievant a Notice of Proposed Removal dated February 2, 2006 which included charges of improper conduct, failure to follow instructions, failure to follow agency leave requesting procedures, and failure to maintain a regular work schedule. The letter included two elements of past record, a warning letter dated 07/05 for failure to maintain a regular work schedule and a 7-day no time off suspension for unacceptable conduct dated 09/05. Jt. Ex. 2, pp. 24-36. This proposal to remove Grievant was affirmed by Management following Grievant's appeal through the contractual grievance/arbitration procedures and the matter was appealed to arbitration. See Jt. Ex. 2, pp. 30-32.

Charge 1 against Grievant concerned Sick Leave taken by Grievant on Saturday November 12, 2005 and Friday and Saturday November 18 and 19, 2005.Grievant's normal work schedule was from 5:30 AM until 2:00 PM with regular off days as Sunday and Monday.

On Saturday November 12, 2005 Grievant reported for duty as scheduled but left work after an hour claiming sick leave, which was approved. Later in the day it is undisputed that Grievant left home to attend a college football game in Athens, GA between Auburn University and the University of Georgia scheduled for 7:30 PM CST, according to the testimony at the hearing. Grievant rode to the game with the mother of an Auburn football player and testified that he did not leave home until after 2:00 PM which would have been after his regular work schedule ended. The player's mother testified that she picked Grievant up at his home and drove as Grievant was not feeling well. The testimony revealed that Grievant often attended Auburn football games with the player's mother and was on the Auburn University's complimentary ticket list as the football player's Uncle. Jt. Ex. 2, p. 60.

The testimony revealed that Grievant's regular job duties required that he load and unload trucks and lift up to 70 lbs.

duty status. Grievant was on extended sick leave at the time. The Supervisor asked Grievant to meet with him at that time and Grievant refused, stating that he was not on the clock. Grievant was told that he would be placed on the clock for the meeting, but Grievant nevertheless still refused to meet with the Supervisor. Thereafter, on January 6, 2006 Grievant was sent a letter directing that he report for duty on January 10, 2006 to meet with the Supervisor. Grievant failed to report as instructed and sent management a letter dated January 7, 2006 stating that he did not have anything to discuss with the Supervisor. On January 10, 2006 Grievant was sent another letter directing that he report for duty no later than January 17, 2006 to participate in an Investigative Interview regarding an investigative report concerning his attendance at the two football games

4.

Grievant testified that he was sick and on medication while he attended the game but that he was not too sick to ride to the game or to sit at the game although he did not feel well at all and was too sick to work his regular duty hours on that date. The Mother of the football player also testified that Grievant was ill. While records reveal that Grievant did receive sick pay for his duty hours on that date there is insufficient proof that he was either en route to or attending the game during duty hours. Later, after being confronted with these facts during investigation of the matter, Grievant contended that he left a blank leave slip with another employee for the time off and that the Supervisor checked the sick leave block rather than the annual leave block on the form and that he had intended to take annual leave although either type leave would have been appropriate as he was sick. The Supervisor credibly testified that he had been told earlier that day by Grievant that he was sick and was leaving work and that was the reason he checked the sick leave block on the form. The Supervisor testified that he would not have approved annual leave had it been requested as he was short of personnel on that day and had others working on overtime status.

On November 18, 2005 Grievant called in and requested sick leave for November 18-19, 2005. He testified that he had back problems on Nov.18, 2005, which kept him in bed. Evidence reveals that Grievant attended the Auburn – University of Alabama football game in Auburn, AL on November 19, scheduled for 2:00 PM. Auburn, AL is approximately a one-hour drive from Montgomery, AL. Grievant was first seen in the stadium at 1:45 PM revealing that he had to have been en route to the game during his work hours for which he used sick leave. During investigation of the matter Grievant contended that while he was too ill to work he nevertheless attended the game, which he contended, was after his duty hours.

Grievant was also charged with failing to follow instructions for leaving a form 3971 requesting sick leave to attend a doctors appointment on another employee's desk on December 2, 2005 contrary to prior instructions to notify a supervisor prior to leaving work.

On January 3, 2006 Grievant's Supervisor called Grievant's home and left Grievant a message that he needed to speak with him. The Supervisor was attempting to schedule an Investigative Interview with Grievant regarding the final investigation report regarding Grievant's being on sick leave when attending the two football games. Grievant did not return his Supervisor's telephone call. On January 5, 2006 the Supervisor found Grievant at the Post Office in the break room playing cards with other employees while in an off-duty status. Grievant was on extended sick leave at the time. The Supervisor asked Grievant to meet with him at that time and Grievant refused, stating that he was not on the clock. Grievant was told that he would be placed on the clock for the meeting, but Grievant nevertheless still refused to meet with the Supervisor. Thereafter, on January 6, 2006 Grievant was sent a letter directing that he report for duty on January 10, 2006 to meet with the Supervisor. Grievant failed to report as instructed and sent management a letter dated January 7, 2006 stating that he did not have anything to discuss with the Supervisor. On January 10, 2006 Grievant was sent another letter directing that he report for duty no later than January 17, 2006 to participate in an Investigative Interview regarding an investigative report concerning his attendance at the two football games

EX-18-
50E10

5.

discussed above while in a sick leave status. Grievant again refused to report as instructed leading to the charge of failing to follow instructions. Grievant testified that he went to work on December 2, 2005 and told his Supervisor that he needed a longer break due to his medical condition. The Supervisor told him to see employee Osborne who would gather the necessary forms for Grievant to take to his doctor. After Osborne gave Grievant the forms Grievant gave Osborne a form 3971 and left. Grievant testified that the Supervisor was tied up with other matters at that time and was not on the work room floor and as he had told him earlier that he was leaving he assumed it was appropriate to leave the 3971 with Osborne who the Supervisor has designated to obtain the papers for him.

Grievant testified that his physician sent him for scans on December 5, 2005 to determine what his problems were and gave him forms to request Family Medical Leave (FMLA) on December 7, 2005 and restricted him to no prolonged standing or walking and no lifting more than 7 lbs. Upon receipt of Management's letter dated January 5, 2006 instructing him to report for a meeting on January 10, 2006 to discuss his request for light duty Grievant wrote to Management advising that since he was on FMLA he could not attend the meeting as instructed.

The third charge against Grievant in the proposal to remove letter was for failing to follow leave request procedures. Grievant was scheduled to work overtime on October 3, 2005 and failed to report as scheduled or to follow established call-in procedures to report his absence. Additionally, he was charged with failing to follow call-in procedures on November 18, 2005 when he called the workroom floor and advised Acting Supervisor Nikki Lowe that he was requesting sick leave for 2 days. Ms. Lowe instructed Grievant to call the IRT Center as he was supposed to do and he refused to do so. Grievant testified that he had attempted to call the center but could not get through and that it was well known that the call-in center was having major problems at that time.

Grievant conceded that he did not call in to report his absence when scheduled to work overtime on October 3, 2005 but testified that employees did not have to call in when missing overtime, they simply did not show up and this was a long standing practice. Grievant's testimony in this regard was supported by the testimony of two other employees.

Grievant was also charged with failing to maintain a regular work schedule citing absences on 10/03/05, 10/18/05, 10/19/05, 10/20/05, 10/21/05, 11/12/05, 11/18/05, 11/19/05 and 12/02/05. Grievant testified that he notified his Supervisor on either 10/12 or 10/13/05 that he was to have an overnight stay in a hospital and submitted appropriate leave forms for the absences. He left work early on 10/18 and reported to a sleep disorder clinic for tests. He remained there through 10/19, and after these testes were completed he had a digestive disorder requiring absence from work on 10/20-21.

Grievant testified, without contradiction, that he was a 35 year employee of the Postal Service, had accumulated over 1500 hours of sick leave and over 1200 hours of annual leave and had not been irregular in attendance despite having these health problems which required the absences cited.

6.

**Conclusions:**

The charge against Grievant for failure to maintain a regular work schedule (Charge 4) is based upon 9 absences within a two-month period for which Grievant was granted sick leave. While employees may be held accountable for absences when sick where the absenteeism is so chronic to lead to the conclusion that the employee will be unable to meet requirements to come to work regularly such a conclusion is usually reached after a prolonged period of illness and absenteeism which demonstrates that the employee cannot meet his/her obligations to come to work, and not on short or sporadic instances of absenteeism due to illness. This theory of discharge is commonly referred to as one of economic necessity rather than a disciplinary action (i.e. the employee, despite good effort is simply unable to uphold his duty to come to work for the pay he receives). The factors supporting this theory of discharge are not present here and it is difficult to conclude that a 35 year employee who has accumulated over 1500 hours of sick leave and over 1200 hours of annual leave has not maintained a regular work schedule, especially where such decision is based upon such a short time span. I must conclude that charge 4 lacks merit.

Regarding Charge 3, failure to follow leave requesting procedures when Grievant failed to call in to report that he would not work scheduled overtime, two Union witnesses testified that it was common practice for employees scheduled for overtime to simply not report for duty if they were unable to work the overtime and that there was no action taken against the employees who did not report for the overtime work even if they did not call in to report their absence. Accordingly, I must find that the charge against Grievant for not calling in when he missed overtime on October 3, 2005 is insufficient to sustain discipline.

With respect to the November 18, 2005 sick leave instance it is not rebutted that Grievant called and notified an acting Supervisor (Nikki Lowe) that he would not report for his regularly scheduled tour of duty and that Lowe reported same to the General Supervisor. Management therefore knew that Grievant was taking sick leave and initially approved the sick leave. Management issued the charge because Grievant did not call the IRT center as instructed. Grievant testified that he attempted to call the IRT center but could not get through. Management witnesses agreed that they were having problems with the IRT telephones at that time. I must conclude, based on this evidence, that this charge against Grievant is not supported by the evidence.

With respect to charge 2, failure to follow instructions concerning Grievant's leaving a leave slip on a desk On December 2, 2005 and not advising his Supervisor that he was leaving work, the facts as developed at hearing do not comport with the charge stated in the proposed removal letter. Grievant testified that he reported to work and advised two Supervisors that he needed a longer break at work due to medical problems. Supervisor Harris told him he needed necessary light duty forms signed by his Doctor and assigned another employee, Mike Osborne, to work with Grievant to obtain the necessary forms for Grievant to take to his physician for signature. Osborne obtained the forms for Grievant and Grievant completed a sick leave form in order to go to the Doctor

7.

and left the form with Osborne to give to the Supervisor. Grievant testified that Supervisor Harris was not present at the time and since he had already informed him that he would be leaving and Harris had assigned Osborne to obtain the necessary forms for him to take to the Doctor he thought it was appropriate to leave the sick-leave form with Osborne. Harris did not dispute this testimony and employee Osborne was not called to testify. Under these circumstances I cannot conclude that this constituted a refusal by Grievant to comply with Management instructions.

The next two elements of charge 2 are interrelated with charge 1 and will be dealt with below. These two incidents, letters to Grievant dated January 6, 2006 and January 10, 2006, were attempts by Management to have Grievant report to the Post office to conduct an investigatory interview with him regarding the investigative report submitted by the OIG Investigator concerning Grievant's attendance at the Auburn-Georgia, and the Auburn-Alabama football games in 2005 while in a sick leave status.

The improper conduct charge of charge 1 (attendance at these football games by Grievant while in a sick leave status) are the two most serious charges herein and undoubtedly led to Management's decision to issue the notice of discharge. Management has submitted sufficient prior arbitration awards relevant to such situations to convince me that if the proof revealed Grievant intentionally requested sick leave for the purpose of attending these games when he was not ill that is grounds for discharge. The rationale for these awards is that the Postal Service must expect honesty of their employees and that a showing of employee dishonesty in such regards is grounds for discharge even where progressive discipline under the contract has not occurred.

There is evidence herein that Grievant is guilty of this. The evidence shows that Grievant had planned in advance to attend the games but did not request advance annual leave which would have placed him in a scheduled leave status. The football player's mother testified that Grievant had attended games with her in the past and that he had planned to attend these two games also. The OIG report reveals that Auburn University officials stated that the complimentary tickets, such as used by Grievant, are scheduled in advance as names are placed on a list and the listed individuals scheduled to attend the game are admitted with a proper showing of identity after they sign for the tickets at the game. Such precautions are taken in order to prevent the tickets being resold or used by someone else. Clearly Grievant had planned to attend these games in advance. Clearly Grievant did not request annual leave in advance to attend either game. The evidence is also conclusive that Grievant left work on the day of the Auburn-Georgia game (November 12, 2005) in a sick leave status and traveled to Athens, GA for the game which was scheduled for 7:30 PM. The evidence in inconclusive as to the time he left and it cannot be determined if he actually traveled during his working hours or not. He testified at hearing that he left a blank leave form for his Supervisor to fill in the blanks, and he thought the Supervisor would check the annual leave box rather than the sick

8.

leave box. Again, although he maintains that he was, in fact, ill his claim that he wanted the Supervisor to check the annual leave box on the form rather than the sick leave box implies that he was not, in fact sick. He did not, however, raise the contention that he thought he was getting annual leave when initially questioned by the OIG Investigator. When initially asked by the Investigator why he used sick leave to attend the Auburn-Alabama game Grievant stated that did not happen, that the game was after his tour of duty ended. (Jt. Ex. 2, pp 63-64). After the interview was completed and Grievant and his Union Representative had left the room, Grievant returned after a brief period and asked the Investigator to review the leave form again. After reviewing the form Grievant stated that the comment on the form "Left Sick" was not his handwriting and that he intended to take annual leave for the absence. (Jt. Ex. 2, pp.63-64). Grievant's Supervisor, however, credibly testified that he wrote the comment on the blank form left by Grievant and checked the sick leave box because Grievant had informed him earlier in the morning that he wanted sick leave. The Supervisor further testified that he would not have approved unscheduled annual leave for Grievant.

The proof is conclusive that Grievant traveled to Auburn, AL on Nov. 19, 2005 during his working hours while in a sick leave status as he was seen inside the stadium at 1:45 PM while his work tour did not end until 2:00 PM. Again Grievant contends that he was sick, although he attended the game. While it may be possible for Grievant to attend these games sick while feeling too ill to go to work, Grievant never offered an explanation as to why he did not apply for scheduled annual leave in advance in order to attend the games. The evidence is preponderant that Grievant planned to attend the games in advance. If he had applied for annual leave and then became ill he could have changed the leave from annual to sick. Under all these circumstances I am persuaded that Grievant improperly used sick leave to attend these athletic events when, in fact, he was not sick. Part of the evidence leading to this conclusion is Grievant's complete lack of cooperation with Management Official's efforts to properly investigate these matters. Management notified Grievant by letter dated November 18, 2005 that he was being required to provide medical documentation for the sick leave he claimed for November 18 and 19, 2005. He simply refused to provide such documentation, and the fact that he was not on sick leave restriction does not provide him an excuse for such a refusal. Had he provided some type of medical evidence that he was ill his claim that he was, in fact, sick on Nov. 19, 2005 when attending the football game would have more validity.

Under the terms of the contract Grievant is entitled to an investigatory interview to provide his side of the story during such investigations. The evidence reveals that Grievant simply refused to cooperate with Management in its attempt to follow the contract in these regards. After the OIG investigative report regarding Grievant's attendance at the two football games in a sick leave status was received a copy was sent to Grievant. On January 3, 2006 the Supervisor called Grievant's home, Grievant was on extended sick leave as work with his light duty restrictions was not available at the time, and left a message that he needed to speak with Grievant. Grievant did not return the call. On January 5, 2006 the Supervisor found Grievant in the break room while still off duty playing cards with other employees who were on break and asked him to come to the

9.

office for a meeting. Grievant refused stating that he was not on the clock. He was told that he would be placed on the clock for the meeting but Grievant still refused to meet with the Supervisor. Grievant was then sent a letter on January 6, 2006 instructing him to report for duty on January 10, 2006 to meet with the Supervisor. Grievant replied by letter dated January 7, 2006 again refusing to meet. Grievant was sent another letter dated January 10, 2006 instructing him to report immediately, no later than January 17, 2006 for another Investigative Interview. Grievant responded by letter dated January12, 2006 again refusing to report and requesting sick leave. At hearing the Union raised an FMLA issue with respect to Grievant's refusal to meet with Management and Management objected contending that such an issue was never raised in the Grievance procedure. Such an issue is precluded from being belatedly raised by Article 15 of the contract. Even if an FMLA issue had been properly raised, however, it would not have precluded Management's meeting with Grievant to give him an opportunity to answer the allegations against him contained in the OIG Investigative report. The authorities provided by the Union to the effect that Management cannot order an employee back to duty who is in an FMLA status are totally inapposite to the situation here.

Grievant has two prior disciplinary incidents of record, a letter of warning dated 7/5/05 regarding a failure to maintain a regular work schedule and a 7-day No Time Off Suspension for taking sick leave to go to a Biloxi, MS gambling casino. Although this was a no time off suspension the letter warned Grievant that it was considered the same as a regular 7 day suspension for purposes of meeting the progressive discipline standards of the contract. Apparently this warning went unheeded by Grievant as he has now utilized sick leave to attend two separate football games. Under all these circumstances I must conclude that the evidence is sufficient to prove just cause for Grievant's discharge.

**Award:**

I find that just cause has been proven for Grievant's removal from employment. Accordingly, the grievance is DENIED.


Date of Award: November 29, 2006
PANEL:  Southeast Area Regular



ARBITRATOR



# U.S. MERIT SYSTEMS PROTECTION BOARD

### Office of the Clerk of the Board
**1615 M Street, N.W.
Washington, D.C. 20419-0002**

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

**December 21, 2006**

Notice to:

Butler B. Browder
4504 Sunnybrook Drive
Montgomery, AL 36108



PLAINTIFF'S
EXHIBIT

CASE
NO.

EXHIBIT
NO. 19

Re: Butler B. Browder v. United States Postal Service
MSPB Docket Number: AT-0752-06-1072-I-1

The Board acknowledges <u>December 15, 2006</u> as the filing date of your petition for review. The other party(s) may file a response, or file a cross petition for review, on or before <u>January 9, 2007</u>. A cross petition for review differs from a response because it also disagrees with the initial decision. If a cross petition for review is filed, any response must be filed within 25 days after the date of service of the cross petition. The filing date is the date the document is postmarked, if mailed; the date the document is received by the Board, if personally delivered; the date the facsimile of the document was sent; or the date of electronic submission, if filed via e-Appeal.

The record closes when the time period ends for filing a response to the petition for review or to the cross petition. After the record closes, the Board may consider an additional submission only if the submission includes a statement that convinces the Board why the submission was not available earlier. 5 C.F.R. § 1201.114(i).

The Board encourages settlement. If the parties settle and they enter a written settlement agreement into the record, the Board will enforce the terms. The Board has no enforcement authority over settlement agreements that are not entered into its record.

Bentley M. Roberts, Jr.
Clerk of the Board

Dinh Chung
Case Management Specialist

Attachment: Settlement Program Information

Exhibit 19