IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

| | |
|---|---|
| BUTLER BROWDER, | * |
| | * |
| Plaintiff | * |
| | * |
| v. | * CIVIL ACTION NO. 2:07-CV-546-MEF |
| | * |
| JOHN E. POTTER, USPS | * |
| POSTMASTER GENERAL | * |
| | * |
| Defendants | * |
| | * |
| | * |

RECEIVED 2007 SEP 12 P 2:03
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

## MOTION TO AMEND COMPLAINT

Comes now the Plaintiff, Butler B. Browder, pro se, in the above-styled case, who seeks to amend the above-styled case to include a protest of the Arbitrator's decision, dated November 29, 2006. See Exhibit A

Wherein the Arbitrator determined that the Plaintiff in this case was "dishonest and not ill" when he requested sick leave while unable to perform his normal duties as a Mailhandler postal employee, when he attended a social function that did not require him to stand, lift, bend, or walk, as did his Mailhandler duties.

Plaintiff avers that Rod Carleton, Plant Manager, C.J. Harris, MDO, Joey Sherman, the deciding official, and Thomas Pigford, Arbitrator, were bound by the Collective Bargaining Agreement to order a Fitness for Duty Exam, or at least employ a medical professional to make the determination as to Browder's medical fitness.

Sherman and Pigford totally ignored the determinations made by Dr. John Jernigan, Dr. Joseph Jackson, and Jackson Hospital, in making their determination, which were submitted to the Defendant during the period of June 2, 2005 through February 2, 2006.

Page 2
Motion to Amend Complaint
B.B. Browder

Plaintiff hereby requests an extension of time if this Motion would otherwise be considered untimely under the principles of res judicata, as to follow all issues to be heard in this case.

Signed:

*(signature)*

Butler B. Browder
Pro Se
4504 Sunnybrook Drive
Montgomery, AL 36104
(334) 281-1472

BBB/lsh
c: file

## Certificate of Service

This is to certify that the attached documents were sent to the below named individuals via U.S. mail on 9/12/2007

Signed *[signature]*

Butler Browder  Pro Se
4504 Sunnybrook Dr
Montgomery AL 36108
281-1473

LEURA G. CANARY
1 COURT SQUARE
MONTGOMERY, AL

ANDERSON NELMS
847 S. MCDONOUGH ST.
MONTGOMERY, AL 36104

REGULAR ARBITRATION



PLAINTIFF'S EXHIBIT A

In The Matter of the Arbitration    Grievant: Browder JR
    Case No: H00M-1H-D 06062642
    Union No: RG008

Between

UNITED STATES POSTAL SERVICE

And

National Postal Mail Handlers Union

BEFORE: Thomas H. Pigford
    Arbitrator

APPEARANCES:

   For the U.S. Postal Service:  Ms. Jerri Taylor

   For the Union:  Mr. Jessie J. Leonard

   Place of Hearing:  Montgomery, AL P&DC

   Date of Hearing:  October 25, 2006

AWARD SUMMARY

I conclude that Management had just cause to discharge Grievant from employment. Accordingly, the grievance must be DENIED

EX-A-1

2.

**Issue:**

Did the Postal Service have just cause to discharge Grievant from employment and, if not, what is the appropriate remedy?

**Stipulations:**

The parties stipulated Jt. Ex. 1, the National Agreement; Jt. Ex. 2, the grievance file, (pp. 1 – 170, excluding pp. 69, 70, 90-94, 100-103, 118-120, and 130); Jt. Ex. 3 (2 pages from the Employee and Labor Relations Manual-ELM); and Jt. Ex. 4 (2 pages from the Contract Interpretation Manual-CIM); into evidence.
The parties also stipulated that on November 19, 2005 Grievant attended the Auburn University vs. The University of Alabama football game played in Auburn, AL.

**Background:**

The hearing was held on October 25, 2006. The parties presented documentary evidence and witnesses for sworn testimony. Additionally, the parties requested and were granted the opportunity to present written briefs. The briefs were to be postmarked by November 24, 2006. All briefs and citations of authority were duly received and have been considered in reaching the decision herein. The record was closed on November 24, 2006.
The initial issue raised concerned the appearance of a Court Reporter at the hearing to transcribe the proceedings. Management had procured the services of the reporter stating that there were other legal proceedings occurring with Grievant and that a transcript of the Arbitration proceedings may be needed. The Union vigorously objected to the Court Reporter's presence to transcribe the proceedings. The Contract, Article 15.B.8, p. 81, states;

> Normally, there will be no transcripts of arbitration hearings or filing of post-hearing briefs in cases heard in Regular Regional level arbitration, except either party at the National level may request a transcript, and either party, at the hearing may request to file a post-hearing brief. ---

Since both parties desired to file briefs in the case there were no contested issues regarding the filing of briefs.
With respect to the Court Reporter's transcribing the arbitration proceeding Management pointed to the file, Jt. Ex. 2, p. 1, revealing a letter dated October 16, 2006 from a National Level Postal Official to a National Level Union Official requesting the transcription of the hearing. No response from the Union was found in the file. The Union advocate noted the date on the letter, October 16, 2006, and its proximity (time-

EX-A-2

3.

wise) to the hearing date, and stated that he was unaware of the Union's permission being given to transcribe the hearing. The Union representative argued that the Contract only gave USPS the right to request a transcript and absent evidence that the Union's consent had been given the transcription should not be allowed.

My ruling at the hearing was that there is obvious ambiguity in the contractual language regarding transcription of such arbitration proceedings absent the consent of both parties, and that I would allow the Court Reporter to remain and transcribe the hearing but that my notes would be the official record of the arbitration hearing and that I would not use the Court Reporter's transcription in reaching a decision in the case. Additionally, I stated that my notes of the arbitration proceeding would be destroyed following issuance of my decision as is my usual practice and I also stated that the Union and/or the Grievant could make their objections known to any other Hearing Official(s) in which the Postal Service might attempt to use the Court Reporter's transcript and that official could rule on such matters should they occur. I have not received a copy of the Court Reporter's transcription and obviously have not read nor relied upon such in reaching my conclusions herein.

Management issued Grievant a Notice of Proposed Removal dated February 2, 2006 which included charges of improper conduct, failure to follow instructions, failure to follow agency leave requesting procedures, and failure to maintain a regular work schedule. The letter included two elements of past record, a warning letter dated 07/05 for failure to maintain a regular work schedule and a 7-day no time off suspension for unacceptable conduct dated 09/05. Jt. Ex. 2, pp. 24-36. This proposal to remove Grievant was affirmed by Management following Grievant's appeal through the contractual grievance/arbitration procedures and the matter was appealed to arbitration. See Jt. Ex. 2, pp. 30-32.

Charge 1 against Grievant concerned Sick Leave taken by Grievant on Saturday November 12, 2005 and Friday and Saturday November 18 and 19, 2005. Grievant's normal work schedule was from 5:30 AM until 2:00 PM with regular off days as Sunday and Monday.

On Saturday November 12, 2005 Grievant reported for duty as scheduled but left work after an hour claiming sick leave, which was approved. Later in the day it is undisputed that Grievant left home to attend a college football game in Athens, GA between Auburn University and the University of Georgia scheduled for 7:30 PM CST, according to the testimony at the hearing. Grievant rode to the game with the mother of an Auburn football player and testified that he did not leave home until after 2:00 PM which would have been after his regular work schedule ended. The player's mother testified that she picked Grievant up at his home and drove as Grievant was not feeling well. The testimony revealed that Grievant often attended Auburn football games with the player's mother and was on the Auburn University's complimentary ticket list as the football player's Uncle. Jt. Ex. 2, p. 60.

The testimony revealed that Grievant's regular job duties required that he load and unload trucks and lift up to 70 lbs.

duty status. Grievant was on extended sick leave at the time. The Supervisor asked Grievant to meet with him at that time and Grievant refused, stating that he was not on the clock. Grievant was told that he would be placed on the clock for the meeting, but Grievant nevertheless still refused to meet with the Supervisor. Thereafter, on January 6, 2006 Grievant was sent a letter directing that he report for duty on January 10, 2006 to meet with the Supervisor. Grievant failed to report as instructed and sent management a letter dated January 7, 2006 stating that he did not have anything to discuss with the Supervisor. On January 10, 2006 Grievant was sent another letter directing that he report for duty no later than January 17, 2006 to participate in an Investigative Interview regarding an investigative report concerning his attendance at the two football games

EX-A-3

4.

Grievant testified that he was sick and on medication while he attended the game but that he was not too sick to ride to the game or to sit at the game although he did not feel well at all and was too sick to work his regular duty hours on that date. The Mother of the football player also testified that Grievant was ill. While records reveal that Grievant did receive sick pay for his duty hours on that date there is insufficient proof that he was either en route to or attending the game during duty hours. Later, after being confronted with these facts during investigation of the matter, Grievant contended that he left a blank leave slip with another employee for the time off and that the Supervisor checked the sick leave block rather than the annual leave block on the form and that he had intended to take annual leave although either type leave would have been appropriate as he was sick. The Supervisor credibly testified that he had been told earlier that day by Grievant that he was sick and was leaving work and that was the reason he checked the sick leave block on the form. The Supervisor testified that he would not have approved annual leave had it been requested as he was short of personnel on that day and had others working on overtime status.

On November 18, 2005 Grievant called in and requested sick leave for November 18-19, 2005. He testified that he had back problems on Nov.18, 2005, which kept him in bed. Evidence reveals that Grievant attended the Auburn – University of Alabama football game in Auburn, AL on November 19, scheduled for 2:00 PM. Auburn, AL is approximately a one-hour drive from Montgomery, AL. Grievant was first seen in the stadium at 1:45 PM revealing that he had to have been en route to the game during his work hours for which he used sick leave. During investigation of the matter Grievant contended that while he was too ill to work he nevertheless attended the game, which he contended, was after his duty hours.

Grievant was also charged with failing to follow instructions for leaving a form 3971 requesting sick leave to attend a doctors appointment on another employee's desk on December 2, 2005 contrary to prior instructions to notify a supervisor prior to leaving work.

On January 3, 2006 Grievant's Supervisor called Grievant's home and left Grievant a message that he needed to speak with him. The Supervisor was attempting to schedule an Investigative Interview with Grievant regarding the final investigation report regarding Grievant's being on sick leave when attending the two football games. Grievant did not return his Supervisor's telephone call. On January 5, 2006 the Supervisor found Grievant at the Post Office in the break room playing cards with other employees while in an off-duty status. Grievant was on extended sick leave at the time. The Supervisor asked Grievant to meet with him at that time and Grievant refused, stating that he was not on the clock. Grievant was told that he would be placed on the clock for the meeting, but Grievant nevertheless still refused to meet with the Supervisor. Thereafter, on January 6, 2006 Grievant was sent a letter directing that he report for duty on January 10, 2006 to meet with the Supervisor. Grievant failed to report as instructed and sent management a letter dated January 7, 2006 stating that he did not have anything to discuss with the Supervisor. On January 10, 2006 Grievant was sent another letter directing that he report for duty no later than January 17, 2006 to participate in an Investigative Interview regarding an investigative report concerning his attendance at the two football games

EX-A-4

5.

discussed above while in a sick leave status. Grievant again refused to report as instructed leading to the charge of failing to follow instructions. Grievant testified that he went to work on December 2, 2005 and told his Supervisor that he needed a longer break due to his medical condition. The Supervisor told him to see employee Osborne who would gather the necessary forms for Grievant to take to his doctor. After Osborne gave Grievant the forms Grievant gave Osborne a form 3971 and left. Grievant testified that the Supervisor was tied up with other matters at that time and was not on the work room floor and as he had told him earlier that he was leaving he assumed it was appropriate to leave the 3971 with Osborne who the Supervisor has designated to obtain the papers for him.

Grievant testified that his physician sent him for scans on December 5, 2005 to determine what his problems were and gave him forms to request Family Medical Leave (FMLA) on December 7, 2005 and restricted him to no prolonged standing or walking and no lifting more than 7 lbs. Upon receipt of Management's letter dated January 5, 2006 instructing him to report for a meeting on January 10, 2006 to discuss his request for light duty Grievant wrote to Management advising that since he was on FMLA he could not attend the meeting as instructed.

The third charge against Grievant in the proposal to remove letter was for failing to follow leave request procedures. Grievant was scheduled to work overtime on October 3, 2005 and failed to report as scheduled or to follow established call-in procedures to report his absence. Additionally, he was charged with failing to follow call-in procedures on November 18, 2005 when he called the workroom floor and advised Acting Supervisor Nikki Lowe that he was requesting sick leave for 2 days. Ms. Lowe instructed Grievant to call the IRT Center as he was supposed to do and he refused to do so. Grievant testified that he had attempted to call the center but could not get through and that it was well known that the call-in center was having major problems at that time.

Grievant conceded that he did not call in to report his absence when scheduled to work overtime on October 3, 2005 but testified that employees did not have to call in when missing overtime, they simply did not show up and this was a long standing practice. Grievant's testimony in this regard was supported by the testimony of two other employees.

Grievant was also charged with failing to maintain a regular work schedule citing absences on 10/03/05, 10/18/05, 10/19/05, 10/20/05, 10/21/05, 11/12/05, 11/18/05, 11/19/05 and 12/02/05. Grievant testified that he notified his Supervisor on either 10/12 or 10/13/05 that he was to have an overnight stay in a hospital and submitted appropriate leave forms for the absences. He left work early on 10/18 and reported to a sleep disorder clinic for tests. He remained there through 10/19, and after these testes were completed he had a digestive disorder requiring absence from work on 10/20-21.

Grievant testified, without contradiction, that he was a 35 year employee of the Postal Service, had accumulated over 1500 hours of sick leave and over 1200 hours of annual leave and had not been irregular in attendance despite having these health problems which required the absences cited.

EX-A-5

6.

**Conclusions:**

The charge against Grievant for failure to maintain a regular work schedule (Charge 4) is based upon 9 absences within a two-month period for which Grievant was granted sick leave. While employees may be held accountable for absences when sick where the absenteeism is so chronic to lead to the conclusion that the employee will be unable to meet requirements to come to work regularly such a conclusion is usually reached after a prolonged period of illness and absenteeism which demonstrates that the employee cannot meet his/her obligations to come to work, and not on short or sporadic instances of absenteeism due to illness. This theory of discharge is commonly referred to as one of economic necessity rather than a disciplinary action (i.e. the employee, despite good effort is simply unable to uphold his duty to come to work for the pay he receives). The factors supporting this theory of discharge are not present here and it is difficult to conclude that a 35 year employee who has accumulated over 1500 hours of sick leave and over 1200 hours of annual leave has not maintained a regular work schedule, especially where such decision is based upon such a short time span. I must conclude that charge 4 lacks merit.

Regarding Charge 3, failure to follow leave requesting procedures when Grievant failed to call in to report that he would not work scheduled overtime, two Union witnesses testified that it was common practice for employees scheduled for overtime to simply not report for duty if they were unable to work the overtime and that there was no action taken against the employees who did not report for the overtime work even if they did not call in to report their absence. Accordingly, I must find that the charge against Grievant for not calling in when he missed overtime on October 3, 2005 is insufficient to sustain discipline.

With respect to the November 18, 2005 sick leave instance it is not rebutted that Grievant called and notified an acting Supervisor (Nikki Lowe) that he would not report for his regularly scheduled tour of duty and that Lowe reported same to the General Supervisor. Management therefore knew that Grievant was taking sick leave and initially approved the sick leave. Management issued the charge because Grievant did not call the IRT center as instructed. Grievant testified that he attempted to call the IRT center but could not get through. Management witnesses agreed that they were having problems with the IRT telephones at that time. I must conclude, based on this evidence, that this charge against Grievant is not supported by the evidence.

With respect to charge 2, failure to follow instructions concerning Grievant's leaving a leave slip on a desk On December 2, 2005 and not advising his Supervisor that he was leaving work, the facts as developed at hearing do not comport with the charge stated in the proposed removal letter. Grievant testified that he reported to work and advised two Supervisors that he needed a longer break at work due to medical problems. Supervisor Harris told him he needed necessary light duty forms signed by his Doctor and assigned another employee, Mike Osborne, to work with Grievant to obtain the necessary forms for Grievant to take to his physician for signature. Osborne obtained the forms for Grievant and Grievant completed a sick leave form in order to go to the Doctor

EX-A-6

7.

and left the form with Osborne to give to the Supervisor. Grievant testified that Supervisor Harris was not present at the time and since he had already informed him that he would be leaving and Harris had assigned Osborne to obtain the necessary forms for him to take to the Doctor he thought it was appropriate to leave the sick-leave form with Osborne. Harris did not dispute this testimony and employee Osborne was not called to testify. Under these circumstances I cannot conclude that this constituted a refusal by Grievant to comply with Management instructions.

The next two elements of charge 2 are interrelated with charge 1 and will be dealt with below. These two incidents, letters to Grievant dated January 6, 2006 and January 10, 2006, were attempts by Management to have Grievant report to the Post office to conduct an investigatory interview with him regarding the investigative report submitted by the OIG Investigator concerning Grievant's attendance at the Auburn-Georgia, and the Auburn-Alabama football games in 2005 while in a sick leave status.

The improper conduct charge of charge 1 (attendance at these football games by Grievant while in a sick leave status) are the two most serious charges herein and undoubtedly led to Management's decision to issue the notice of discharge. Management has submitted sufficient prior arbitration awards relevant to such situations to convince me that if the proof revealed Grievant intentionally requested sick leave for the purpose of attending these games when he was not ill that is grounds for discharge. The rationale for these awards is that the Postal Service must expect honesty of their employees and that a showing of employee dishonesty in such regards is grounds for discharge even where progressive discipline under the contract has not occurred.

There is evidence herein that Grievant is guilty of this. The evidence shows that Grievant had planned in advance to attend the games but did not request advance annual leave which would have placed him in a scheduled leave status. The football player's mother testified that Grievant had attended games with her in the past and that he had planned to attend these two games also. The OIG report reveals that Auburn University officials stated that the complimentary tickets, such as used by Grievant, are scheduled in advance as names are placed on a list and the listed individuals scheduled to attend the game are admitted with a proper showing of identity after they sign for the tickets at the game. Such precautions are taken in order to prevent the tickets being resold or used by someone else. Clearly Grievant had planned to attend these games in advance. Clearly Grievant did not request annual leave in advance to attend either game. The evidence is also conclusive that Grievant left work on the day of the Auburn-Georgia game (November 12, 2005) in a sick leave status and traveled to Athens, GA for the game which was scheduled for 7:30 PM. The evidence in inconclusive as to the time he left and it cannot be determined if he actually traveled during his working hours or not. He testified at hearing that he left a blank leave form for his Supervisor to fill in the blanks, and he thought the Supervisor would check the annual leave box rather than the sick

Ex-A-7

8.

leave box. Again, although he maintains that he was, in fact, ill his claim that he wanted the Supervisor to check the annual leave box on the form rather than the sick leave box implies that he was not, in fact sick. He did not, however, raise the contention that he thought he was getting annual leave when initially questioned by the OIG Investigator. When initially asked by the Investigator why he used sick leave to attend the Auburn-Alabama game Grievant stated that did not happen, that the game was after his tour of duty ended. (Jt. Ex. 2, pp 63-64). After the interview was completed and Grievant and his Union Representative had left the room, Grievant returned after a brief period and asked the Investigator to review the leave form again. After reviewing the form Grievant stated that the comment on the form "Left Sick" was not his handwriting and that he intended to take annual leave for the absence. (Jt. Ex. 2, pp.63-64). Grievant's Supervisor, however, credibly testified that he wrote the comment on the blank form left by Grievant and checked the sick leave box because Grievant had informed him earlier in the morning that he wanted sick leave. The Supervisor further testified that he would not have approved unscheduled annual leave for Grievant.

The proof is conclusive that Grievant traveled to Auburn, AL on Nov. 19, 2005 during his working hours while in a sick leave status as he was seen inside the stadium at 1:45 PM while his work tour did not end until 2:00 PM. Again Grievant contends that he was sick, although he attended the game. While it may be possible for Grievant to attend these games sick while feeling too ill to go to work, Grievant never offered an explanation as to why he did not apply for scheduled annual leave in advance in order to attend the games. The evidence is preponderant that Grievant planned to attend the games in advance. If he had applied for annual leave and then became ill he could have changed the leave from annual to sick. Under all these circumstances I am persuaded that Grievant improperly used sick leave to attend these athletic events when, in fact, he was not sick. Part of the evidence leading to this conclusion is Grievant's complete lack of cooperation with Management Official's efforts to properly investigate these matters. Management notified Grievant by letter dated November 18, 2005 that he was being required to provide medical documentation for the sick leave he claimed for November 18 and 19, 2005. He simply refused to provide such documentation, and the fact that he was not on sick leave restriction does not provide him an excuse for such a refusal. Had he provided some type of medical evidence that he was ill his claim that he was, in fact, sick on Nov. 19, 2005 when attending the football game would have more validity.

Under the terms of the contract Grievant is entitled to an investigatory interview to provide his side of the story during such investigations. The evidence reveals that Grievant simply refused to cooperate with Management in its attempt to follow the contract in these regards. After the OIG investigative report regarding Grievant's attendance at the two football games in a sick leave status was received a copy was sent to Grievant. On January 3, 2006 the Supervisor called Grievant's home, Grievant was on extended sick leave as work with his light duty restrictions was not available at the time, and left a message that he needed to speak with Grievant. Grievant did not return the call. On January 5, 2006 the Supervisor found Grievant in the break room while still off duty playing cards with other employees who were on break and asked him to come to the

EX-A-8

9.

office for a meeting. Grievant refused stating that he was not on the clock. He was told that he would be placed on the clock for the meeting but Grievant still refused to meet with the Supervisor. Grievant was then sent a letter on January 6, 2006 instructing him to report for duty on January 10, 2006 to meet with the Supervisor. Grievant replied by letter dated January 7, 2006 again refusing to meet. Grievant was sent another letter dated January 10, 2006 instructing him to report immediately, no later than January 17, 2006 for another Investigative Interview. Grievant responded by letter dated January 12, 2006 again refusing to report and requesting sick leave. At hearing the Union raised an FMLA issue with respect to Grievant's refusal to meet with Management and Management objected contending that such an issue was never raised in the Grievance procedure. Such an issue is precluded from being belatedly raised by Article 15 of the contract. Even if an FMLA issue had been properly raised, however, it would not have precluded Management's meeting with Grievant to give him an opportunity to answer the allegations against him contained in the OIG Investigative report. The authorities provided by the Union to the effect that Management cannot order an employee back to duty who is in an FMLA status are totally inapposite to the situation here.
Grievant has two prior disciplinary incidents of record, a letter of warning dated 7/5/05 regarding a failure to maintain a regular work schedule and a 7-day No Time Off Suspension for taking sick leave to go to a Biloxi, MS gambling casino. Although this was a no time off suspension the letter warned Grievant that it was considered the same as a regular 7 day suspension for purposes of meeting the progressive discipline standards of the contract. Apparently this warning went unheeded by Grievant as he has now utilized sick leave to attend two separate football games. Under all these circumstances I must conclude that the evidence is sufficient to prove just cause for Grievant's discharge.

**Award:**

I find that just cause has been proven for Grievant's removal from employment. Accordingly, the grievance is DENIED.

Date of Award: November 29, 2006
PANEL: Southeast Area Regular

*[signature]*
ARBITRATOR

EX-A-9